

ORIGINAL

1  UNITED STATES DISTRICT COURT
   EASTERN DISTRICT OF NEW YORK
2  -------------------------------------x
   GONZALO CORTES,
3
                          Plaintiff,
4
            - against -                 14-CV-3014
5                                       (SLT) (RML)
   CITY OF NEW YORK; Sergeant JONCRIS
6  RZONCA, Shield No. 2960; Police
   Officer MATTHEW SMITH, Shield No.
7  9407; Police Officer CHRISTOPHER
   MUSA, Shield No. 9064; Police
8  Officer DOMINIC RUGGIERO, Shield No.
   20894; Police Officer SHAUN RYAN,
9  Shield No. 10960; Police Officer
   JOHN CESTARO, Shield No. 9553;
10 Police Officer ANDREW SCHULZ, Shield
   No. 5758; Sergeant STEPHEN DALY,
11 Shield No. 944; Police Officer MARIO
   CAPPUCCIA, Shield No. 19046; and
12 JOHN and JANE DOE 6 through 10,
   individually and in their official
13 capacities (the names John and Jane
   Doe being fictitious, as the true
14 names are presently unknown),
15                        Defendants.
   -------------------------------------x
16
                        305 Broadway
17                      New York, New York
18                      June 1, 2016
                        12:01 p.m.
19
20
21      VIDEOTAPED EXAMINATION BEFORE TRIAL of
   SGT. STEPHEN DALY, a Defendant in the
22 above-entitled action, held at the above
   time and place, taken before Jessica R.
23 Taft, a Notary Public of the State of New
   York, pursuant to Order and stipulations
24 between Counsel.
25



Page 2

1    APPEARANCES:
2
       HARVIS & FETT LLP
3      Attorneys for Plaintiff
             305 Broadway, 7th Floor
4            New York, New York  10007
5      BY:   GABRIEL HARVIS, ESQ.
                   -and-
6            BAREE N. FETT, ESQ.
7
8      ZACHARY W. CARTER, ESQ.
       CORPORATION COUNSEL
9      NEW YORK CITY LAW DEPARTMENT
       Attorney for Defendants
10           100 Church Street, Room 3-193
             New York, New York 10007
11
       BY:   ELISSA JACOBS, ESQ.
12
13
     ALSO PRESENT:
14
       CHRIS HANLON, Videographer
15
16                 *      *      *
17
18
19
20
21
22
23
24
25

Page 57

S. Daly

1

2      A     I am sure there would.

3      Q     And how quickly upon learning of

4    the need for treatment should the desk

5    officer call an ambulance?

6              MS. JACOBS:  Objection.

7              THE WITNESS:  Should be immediate.

8    BY MR. HARVIS:

9      Q     Do you think there is any

10   appropriate amount of time to wait before

11   obtaining medical treatment for an injured

12   prisoner?

13             MS. JACOBS:  Objection.

14             THE WITNESS:  It should be

15        immediate.

16   BY MR. HARVIS:

17     Q     Can you think of a reason why a

18   desk sergeant would delay calling an

19   ambulance once the sergeant became aware

20   that someone inside the precinct needed

21   medical attention?

22             MS. JACOBS:  Objection.

23             THE WITNESS:  No, there should

24        be no reason.

25   BY MR. HARVIS:

Page 83

1                              S. Daly
2   would be where the desk would be, yes.
3        Q    And through one of those doors
4   are those auxiliary cells that you discussed
5   earlier?
6        A    Yes.
7        Q    And is that door that leads to
8   the auxiliary cells also the door that
9   prisoners are led through if they need to
10  use the bathroom while in custody?
11       A    Yes.
12       Q    Seated at the desk, would the
13  desk officer at the 115th Precinct have line
14  of sight to the doorway that leads to those
15  cells?
16       A    Directly to the front of the
17  doorway, yes.
18       Q    And if the door is open in the
19  photograph, which I will mark as Plaintiff's
20  Exhibit 3, can the desk officer see down the
21  hallway from his normal seat at the desk?
22       A    Yes, I believe so.
23            MR. HARVIS:  Mark that as
24       Plaintiff's Exhibit 3, please.
25            (Thereupon, the photograph was

Page 134

1                      S. Daly

2    brought into the precinct?

3         A    I don't recall him specifically.

4    I couldn't say if I was or I wasn't.  I

5    mean, I don't recall what he looks like.  I

6    don't know anything about him.

7              But I would, should have been at

8    that desk when anybody comes in, I would

9    assume.  It is not good to assume, but --

10        Q    Okay.

11        A    -- I should have --

12        Q    Yeah.

13        A    -- been at the desk.

14        Q    So, you said the document that

15   you reviewed prior to your testimony was the

16   command log, right?

17        A    Yes.

18        Q    And based on your review of the

19   command log, is it indicated, is there an

20   indication in the command log that you were

21   the person that was there when Gonzalo

22   Cortes was brought in?

23        A    Yes.

24        Q    And is that the fact that his

25   arrest stamp information is written in your

Page 135

1                         S. Daly

2    handwriting?

3         A    Yes.

4         Q    Based upon your practice in the

5    times that you have acted as the desk

6    sergeant in that command, would you

7    ordinarily make the entries for the

8    prisoners that are brought in front of the

9    desk when you are on the desk?

10               MS. JACOBS:  Objection.

11               You can answer.

12               THE WITNESS:  Yes.

13   BY MR. HARVIS:

14        Q    But you do not have any specific

15   recollection of that particular prisoner

16   coming in front of you that night?

17        A    No.

18        Q    Based upon the information in the

19   command log that you wrote down, do you

20   believe that Mr. Cortes appeared to be

21   injured at the time that he was brought in

22   front of the desk?

23        A    No.

24        Q    And why do you say that?

25        A    Because I wrote apparently

Page 136

1                    S. Daly
2   normal, I believe.
3        Q    Would you like to have the
4   command log in front of you?
5        A    Yes.
6        Q    Okay, great.  So what I would
7   like to do is enter as Exhibit 6 a copy of
8   the command log and then have you refer to
9   the actual document.  Okay?
10       A    Okay, that is fine.
11            (Thereupon, the document was
12       marked Plaintiff's Exhibit 6 for
13       identification, as of this date.)
14            THE WITNESS:  Okay.
15  BY MR. HARVIS:
16       Q    Okay.  So, based on the entry
17  that you are looking at for Mr. Cortes, can
18  you say that he neither appeared injured nor
19  indicated that he was injured when he was in
20  front of you at the desk?
21            MS. JACOBS:  And just to be
22       clear, we are looking at page 132 of
23       the command log.  This was marked as
24       part of Plaintiff's Exhibit 6.  This
25       is a multi-page document, but this is

Page 137

```
 1              S. Daly
 2      Confidential Defendant's 184.
 3           MR. HARVIS:  Thank you.
 4           THE WITNESS:  Repeat the question.
 5           MR. HARVIS:  Yes.
 6           Can we just have that read back.
 7           (Thereupon, the record was read
 8      back by the reporter as recorded above.)
 9           THE WITNESS:  It would appear
10      that he was not injured.
11 BY MR. HARVIS:
12      Q    And is it also fair to say, based
13 upon the entry that you are looking at, that
14 Mr. Cortes was not, in your opinion,
15 intoxicated to the point where he could not
16 care for himself?
17      A    That is correct.
18      Q    Did you determine the validity of
19 Mr. Cortes's arrest when he was in front of
20 you at the desk?
21      A    Yes.
22      Q    How do you know that?
23      A    Because any time an officer comes
24 to me with an arrest, I will ask him what is
25 this arrest for.
```

Page 157

1                    S. Daly

2              THE WITNESS:  Okay.

3   BY MR. HARVIS:

4        Q    Okay.  Does your handwriting

5   appear on this document?

6        A    No.

7        Q    Do you see where it says NYPD

8   supervisor slash desk officer?

9        A    Yes.

10        Q    Is that your signature?

11        A    No.

12        Q    Whose signature is it?

13        A    I don't know.  I don't sign my

14   name that way.

15        Q    Take a look at the -- we can use

16   this.  There is a copy that is already

17   marked.  Take a look at the first page of

18   that.  And you see the sixth entry down, it

19   says Sergeant Daly to Desk Sergeant Nomani

20   to admin?

21        A    Yes.

22        Q    Did you write that?

23        A    Yes.

24        Q    Take a look at that Sergeant Daly

25   next to the signature that's on the medical

Page 158

```
 1                    S. Daly
 2   treatment of prisoner form that we are
 3   looking at.
 4        A    Some things are similar.  But
 5   only under where it says NYPD supervisor
 6   desk officer --
 7        Q    Uh-huh.
 8        A    -- the signature spot is not my
 9   signature.
10        Q    Does it look like your first and
11   last name being written there?
12        A    Yes.
13        Q    By you?
14        A    No.
15        Q    How about the 115, is that your
16   handwriting?
17        A    Not sure.
18        Q    How about the 0600?
19        A    Let me compare it to... I guess.
20   I am not sure.
21             MS. JACOBS:  Don't guess.
22   BY MR. HARVIS:
23        Q    I don't want you to guess.
24        A    I'm not --
25        Q    I want you to be sure.  So if you
```

Page 167

1                      S. Daly

2       Q     What makes you sure?

3       A     Because it was signed in the

4    supervisor area of the box.

5       Q     How do you know someone else

6    didn't sign that?

7       A     I don't.

8       Q     Okay.  So you are not sure?

9       A     Yes, not sure.

10      Q     You have no idea, is that fair to

11   say, whose signature that is?

12      A     That is correct.

13      Q     Based upon your understanding of

14   how this form works, do you believe that a

15   supervisor was aware that Gonzalo Cortes had

16   a shoulder injury at six o'clock?

17      A     Yes.

18      Q     And assuming that the supervisor

19   was aware of a shoulder injury, what would

20   have been the appropriate action for that

21   supervisor to take at that time?

22      A     To call an EMT.

23      Q     Do you know who completed the

24   rest of the form?

25      A     No.

Page 175

                              S. Daly
1
2  none of that was written by you?
3       A    No.
4       Q    Okay.  But, again, would you
5  agree it is the same name that is written
6  from one form to the other?
7       A    It looks similar.
8       Q    Okay.  Any idea how or why a
9  second medical treatment of prisoner form
10 was prepared for this prisoner?
11      A    It is possible.  I mean, I am
12 looking -- the differences that I see right
13 now is that this one had an escort officer,
14 or had no escort officer, and this one had
15 an escort officer.
16           It is possible that whoever
17 prepared the first form, maybe when the
18 escort officer went down to the hospital,
19 maybe he forgot the form or just didn't have
20 one and just re-prepared one.
21      Q    Okay.  And so that would explain
22 why Sadiq is listed as the escort officer on
23 Exhibit 8, but Smith's name is crossed out
24 on Exhibit 7?
25      A    Yes.

Page 180

1                    S. Daly

2    along that police contact, the way I

3    interpret an old injury and a new injury was

4    an old injury was something where they are

5    coming in in a cast or something, or

6    something that's clearly old.  But if they

7    scuffled with somebody that day and injured

8    themselves, that to me is new.  Or if they

9    scuffled with police or anything in the

10   street, that is a new injury.

11              Now, if that happened in the

12   street and they are in the cells and now

13   let's just say four hours later they, they

14   have a complaint that, yeah, now it hurts,

15   you wouldn't notify IAB, because that

16   happened outside in the street during their

17   arrest.  That is a normal thing to happen.

18        Q    What if their complaint isn't

19   that this happened to me in the street; what

20   if their complaint is, Sarge, ten minutes

21   ago five officers used excessive force and

22   pushed me against bars and injured my

23   shoulder?

24        A    That is a notification to IAB, a

25   duty captain and the 49.

Page 186

```
 1                      S. Daly
 2    Cortes?
 3         A    Yes.
 4         Q    How do you know that?
 5         A    The command log.
 6         Q    Do you know when?
 7         A    I do not know when.
 8              MR. HARVIS:  Mark this as
 9         Plaintiff's Exhibit 9, please.
10              (Thereupon, the document was
11         marked Plaintiff's Exhibit 9 for
12         identification, as of this date.)
13              MR. HARVIS:  And let's mark
14         this as 10 as well.
15              (Thereupon, the document was
16         marked Plaintiff's Exhibit 10 for
17         identification, as of this date.)
18    BY MR. HARVIS:
19         Q    Does -- do you know what these
20    documents are that you are looking at, 9 and 10?
21         A    Yes.
22         Q    Nine is a Sprint report, right, and 10
23    is a prehospital care report from the FDNY?
24         A    Yes.
25         Q    And so, based on looking at these
```

Page 187

                        S. Daly

1        documents together, can you piece together

2        when an ambulance was called for Gonzalo Cortes?

3            A    7:26.

4            Q    Okay.  Do you know who would have

5        made that call?

6            A    The desk would make that call.

7        We have a radio there.

8            Q    Okay, because when it says -- if

9        you look at the, I guess it is the fourth,

10       fifth line down, it says authority of 115

11       base, have EMS to the 115 Precinct, I think

12       S -- what does that say?  Does that mean

13       quickly?  SH --

14               MS. JACOBS:  If you know.

15               THE WITNESS:  Stationhouse.

16               MR. HARVIS:  Stationhouse,

17           thank you, for a sick prisoner.

18       BY MR. HARVIS:

19           Q    Is the, is the desk sergeant the

20       person who would call on the authority of

21       the 115 base?

22           A    Yes.

23           Q    Okay.  Now, do you know why

24       someone, or two people perhaps, signed as

Page 189

1                              S. Daly

2          Q      And you see at the top of the

3    same page you are looking at where it says

4    there is an injury line and it says right

5    dislocation?

6          A      Yes.

7          Q      So, based on your understanding

8    and protocol, if a prisoner is saying that

9    his dislocated shoulder was caused by police

10   officers taking him down when he went to the

11   bathroom, is that the kind of injury and

12   mechanism that would trigger a call to IAB

13   and notification to IAB?

14         A      Absolutely.

15         Q      Is there any indication in the

16   command log that there was a notification to

17   IAB in this case?

18         A      No.

19         Q      And you didn't prepare a UF49 in

20   connection with Gonzalo Cortes, right?

21         A      No.

22         Q      You didn't notify IAB, right?

23         A      No.

24         Q      When you were on the desk and

25   somebody -- withdrawn.