```
 1:1
 1:2    UNITED STATES DISTRICT COURT
 1:3    EASTERN DISTRICT OF NEW YORK
 1:4    INDEX NO. 14-CV-3014(SLT)(RML)
        ------------------------------------------x
 1:5
        GONZALO CORTES,
 1:6
                Plaintiff,
 1:7
            - against -
 1:8
        THE CITY OF NEW YORK, et al,
 1:9
                Defendants.
 1:10   ------------------------------------------x
 1:11
                        305 Broadway
 1:12                   New York, New York
 1:13                   September 13, 2016
                        11:15 a.m.
 1:14
 1:15           EXAMINATION UNDER OATH of PETER
 1:16   RODESCHIN, a Defendant, held at the
 1:17   above-entitled time and place, taken before
 1:18   Carolyn Crescio, a Professional Shorthand
 1:19   Reporter and Notary Public of the State of New
 1:20   York.
 1:21
 1:22
 1:23              *     *     *
 1:24
 1:25
```

2:1
2:2  A P P E A R A N C E S:
2:3
     HARVIS & FETT, LLP
2:4  Attorneys for Plaintiff
         305 Broadway
2:5      New York, New York 10007
2:6  BY: GABRIEL P. HARVIS, ESQ.
2:7
2:8  NEW YORK CITY LAW DEPARTMENT OFFICE OF THE
     CORPORATION COUNSEL
2:9  Attorneys for Defendants
         100 Church Street
2:10     Room 3-193
         New York, New York 10007
2:11
     BY: ELISSA JACOBS, ESQ.
2:12
2:13
2:14 ALSO PRESENT:
2:15 MARK HALL- Videographer
2:16
2:17
2:18
2:19
2:20
2:21
2:22
2:23
2:24
2:25

```
142:1                         P. RODESCHIN
142:2    RMA'd at the scene of his arrest?
142:3         A.    I don't know if it was at the scene
142:4    or it was actually when he was brought to the
142:5    desk; I don't know which one it was.
142:6         Q.    I see.  But either way, a police
142:7    officer was aware that there was an injury and
142:8    that there was a refusal to accept medical
142:9    attention?
142:10        A.    Correct.
142:11        Q.    But yet, the stamp at the command
142:12   log and in the arrest report and in every piece
142:13   of paper that was prepared about the arrest
142:14   indicated that he was apparently normal?
142:15        A.    Yeah.
142:16             MS. JACOBS:  Objection.  You can
142:17        answer.
142:18        A.    Yeah.
142:19        Q.    And what is your explanation for
142:20   that?
142:21             MS. JACOBS:  Objection.  You can
142:22        answer.
142:23        A.    My explanation, would be my opinion,
142:24   is guys simply don't fill things out right.
142:25        Q.    That's an error?
```

```
144:1                    P. RODESCHIN
144:2        A.    It was -- actually I think it was
144:3   fairly quick.  I would probably say within 20
144:4   minutes.
144:5        Q.    Who called the ambulance?  Did you
144:6   do it?
144:7        A.    I directed it to be called.  I don't
144:8   remember if I did it personal -- or I told
144:9   somebody to call it in.  You know, my thing is
144:10  what's the sense of -- you know what?  Just go
144:11  to the hospital.
144:12       Q.    Well -- well, actually what you just
144:13  said is that the first thing you said to him is
144:14  that you said to him, Why do you want to go,
144:15  right?
144:16       A.    Right.
144:17       Q.    What was the purpose of that
144:18  conversation?
144:19       A.    To know why he wanted to go.  I
144:20  mean, you know, because some -- like I said, at
144:21  times people just want to go to the hospital
144:22  thinking that they can -- they don't -- you
144:23  know, I don't want to wait in court; that
144:24  happens a lot.  Or for whatever reason.  I just
144:25  wanted to make sure that he understood he was
```

```
177:1                         P. RODESCHIN
177:2        A.    Yeah.
177:3        Q.    Did you change it?
177:4        A.    Yeah.  I believe I shook my head and
177:5   says, how is this guy apparently normal if,
177:6   number one, he was hurt prior to his contact,
177:7   he's -- his -- he reeks of booze, and now he's
177:8   complaining that his arm still hurts, so that's
177:9   not apparently normal.
177:10       Q.    What changes did you make at that
177:11  time?
177:12       A.    I believe I crossed off the AN,
177:13  which is shorthand for that, and wrote down that
177:14  he had a complaint of pain, and I believed that
177:15  it was prior to police contact, which is what I
177:16  determined.  Because if it wasn't prior to
177:17  police contact, then I would have a whole other
177:18  job to do now.
177:19       Q.    Right.  What -- did you write down
177:20  he was RMA?
177:21       A.    No, he didn't refuse -- he refused
177:22  medical attention when he came into the house,
177:23  so that would be RMA.
177:24       Q.    Okay.  So did you write it down?
177:25       A.    I don't recall.  I have to look at
```

179:1       P. RODESCHIN

179:2       So there's a lot to do, so I may have forgot
179:3   to initial or put my stamp on it, my tax number,
179:4   due to the fact that I'm -- I did a lot of work.
179:5   Within the first 10 minutes I just did an hour's
179:6   worth of work.
179:7       Q.   So when you first had the
179:8   conversation with Mr. Cortes, the officer, the
179:9   desk sergeant you were relieving was still on
179:10  the desk, right?
179:11      A.   Yeah.  (indecipherable) -- relief.
179:12  Plus, I had to ask him about other things, other
179:13  than prisoners.
179:14      Q.   So you walk over to the desk, and
179:15  you take out the command log and change the
179:16  entry for Gonzalo Cortes?
179:17      A.   When I observed it.
179:18      Q.   Uh-huh.
179:19      A.   Because I flipped back, so I could
179:20  see it was like nothing, to make sure that
179:21  obviously what's in there matches what's in the
179:22  book.
179:23      Q.   Right.
179:24      A.   Sometimes it can get so hectic,
179:25  which did not happen, that sometimes they forget

201:1                          P. RODESCHIN
201:2    move.
201:3         Q.    You say double locked is to prevent
201:4    it from getting tighter or looser?
201:5         A.    Correct.
201:6         Q.    I see.
201:7         A.    And also to prevent it from being
201:8    picked open.
201:9         Q.    Okay.  Was Gonzalo Cortes in a sling
201:10   when he left the precinct?
201:11        A.    I don't recall.  I don't believe so.
201:12        Q.    Did you physically tighten the cuffs
201:13   for -- on Gonzalo Cortes before he left, or did
201:14   you instruct a subordinate to do that?
201:15        A.    I instructed.  I ascertained that
201:16   they were double-locked.  I can't remember --
201:17   actually I can't -- that's what I do, verbatim
201:18   procedure, regardless of who it is so I know it
201:19   always happens the same way, you know, to be
201:20   sure it's always done so nothing slips by.
201:21   I -- when he left I don't recall if he walked
201:22   out, if he was wheeled out in a chair or if he
201:23   was in a gurney.  So I can't I know that if --
201:24   he's got to be cuffed.  One way he's cuffed,
201:25   they are double-locked.  I know that that's

```
202:1                      P. RODESCHIN
202:2    done.  I know he's cuffed, I know he's shackled.
202:3    So I don't recall which way it was.
202:4         And now you're probably going to ask well,
202:5    what if he only has use of one arm, right?  Then
202:6    his uninjured arm would be double-locked and cuffed
202:7    usually to the loop of his pants.
202:8         Q.   What about his injured arm?
202:9         A.   Then it would be in a sling.
202:10        Q.   Okay.  And not cuffed?
202:11        A.   Correct.
202:12        Q.   You don't know whether -- which it
202:13   was here, right?
202:14        A.   I don't recall.
202:15        Q.   But would it -- would you ever cuff
202:16   someone's arm that was in a sling?
202:17        A.   No.  Well, like, why is it in a
202:18   sling?
202:19        Q.   Well, I -- knowing nothing else but
202:20   that it's in a sling.
202:21        A.   I don't know.  If EMS just put it in
202:22   a sling --
202:23        Q.   Right.
202:24        A.   -- I wouldn't unsling it.
202:25        Q.   Right.
```

```
243:1                    P. RODESCHIN
243:2        A.    There was no time.  That guy was
243:3    just staying -- like sometimes you try to do the
243:4    best you can.  I don't know what time the
243:5    prisoner left.  You see that there?
243:6        Q.    Okay.  So at 4:22, that's
243:7    Cappuccia's prisoner.  Do you see -- did you
243:8    write in the margins there?
243:9        A.    Yes, a 7:35 transport.
243:10       Q.    Okay.  And then Caribi's prisoner,
243:11   is that your handwriting in the margin there at
243:12   5:05?
243:13       A.    Yeah.  10:35 transport.
243:14       Q.    Okay.  All right, keep going, tell
243:15   me when you see your handwriting again.
243:16       A.    7:05, post change.
243:17             (Multiple voices speaking at
243:18             once.)
243:19       A.    Yeah, at that time I signed in.  I
243:20   didn't catch it because the ink is different.
243:21       Q.    That's okay, right, exactly.  So
243:22   that's actually your handwriting at 6:30, right?
243:23       A.    Yeah, 6:30 that's my handwriting.
243:24   That's me signing in for work.
243:25       Q.    Okay.  So you said at some point it
```

286:1                     P. RODESCHIN

286:2      A.   It's' -- well, accordingly this
286:3 should be, or is, a request for an ambulance to
286:4 the station house.
286:5      Q.   On July 1st, right?
286:6      A.   Correct.
286:7      Q.   Okay.  So based on this, when was
286:8 the call for the ambulance put over?
286:9      A.   7:26 a.m.
286:10     Q.   Okay.  And does it -- does this
286:11 document give you any indication of what -- how
286:12 the call was put over?
286:13     A.   If it was put over by phone or
286:14 radio?
286:15     Q.   Well, what was told to the
286:16 dispatcher?
286:17     A.   Sick prisoner.  That's it.
286:18     Q.   You see the fifth line down it says,
286:19 Ambulance case serious inside?
286:20     A.   Correct.
286:21     Q.   Does that mean that the person who
286:22 called said that it was a serious incident?
286:23          MS. JACOBS:  Objection.
286:24     A.   No.
286:25     Q.   What does it mean?