UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

GONZALO CORTES,

                                        Plaintiff,

                    v.

CITY OF NEW YORK; Sergeant JONCRIS RZONICA,
Shield No. 2960; Police Officer MATTHEW SMITH,
Shield No. 9407; Police Officer CHRISTOPHER MUSA,
Shield No. 9064; Police Officer DOMINIC RUGGIERO,
Shield No. 20894; Police Officer SHAUN RYAN, Shield
No. 10960; Police Officer JOHN CESTARO, Shield No.
9553; Police Officer ANDREW SCHULZ, Shield No.
5758; Sergeant STEPHEN DALY, Shield No. 944; Police
Officer MARIO CAPPUCCIA, Shield No. 19046;
Sergeant PETER RODESCHIN, Shield No. 3411; and
JOHN and JANE DOE 7 through 10, individually and in
their official capacities (the names John and Jane Doe
being fictitious, as the true names are presently unknown),

                                        Defendants.

**MEMORANDUM
AND ORDER**

14-CV-03014 (LDH) (RML)

LaSHANN DeARCY HALL, United States District Judge:

        Plaintiff asserts claims pursuant to 42 U.S.C. §§ 1983 and 1988 against Defendants City

of New York, Sergeant Joncris Rzonica, Police Officer Matthew Smith, Police Officer

Christopher Musa, Police Officer Dominic Ruggiero, Police Officer Shaun Ryan, Police Officer

John Cestaro, Police Officer Andrew Schulz, Sergeant Stephen Daly, Police Officer Mario

Cappuccia, Sergeant Peter Rodeschin, and John and Jane Doe 7 through 10, individually and in

their official capacities.  Specifically, Plaintiff alleges violations of his rights under the Fourth,

Fifth, Sixth, and Fourteenth Amendments to the United States Constitution during his July 1,

2012 arrest and detention.  Plaintiff asserts claims against one or more Defendants each for

unreasonable search and seizure; false arrest; malicious prosecution; excessive force; denial of

Plaintiff's right to a fair trial; *Monell* failure to train, discipline, and supervise officers; deliberate

indifference to medical needs; and failure to intervene.

Defendants Smith, Musa, Ryan, Schulz, Daly, Cappuccia, and Rodeschin (collectively, "Defendants") move pursuant to Rule 56(c) of the Federal Rules of Civil Procedure for partial summary judgment dismissing the claims against Defendants Capuccia, Daly, Rodeschin, Ryan, Schulz, and Smith for excessive force and failure to intervene.  Defendants also seek dismissal of the claim against all of them for deliberate indifference to medical needs.[1]

## BACKGROUND[2]

At 3:38 a.m. on July 1, 2013, Plaintiff was arrested by Defendant Smith and transported to the NYPD's 115th Precinct.  (Pl.'s Counterstatement Pursuant Local Civ. R. 56.1 ("Pl.'s 56.1") ¶¶ 1–4, ECF No. 64.)  The arrest report indicates Plaintiff's physical condition as apparently normal.  (ECF No. 65-13.)  Defendant Daly was the desk sergeant on duty at the time. (Defs.' Response Pl.'s Local Civ. R. 56.1 Statement Undisputed Facts ("Defs.' 56.1 Reply") ¶ 25, ECF No. 68.)  In the precinct's command log, he recorded Plaintiff's condition upon arrival at the precinct as normal.  (Id. ¶ 22.)  After about an hour in a holding cell among other detainees, Plaintiff asked to use the restroom.  (Id. ¶ 24.)

---

[1] Defendants state that "Plaintiff has withdrawn his claims against defendants City of New York, John Cestaro, Dominic Ruggiero and JonKris Rzonca. . . . [and] has also withdrawn his false arrest, *Monell*, unlawful stop and search, malicious prosecution and denial of a right to fair trial claims."  (Def.'s Mem. Law Supp. Their Mot. Summ. J., ECF No. 61 ("Defs.' Mot.") at 1 n.1 (Jan. 24, 2017).)  During a telephone conference held on January 10, 2019, Plaintiff represented that he would voluntarily withdraw those claims, although no stipulation of dismissal to that effect has yet been filed with the Court.  The parties' joint proposed pretrial order does not include any of these claims.  (ECF No. 87-1 at 2.)

[2] The following facts are taken from the parties' statements of material fact and responses pursuant to Local Rule 56.1, as well as the exhibits annexed thereto.  (*See generally* ECF Nos. 62, 64, 68.)  Both parties' Local Rule 56.1 statements contain numerous deficiencies that add unnecessary barriers to understanding the undisputed facts of this case.  For example, Plaintiff's Local Rule 56.1 counterstatement (ECF No. 64) fails to reproduce Defendants' citations to record evidence, purports to dispute some of Defendants' statements without actually disputing them in substance (*e.g.*, *id.* ¶¶ 4, 7–9, 14), improperly includes some of these purported disputes among his statement of additional facts (*see id.* ¶¶ 18–46), and improperly cites to the legal arguments Plaintiff makes in his memorandum of law (*e.g.*, *id.* ¶¶ 6, 9, 10, 13).  Both parties embellish or mischaracterize the evidence they claim supports their statements of fact.  *Compare id.* ¶ 4 ("Mr. Cortes arrived at the precinct by 3:45 a.m., sober and uninjured.") *and id.* ¶ 13 ("The single shove lasted no more than five to ten seconds.") *with id.* Ex. 12 (command-log entry indicating no arrival time and describing Mr. Cortes's condition only as "normal") *and id.* Ex. 2 (Cortes Dep.) at 122 ("[I]t is hard for me to calculate how long I spent against the cell.").  Nonetheless, given the relatively limited record in this case, the Court has been able to review the entirety of the evidence at issue, which supports the Court's findings.

2

At approximately 4:45 a.m., Defendant Musa handcuffed Plaintiff and escorted him through a doorway toward the restroom.  (*Id.* ¶ 25.)  The hallway beyond the door was lined with the bars of vacant cells.  (*Id.*)  The area was visible from the desk sergeant's position, though the record does not establish whether Defendant Daly actually observed the incident at issue.  (*Id.*)  Plaintiff grew scared and told Defendant Musa that he no longer needed to use the restroom.  (*Id.* ¶ 27.)  Plaintiff turned around and saw four additional officers—later identified as Defendants Cappuccia, Ryan, Schulz, and Smith—standing behind Defendant Musa.  (*Id.* ¶ 26.)  Plaintiff was then pushed—by a single shove—into the cell bars lining the hallway.  (*Id.* ¶ 28; Pl.'s 56.1 ¶ 13.)  The parties dispute the exact duration of the incident.  (Pl.'s 56.1 ¶ 13.)  However, Plaintiff testified that it occurred "really fast."  (Decl. Gabriel P. Harvis ("Harvis Decl.") Ex. 2 ("Cortes Dep.") at 124, ECF No. 65-2.)  The impact injured Plaintiff's right shoulder.  (Defs.' 56.1 Reply ¶ 28.)  Defendant Musa returned Plaintiff, still handcuffed, to the holding cell.  (*Id.* ¶¶ 31, 33.)

Plaintiff then "started feeling the pain and the pain was increasing," and he requested medical treatment.  (*Id.* ¶ 33; Cortes Dep. 127.)  An officer informed Plaintiff that calling an ambulance would prolong Plaintiff's detention, to which Plaintiff responded that he did not care, because he was in pain.  (Defs.' 56.1 Reply ¶ 33.)  Plaintiff's shoulder injury was recorded on two conflicting NYPD medical-treatment forms, each purportedly recorded at 6 a.m.—one form indicates that Plaintiff's injury was old; the other states that the injury was new.  (*Id.* ¶ 36.)  At 6:30 a.m., Defendant Rodeschin signed in for his shift relieving Defendant Daly as desk sergeant.  (*Id.* ¶ 38.)  Defendant Rodeschin altered Defendant Daly's command-log entry regarding Plaintiff's physical condition upon arrival, crossing out "normal" and inserting "injured shoulder."  (*Id.* ¶ 39.)  An ambulance was called at approximately 7:26 a.m.  (*Id.* ¶ 37.)

3

Paramedics reached Plaintiff at approximately 7:37 a.m., noted Plaintiff's shoulder injury, and requested that Plaintiff's handcuffs be removed. (*Id.* ¶ 34.) Paramedics recorded Plaintiff's statement that "[police] took him down when he went to the bathroom," described Plaintiff's injury as a "[d]eformity" and "[d]islocation" of his right shoulder, and placed Plaintiff's arm in a sling. (*Id.* ¶¶ 34, 40–41.) Before Plaintiff left the precinct, Defendant Rodeschin adjusted or directed someone else to adjust the handcuff securing Plaintiff's left arm to his belt loop. (*Id.* ¶ 41.) Plaintiff left the precinct at 8:05 a.m. (*Id.* ¶ 42.) At Elmhurst Hospital, Plaintiff complained of shoulder and neck pain as a result of being "assaulted and pushed against some bars." (*Id.*) According to the medical records included in the parties' submissions, Plaintiff's immediate treatment consisted entirely of taking two tablets of Percocet, 800mg of ibuprofen, and heartburn medication over the subsequent four hours. (Harvis Decl. Ex. 7, ECF No. 65-7.) Plaintiff testified that hospital staff conducted X-rays and diagnosed him with a shoulder sprain. (Cortes Dep. 129–30.)

## STANDARD OF REVIEW

Summary judgment must be granted when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. The movants bear the initial burden of demonstrating the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 330–31 (1986); *Feingold v. New York*, 366 F.3d 138, 148 (2d Cir. 2004). Where the non-movant bears the burden of proof at trial, the movants' initial burden at summary judgment can be met by pointing to a lack of evidence supporting the non-movant's claim. *Celotex Corp.*, 477 U.S. at 325. Once the movants meet their initial burden, the non-movant may defeat summary judgment

4

only by producing evidence of specific facts that raise a genuine issue for trial.  *See* Fed. R. Civ.

P. 56(e); *see also Anderson*, 477 U.S. at 250; *Davis v. New York*, 316 F.3d 93, 100 (2d Cir.

2002).  The Court is to believe the evidence of the non-movant and draw all justifiable inferences

in his favor, *Anderson*, 477 U.S. at 255, but the non-movant must still do more than merely assert

conclusions that are unsupported by arguments or facts.  *Bellsouth Telecomms., Inc. v. W.R.

Grace & Co.*, 77 F.3d 603, 615 (2d Cir. 1996).

## DISCUSSION

I.    **Excessive Force**

A.    **Direct Use of Force**

 "[I]t is well settled in [the Second] Circuit that personal involvement of defendants in

alleged constitutional deprivations is a prerequisite to an award of damages under § 1983."

*Provost v. City of Newburgh*, 262 F.3d 146, 154 (2d Cir. 2001) (internal quotation marks and

citations omitted).  This prerequisite applies to § 1983 claims for excessive force.  *Betts v.

Rodriquez*, No. 15-CV-3836, 2017 WL 2124443, at *3 (S.D.N.Y. May 15, 2017).  Personal

involvement may be established by evidence that a defendant "(i) personally participated in the

alleged constitutional violation, (ii) was grossly negligent in supervising subordinates who

committed the wrongful acts, or (iii) exhibited deliberate indifference to the rights of the plaintiff

by failing to act on information indicating that unconstitutional acts were occurring."  *Provost*,

262 F.3d at 154.

Here, Defendants argue that Plaintiff cannot establish that Defendants Cappuccia, Daly,

Rodeschin, Ryan, Schulz, or Smith used excessive force against Plaintiff.  (Defs.' Mem. Law

Supp. Their Mot. Summ. J. ("Defs.' Mot.") 4–5, ECF No. 61.)  The Court agrees.  As an initial

matter, it is undisputed that the alleged assault consisted of a single shove.  (Pl.'s 56.1 ¶ 13;

Defs.' 56.1 Reply ¶¶ 28–31.)  And Plaintiff's own testimony allows for the singular conclusion

that it was Defendant Musa who shoved him.  Specifically, at Plaintiff's deposition, the

following colloquy occurred:

> Q.  So, immediately after you said I don't want to go through, you were pushed through the doorway?
>
> A.  Yes.
>
> Q.  Where on your body were you pushed?
>
> A.  So, I was handcuffed.  He pushed me.  When they had the handcuffs on he grabbed me with the handcuffs and he pushed me to the cell and that's when he asked me, "oh, I thought you wanted to go to the bathroom."
>
> Q.  So, the officer grabbed your handcuffs?
>
> A.  Yes.
>
> Q.  If you know, this was the officer who had escorted you to the bathroom?
>
> A.  Yes.

(Cortes Dep. 116–17.)  The officer who had escorted Plaintiff was Defendant Musa.  (Defs.' 56.1

Reply ¶ 25.)  Moreover, Plaintiff testified that the four other officers he observed just before the

assault—later identified as Defendants Cappucia, Ryan, Schulz, and Smith—"were behind"

Defendant Officer Musa.  (Cortes Dep. 120.)  Against these facts, no reasonable juror could find

that any officer other than Defendant Musa used force against Plaintiff.[3]

Nevertheless, Plaintiff argues that he has produced sufficient evidence of a collective

attack to require Defendants to prove their own lack of involvement.  (*See* Pl.'s Mem. Law Opp.

Defs.' Mot. Summ. J. ("Pl.'s Opp.") 19, ECF No. 66.)  It is true that where a plaintiff shows that

---

[3] Plaintiff's counsel relies on Plaintiff's intermittent use of the plural "they" to argue that multiple "officers violently yanked Mr. Cortes upward and into cell bars by his rear-cuffed arms."  (Pl.'s 56.1 ¶ 28 (citing Cortes Dep. 120 ("Q. How far away from you were the other four officers?  A.  They were all together."); *id.* at 123 ("[T]hat's the moment they grabbed me and they pushed me against the cell and that's when they hurt my shoulder.")).)  However, Plaintiff eliminated any ambiguity by later clarifying—twice—that he was using the plural pronoun "they" to refer to Defendant Musa alone.  (*Id.* at 122–23, 125 ("Q. When you say, 'they', how many people escorted you back to the cell?  A. When I looked back there were five officers, but only one actually took me back to the cell. . . . Q. You say, 'they.'  Was this [the] one officer who had been escorting you to the bathroom?  A. Yes.").)

several defendants all acted tortiously and in concert, a court may hold that "the burden of proving which tortious defendant caused the particular harm or what part of the particular harm shifts to each tortious defendant." *Universal Calvary Church v. City of New York*, No. 96-CV-4606, 2000 WL 1538019, at *17 (S.D.N.Y. Oct. 17, 2000) (citing *Rutherford v. Berkeley*, 780 F.2d 1444, 1448 (9th Cir. 1986) (denying summary judgment where plaintiff identified the three defendant officers as among the five or six surrounding him while he was assaulted, although he could not clearly state they had assaulted him), *abrogated on other grounds as recognized in Jones v. Williams*, 297 F.3d 930, 935 n.2 (9th Cir. 2002); *Grandstaff v. City of Borger*, 767 F.2d 161, 168 (5th Cir. 1985) (affirming jury verdict and judgment in favor of plaintiff's estate on § 1983 and other claims against four officers who all fired at decedent plaintiff, despite a failure to prove at trial which bullet had actually killed him)).  Of course, in the case of a collective assault, it would be unfair to require a plaintiff to accurately identify each specific defendant who struck each blow.  This is just not that sort of case.  Again, it is undisputed that the alleged assault consisted of a single shove.  For that shove to have constituted a collective assault would have required unimaginable choreography and coordination among Defendants.  Such an inference is simply not reasonable.

### B.     Failure to Intervene

In addition to arguing that Defendants Cappuccia, Daly, Rodeschin, Ryan, Schulz, and Smith used force against Plaintiff—an argument the Court rejects for the reasons set forth above—Plaintiff relies on a theory of failure to intervene to hold those Defendants liable for Defendant Musa's alleged use of excessive force.[4]  (*See* Pl.'s Opp. 18–19 (defining "personal

---

[4] Although Plaintiff also quotes from a district court's recitation of the legal standard for supervisory liability under § 1983 (Pl.'s Opp. 18–19 (citing *Maloney v. City of Nassau*, No. 03-cv-4178, 2010 WL 3940456, at *3 (E.D.N.Y. Sept. 30, 2010), *aff'd* 500 F. App'x 30 (2d Cir. 2012)), Plaintiff does not allege that any Defendants are liable for excessive force in their capacities as supervisors.

involvement" as both direct involvement and failure to intervene).)  Section 1983 imposes

liability not only on an officer who himself uses excessive force but also on fellow officers who

fail to intervene when excessive force is used by a colleague in their presence.  *O'Neill v.*

*Krzeminski*, 839 F.2d 9, 11 (2d Cir. 1988) ("A law enforcement officer has an affirmative duty to

intercede on the behalf of a citizen whose constitutional rights are being violated in his presence

by other officers.").  However, "for a law enforcement officer to be held liable for another

officer's use of excessive force, 'there must have been a realistic opportunity [for the bystander

officer] to intervene to prevent the harm from occurring.'"  *Rogoz v. City of Hartford*, 796 F.3d

236, 251 (2d Cir. 2015) (quoting *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994)).

Here, Defendants Cappuccia, Daly, Rodeschin, Ryan, Schulz, and Smith argue that "no

reasonable jury could find that there was a realistic opportunity for anyone to intervene in

[Defendant Musa's] use of force." (Defs.' Mot. 5–6.)  Again, the Court agrees.  Two Second

Circuit decisions dispose of Plaintiff's arguments.  In *O'Neill v. Krzeminski*, a defendant police

officer appealed the district court's denial of summary judgment on the issue of whether he had

failed to intervene to prevent two other officers from, among other things, punching the plaintiff

three times in rapid succession.  839 F.2d at 10.  The Second Circuit held:

> Even when the evidence is viewed in the light most favorable to the plaintiff,
> there is insufficient evidence to permit a jury reasonably to conclude that [the
> defendant's] failure to intercede was a proximate cause of the beating.  The three
> blows were struck in such rapid succession that [the defendant] had no realistic
> opportunity to attempt to prevent them.  This was not an episode of sufficient
> duration to support a conclusion that an officer who stood by without trying to
> assist the victim became a tacit collaborator.

*Id.* at 11–12.  Likewise, in *Rogoz v. City of Hartford*, the Second Circuit granted summary

judgment in favor of the defendant bystander officers for failing to prevent another officer from

jumping on the back of the plaintiff arrestee:  "As [plaintiff's] counsel stated at oral argument of

this appeal, [the plaintiff] described [the officer's] jumping on his back as 'fairly immediate.'

8

[Plaintiff] did not proffer any evidence from which a juror could rationally infer that the [defendant] officers who were present had a realistic opportunity to prevent [the other officer's] jump." 796 F.3d 236, 251 (2d Cir. 2015). The same conclusion is warranted here.

Although the parties in this case dispute the exact duration of the alleged assault, they do not dispute that it consisted of a single shove. (Pl.'s 56.1 ¶ 13; Defs.' 56.1 Reply ¶¶ 28–31.) As in *O'Neill* and *Rogoz*, no reasonable juror could rationally infer that any other officers had a realistic opportunity to prevent Defendant Musa from shoving Plaintiff.

## II. Deliberate Indifference to Medical Needs

Defendants also move for summary judgment dismissing Plaintiff's claim against them for deliberate indifference to medical needs. (Defs.' Mot. 7.) Pursuant to § 1983, "the official custodian of a pretrial detainee may be found liable for violating the detainee's [Fifth and Fourteenth Amendment] due process rights if the official denied treatment needed to remedy a serious medical condition and did so because of his deliberate indifference to that need." *Weyant v. Okst*, 101 F.3d 845, 856 (2d Cir. 1996). Not every delay in treatment is actionable. In fact, the Second Circuit has reserved the deliberate-indifference classification for "cases in which, for example, officials deliberately delayed care as a form of punishment, ignored a life-threatening and fast-degenerating condition for three days, or delayed major surgery for over two years." *Demata v. N.Y. State Corr. Dep't of Health Servs.*, 198 F.3d 233 (2d Cir. 1999) (internal quotation marks and citations omitted).

The parties do not dispute that Plaintiff was diagnosed with a shoulder injury following the alleged assault.[5] (Pl.'s 56.1 ¶ 17.) The paramedics' report, however, is internally

---

[5] Plaintiff makes the naked assertion that he suffered "a rotator cuff tear requiring multiple surgeries." (Pl.'s Opp. 17.) Because Plaintiff adduces no evidence whatsoever in support of this contention, it is excepted from the Court's analysis. Moreover, there is no evidence that Defendant Rodeschin's adjustment of Plaintiff's handcuffed left arm as he was leaving the station had any effect on his injured right shoulder. Defendant Rodeschin testified that,

inconsistent:  on the one hand, it indicates a "[d]eformity" and "[d]islocation" of Plaintiff's right

shoulder; on the other hand, it indicates the paramedics' impression of "[n]o [m]edical

[p]roblem."  (FDNY Rep., ECF No. 65-5.)  According to the hospital records, Plaintiff's

treatment on the night of the incident was limited to the administration of painkillers.  (ECF No.

65-7.)  There is no evidence of further treatment until Plaintiff's shoulder surgery on January 22,

2015, though it is disputed whether that surgery was related to the July 2013 incident at issue.

(*See* ECF No. 65-9; Defs.' 56.1 Reply ¶ 46.)

Viewing the evidence in the light most favorable to Plaintiff, it is at best a close call

whether his shoulder injury was sufficiently serious to support § 1983 liability—that is, "a

condition of urgency, one that may produce death, degeneration, or extreme pain," *Hathaway v.

Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994) (quoting *Nance v. Kelly*, 912 F.2d 605, 607 (2d Cir.

1990) (Pratt, J., dissenting)); *see also Gaines v. Okpok*, No. 03-CV-5095, 2006 WL 1652654, at

*4 (E.D.N.Y. June 9, 2006) ("A broken finger, without more, simply does not present a condition

of urgency of the type that may produce death, degeneration or extreme pain which

correspondingly merits constitutional protection.").  Nonetheless, Defendants fail to dispute the

seriousness of Plaintiff's injury.  (*See generally* Defs.' Mot. 7–8; Defs.' 56.1 Reply ¶ 28.)  Had

Defendants done so, the deliberate-indifference claim very well may have been dismissed on this

ground.

In any event, the only issue before the Court is whether Defendants were deliberately

indifferent to Plaintiff's medical needs.  Defendants correctly argue that Plaintiff cannot prove

---

pursuant to a "verbatim procedure" he "always" instructed his subordinates to follow, a detainee's "uninjured arm would be double-locked and cuffed usually to the loop of his pants," while an injured arm in a sling would be left uncuffed.  (Harvis Decl. Ex. 4 ("Rodeschin Dep.") at 201–02, ECF No. 65-4.)  Plaintiff testified that, "when [he] was leaving in the ambulance [officers] secured one of the handcuffs toward [his] pants, to the middle of the pants. As [he] was leaving there was an older officer that took a look at [him] and he said that's not the proper way to do it and he secured [the handcuff] all the way to [Plaintiff's] right, which made it harder for him."  (Cortes Dep. 134.)

that any of them acted with a sufficiently culpable state of mind.  (Defs.' Mot. 8.)  Deliberate

indifference is established by evidence of a defendant's "reckless disregard for the substantial

risk posed by the detainee's serious medical condition." *Weyant*, 101 F.3d at 856.  In the context

of pretrial detention, the Second Circuit applies "an objective standard, requiring determination

of what the official knew or should have known" about the risk to a detainee's health or safety.

*Id*.  Typically, the state of a defendant's knowledge is a question of fact reserved for trial.  *Id.*

However, dismissal as a matter of law may nonetheless be appropriate where the pleadings or

evidence cannot support a deliberate-indifference claim.  *E.g.*, *Chatin v. Artuz*, 28 F. App'x 9, 11

(2d Cir. 2001) (summary order) (affirming summary judgment dismissing deliberate-indifference

claim); *Demata v. N.Y. State Corr. Dep't of Health Servs*., 198 F.3d 233 (2d Cir. 1999) (same).

　　　The evidence here, with all justifiable inferences drawn in Plaintiff's favor, establishes

that Defendant Musa caused Plaintiff's shoulder injury shortly after 4:45 a.m. then returned

Plaintiff to the holding cell.  (Defs.' 56.1 Reply ¶¶ 24–25, 28, 31, 33.)  Less than half an hour

later, Plaintiff felt increasing pain in his shoulder.  (Cortes Dep. 127–28.)  He subsequently

spoke to one officer to request medical attention.  (Defs.' 56.1 Reply ¶ 33.)  Plaintiff's injury was

officially recorded at 6 a.m.  (*Id.* ¶ 36.)  Defendant Rodeschin became aware of Plaintiff's injury

at approximately 6:30 a.m.  (*Id.* ¶¶ 38–39.)  An ambulance was called at approximately 7:26 a.m.

(*Id.* ¶ 37.)

　　　On these facts, the Court cannot permit the deliberate-indifference claim to proceed to

trial.  Plaintiff has adduced no evidence that Defendants Cappuccia, Ryan, or Schulz were even

aware of Plaintiff's injury, let alone deliberately indifferent to it.  There is evidence that

Defendants Daly, Musa, Rodeschin, and Smith knew about Plaintiff's injury some time before

medical treatment was summoned.  However, Plaintiff fails to establish that any of these

Defendants acted with the requisite deliberate indifference to be actionable under law.  For example, this is not a case where the defendant officers observed the plaintiff in a visible state of severe insulin shock, knew he was a diabetic, and nonetheless denied his repeated requests for medical treatment while in custody for several hours.  *See Weyant*, 101 F.3d at 849–50, 857 ("[A] reasonable jury infer that [the officers] received information, and could see for themselves, that [the plaintiff] was in serious need of immediate medical care and yet they denied him that care because they were deliberately indifferent to that need.").  Neither is it a case where officials knew that a pregnant plaintiff had been beaten, knew she was experiencing severe pain and vaginal bleeding, knew she might suffer a miscarriage, and nonetheless delayed taking her to the hospital for several hours.  *See Archer v. Dutcher*, 733 F.2d 14, 16 (2d Cir. 1984) ("[I]f defendants did decide to delay emergency medical aid-even for 'only' five hours in order to make Archer suffer, surely a claim would be stated . . . .").  Nor is this a case like *Mills v. Fenger*, where the defendant officers were informed that the plaintiff had suffered a ruptured patellar tendon, the plaintiff could not stand or walk, and the arraigning judge had expressly indicated that he needed medical attention, yet the plaintiff was left untreated, 216 F. App'x 7, 10–11 (2d Cir. 2006) (summary order).

Instead, this case is not unlike *Chatin v. Artuz*, where the plaintiff inmate injured his ankle playing soccer, was taken to the medical clinic two hours later, and was forced to wait two days before receiving an X-ray.  No. 95 CIV. 7994 (KTD), 1999 WL 587885, at *1 (S.D.N.Y. Aug. 4, 1999).  After noting that the plaintiff's foot injury was not "of the type contemplated" by the serious-injury standard, the district court determined that any delay in treatment could not support a cognizable deliberate-indifference claim.  *Id.* at 3.  The Second Circuit affirmed:

> [Plaintiff] only claims that the medical attention he received at Green Haven Correctional Facility was inadequate because (1) officials waited two days before taking him to the hospital for x-rays; (2) a nurse failed to provide him immediately with crutches, ice or pillows; and (3) prison officials failed to follow the treatment recommendations of the hospital.  None of these allegations rises to the level of deliberate indifference to [plaintiff's] serious medical needs.

*Chatin v. Artuz*, 28 F. App'x 9, 10–11 (2d Cir. 2001) (summary order).  A similar finding is warranted here.  Plaintiff's request for medical attention was insufficient to put Defendants on notice of a substantial risk posed by a sufficiently serious medical condition.  Indeed, the hospital records from the night of the incident indicate that Plaintiff was in "no apparent distress."  (ECF No. 65-7.)  Moreover, the period of time between when Plaintiff first complained of pain and when an ambulance was called was, at most, two hours and forty-one minutes—from 4:45 to 7:26 a.m.  Given the nature of Plaintiff's injury, such a delay does not support an inference that Defendants were recklessly indifferent to a serious medical need.[6]

---

[6] In opposition, Plaintiff relies primarily on a single case, *Pizzuto v. County of Nassau*, 239 F. Supp. 2d 301 (E.D.N.Y. 2003).  (Pl.'s Opp. 17.)  The facts in that case, however, cannot reasonably be analogized to the facts here.  In *Pizzuto*, the defendant officers violently beat the plaintiff inmate, left him moaning in his prison cell with internal bleeding and visible bruises, chose not to file a use-of-force report, and advised their supervisor that no such report was necessary.  *Pizzuto*, 239 F. Supp. 2d at 311.  Their actions prevented the plaintiff from receiving immediate medical attention, and he died from his injuries five days later.  *Id.* at 307.  Here, by contrast, there is no evidence to suggest that Plaintiff had a rapidly deteriorating or life-threatening medical condition.  Moreover, there is no evidence to suggest that Defendants undertook any effort to prevent Plaintiff from receiving treatment.  The Court notes that officers may have intentionally altered official medical records to make it appear as though Plaintiff's injury had occurred before he was taken into custody.  (*Compare* ECF No. 65-14 (describing Plaintiff's injury as old), *with* 65-15 (describing it as new).)  Moreover, Defendant Rodeschin altered the official command-log entry reflecting Plaintiff's condition upon arrival at the precinct from normal to injured.  (ECF No. 65-12.)  At his deposition, Defendant Rodeschin attempted to justify the alteration:  "I shook my head and [said], how is this guy apparently normal if, number one, he was hurt prior to his contact, . . . he reeks of booze, and no he's complaining that his arm still hurts, so that's not apparently normal."  (Rodeschin Dep. 177.)  However, Defendant Rodeschin gave away his true motivation in his next answer:  "[I]f it wasn't prior to police contact, then I would have a whole other job to do now."  (*Id.*)  There is no question that this conduct is indeed reprehensible.  However, while it may reflect an effort to escape culpability for Plaintiff's injury, the Court does not interpret it as an effort to deny him medical treatment.

13

## CONCLUSION

For the foregoing reasons, Defendants' motion for partial summary judgment is GRANTED.  Plaintiff's claims against Defendants Cappuccia, Daly, Rodeschin, Ryan, Schulz, and Smith for excessive force and failure to intervene are dismissed with prejudice.  Plaintiff's claim against Defendants Cappuccia, Daly, Musa, Rodeschin, Ryan, Schulz, and Smith for deliberate indifference to medical needs is also dismissed with prejudice.

SO ORDERED.

Dated:  Brooklyn, New York
         February 19, 2019

s/ LDH_____
LASHANN DEARCY HALL
United States District Judge

14