1   UNITED STATES DISTRICT COURT
    EASTERN DISTRICT OF NEW YORK
2   --------------------------------x
                                        14-CV-3014(LDH)
3   GONZALO CORTES,
                                        United States Courthouse
4           Plaintiff,                  Brooklyn, New York

5           -against-                   January 23, 2019
                                        11:00 a.m.
6   POLICE OFFICER CHRISTOPHER MUSA,
    SHIELD NO. 9064,
7
            Defendant.
8   --------------------------------x

9
        TRANSCRIPT OF CIVIL CAUSE FOR PRETRIAL CONFERENCE
10         BEFORE THE HONORABLE LASHANN DEARCY HALL
                UNITED STATES DISTRICT JUDGE
11

12  APPEARANCES:

13  Attorney for Plaintiff:  ELEFTERAKIS, ELEFTERAKIS & PANEK
                             80 Pine Street
14                           New York, New York 10038
                             BY:  RAYMOND PANEK, ESQ.
15                                GABRIEL P. HARVIS, ESQ.
                                  BAREE N. FETT, ESQ.
16

17  Attorney for Defendant:  NEW YORK CITY LAW DEPARTMENT
                             OFFICE OF CORPORATION COUNSEL
18                           100 Church Street
                             New York, New York 10007
19                           BY:  JOSEPH GUTMANN, ESQ.
                                  ERIN T. RYAN, ESQ.
20                                ELISSA B. JACOBS, ESQ.

21
    Court Reporter:          Georgette K. Betts, RPR, FCRR, CCR
22                           Phone:  (718)804-2777
                             Fax:    (718)804-2795
23                           Email:  Georgetteb25@gmail.com

24  Proceedings recorded by mechanical stenography.  Transcript
    produced by computer-aided transcription.
25

1          THE COURTROOM DEPUTY:  All rise.  This is civil

2     cause for pretrial conference.  Cortes V. City of New York,

3     docket number 14-CV-3014.

4          Counsel, please state your appearances.

5          MR. PANEK:  For plaintiff Raymond Panek,

6     Elefterakis, Elefterakis & Panek, 80 Pine Street, New York,

7     New York 10038.

8          Good morning, Your Honor.

9          THE COURT:  Good morning.

10          MR. HARVIS:  Gabriel Harvis of Elefterakis,

11     Elefterakis & Panek for the plaintiff Gonzalo Cortes.

12          Good morning, Your Honor.

13          THE COURT:  Good morning.

14          MS. FETT:  Baree Fett from Elefterakis, Elefterakis

15     & Panek for the plaintiff.

16          MR. GUTMANN:  Joseph Gutmann from the Office of

17     Corporation Counsel for the defendant Christopher Musa.

18          Good morning, Your Honor.

19          MS. RYAN:  Erin Ryan for the defendant.

20          Good morning, Your Honor.

21          THE COURT:  Good morning.

22          MS. JACOBS:  Elissa Jacobs from Corporation Counsel

23     also for the defendant.

24          THE COURT:  Good morning.  You all may be seated.

25          First, let me apologize for having to move this

1    pretrial conference up by a day which becomes inconvenient in

2    light of the status of the joint pretrial order, however, as a

3    result of a death in my family, I will be traveling tomorrow

4    and Friday and therefore unable to hold a pretrial conference

5    as scheduled.  So what we're going to do is to get through

6    what we can and then address whatever other issues on the fly

7    as it were.

8              I have the parties' motions *in limine*, so let's go

9    through those.  Let's start with the plaintiff's motions *in*

10   *limine*.  The first motion *in limine* that the plaintiffs bring

11   is with respect to an adverse inference instruction regarding

12   the spoliation of NYPD records.

13             Now it is my understanding that those records were

14   the subject of a motion to compel before the magistrate judge,

15   am I correct?

16             MR. HARVIS:  Well, yes, Your Honor, they were the

17   subject of a motion -- my condolences, Your Honor.

18             THE COURT:  Thank you.

19             MR. HARVIS:  They were subject to a motion to compel

20   and then subsequent to that we received a verified response

21   that they couldn't be located and so then we then put that

22   into the Court as a motion basically for relief for spoliation

23   and that motion was never opposed.  Then Judge Levy, the

24   magistrate presiding, granted it and that order I believe was

25   in -- I have the date in the motion, Your Honor.

1          THE COURT:  Can I see that motion please and his

2    order so I'm clear about what was requested.

3          MR. HARVIS:  Yes.  I don't think I have the letter

4    motion.  It appears on the docket as docket entry number 47.

5          THE COURT:  But if he granted what you requested,

6    why do you need additional relief from me?

7          MR. HARVIS:  Because what we asked for was relief in

8    connection with spoliation.  We did not -- it was no specific

9    relief that was granted, it was just a granting that there

10   would be relief, so now we're articulating the relief that we

11   seek on the basis of that prior order.

12         THE COURT:  Okay.

13         MS. JACOBS:  Your Honor, I do have the copy of that

14   order if you would like it.

15         THE COURT:  Thank you.  So just an amorphous relief.

16         MR. HARVIS:  Yes, we were expecting there to be more

17   discussion if there was some sort of briefing on it, but then

18   it just ended up being unopposed.

19         Your Honor, I'm just going to hand the docket sheet

20   up because that's where the endorsement is.

21         THE COURT:  Thank you.

22         MR. HARVIS:  Thank you very much.  Thank you.

23         And the order granting, Your Honor, is September 13

24   of 2016 right after docket 48.

25         THE COURT:  I'm sorry, when?

1          MR. HARVIS:  I believe it's September 13th.

2          THE COURT:  Order granting unopposed motion for

3    discovery, granting motion to compel.

4          So the discovery portion of it I'm assuming is the

5    deposition of the defendant, Sergeant Joncris Rzonca, then the

6    motion to compel production of relevant ESI.

7          Where is the -- I'm just trying to make heads or

8    tails of this because it appears as if Judge Levy purposefully

9    addressed each of the requests in the motion that was

10   submitted by letter and there were, I think, three aspects to

11   the letter motion and he addressed them separately.  One

12   regarding discovery, one regarding the motion to compel, but

13   it seems as if he left unaddressed the relief regarding the

14   spoliation or am -- do you all read this entry differently?

15         MR. HARVIS:  Well I read it, Your Honor, as granting

16   the letter in its entirety and I think that the motion for

17   discovery was the portion of the motion that addresses the

18   spoliation issue.  I think it's hard --

19         THE COURT:  Kind of hard for me to read it as just

20   granting the letter motion in its entirety if you went to the

21   effort to address them separately.  He could have just said

22   the letter motion is granted, he specifically addressed them

23   separately and --

24         MR. HARVIS:  Well, he could have said granted in

25   part, or he could have said, you know, deferred ruling or any

1    number of things if the intention was to deny part of the

2    letter or to not address it, but I took the entry to say

3    granting and it refers to the docket entry.

4           THE COURT:  It refers to the docket entry two times,

5    granting 47 unopposed motion for discovery, granting 47 motion

6    to compel.  There seems to be no mention whatsoever -- and I

7    look at them separately, right -- continuing a deposition is

8    different than seeking specific relief, so I'm trying to

9    figure out what to do with this.

10          MR. HARVIS:  Well, I just also think, Your Honor,

11   that just putting it in context, I mean to the extent there is

12   a lack of clarity I would think that the party that elected to

13   not participate in the briefing process should probably not be

14   the benefit of any ambiguity there.  I think it's fairer.

15          THE COURT:  That's the whole point I'm making.

16          MR. HARVIS:  I just wanted to make it a point.

17   Thank you, Your Honor.

18          THE COURT:  I'll hear from the defendants in this

19   case.  I'm not -- it's interesting that there is simply that

20   the defendants were silent with regard to the request that's

21   set out in this August 27th letter.  It seems like you guys

22   may have fallen down on this one, what's up.

23          MS. JACOBS:  Your Honor, I will say it honestly, I

24   did fall down on this one, there is nothing more to say about

25   it other than I should have responded.

1          I will point out, however, that while this was

2     granted with respect to the defendants at the time we were

3     there, there is nothing in either this letter or in the record

4     to support that Officer Musa himself had anything to do with

5     the -- who is the only remaining defendant at this point in

6     time, that he had anything to do with the loss of these

7     documents.

8          The only thing that's listed in the motions *in*

9     *limine* are that during his deposition, Sergeant Musa said he

10    had reviewed the prisoner pedigree form, 20 pages later in his

11    deposition he corrected that to say he had never seen it.  So

12    to the extent that whatever relief plaintiff is now seeking

13    has to do with those two documents, there is nothing in the

14    record that plaintiff has put forward to show this remaining

15    defendant had anything to do with this.

16         MR. HARVIS:  We're now three years later, the time

17    for that, you know, during the discovery process, if there was

18    some concern that there was an insufficient showing, I think

19    that that would have been the time to have presented that

20    evidence, not, you know, now when we're on the verge of trial.

21    We were kind of in repose thinking it had been ruled on, I

22    just think the fairer outcome here would be --

23         THE COURT:  What is it that you want exactly?

24         MR. HARVIS:  We want a permissive adverse inference

25    that tells the jury these records were lost and that they may

GEORGETTE K. BETTS, RPR, FCRR, CCR
Official Court Reporter

1   believe they may come to the conclusion that they were

2   beneficial to plaintiff's case and/or would have undercut

3   whatever defense they intend to offer.  That they are not

4   required to do that, but that they may.

5            THE COURT:  We have the remaining claim is an

6   excessive force claim.

7            MR. HARVIS:  Right.

8            THE COURT:  And so what was lost specifically...

9            MS. JACOBS:  Your Honor, what's the subject of the

10  motion *in limine* is a prisoner pedigree form.  This is a

11  document that would have been completed by the arresting

12  officer.

13           THE COURT:  That says his condition at the time he

14  was arrested.

15           MS. JACOBS:  Correct.  And that was --

16           THE COURT:  Are the defendants trying to maintain

17  that that -- or intending to argue that at the time of his

18  arrest that he already had this shoulder injury, is that where

19  the defense --

20           MS. JACOBS:  Yes, there may be some evidence that he

21  had some injury, but we -- all of the other documents list

22  that he was apparently normal initially.  His arrest report

23  listed he was apparently normal.

24           THE COURT:  It's a tough argument, even putting

25  aside the prisoner pedigree form, it seems like a tough

1   argument to make that he was normal and also a pretty bad one

2   considering the fact that we have a conduct by the officers

3   changing the pedigree forms, right?

4        MS. JACOBS:  It's not changing the pedigree form.

5   The document --

6        THE COURT:  Or the command log.

7        MS. JACOBS:  It's the command log.

8        THE COURT:  Excuse me, the command log.

9        MS. JACOBS:  The testimony also is the information

10  in the command log is most likely taken from the prisoner

11  pedigree form, so to the extent there was something written

12  there that says apparently normal and that comes in, that's

13  already going to be in evidence.

14       THE COURT:  So then you don't have a problem with

15  the inference that this prisoner pedigree form inference that

16  they are suggesting then.

17       MS. JACOBS:  I don't think that there is any

18  reason -- I think there is another discussion or two whether

19  or not that should come in this case because the defendant

20  left, Officer Musa -- or in what manner it might come in

21  because Officer Musa had nothing to do with filling out those

22  forms.

23       THE COURT:  Okay.  That doesn't mean they're not

24  relevant.

25       MS. JACOBS:  They may be relevant depending on what

1   evidence we present I agree, but he had nothing to do with

2   filling out the forms.  And I would also just say there is

3   nothing in there to say Officer Musa had anything to do with

4   losing them to the extent there is some adverse inference

5   about them being lost culpably.

6            THE COURT:  Well, lost and destroyed are different,

7   right?  They were lost.

8            MS. JACOBS:  Correct.

9            THE COURT:  That's just a fact.  I don't think that

10  the fact that they were lost would suggest to the jury that

11  they were destroyed purposely by the defendants but that they

12  were lost and perhaps they have information that might support

13  the plaintiff's case.

14           MS. JACOBS:  I think to the extent it would say

15  something or they may -- the jury may infer that they would

16  also have stated he was apparently normal, I don't believe

17  we're going to dispute that fact.  That the prisoner pedigree

18  form would have listed him as apparently normal when he came

19  into the precinct.

20           THE COURT:  So then you guys are in agreement.

21           MS. JACOBS:  I think it's a question -- one moment,

22  Your Honor.

23           (Pause in proceedings.)

24           MS. JACOBS:  I think that we are in agreement, it's

25  just a question of whether or not -- first of all, the command

1    log says the same thing already, so it's cumulative.  It's

2    also a question in what manner this inference would be

3    presented to the jury because again we have concerns about

4    saying that -- presenting it in a way that implies it was

5    purposefully destroyed by this particular officer, this

6    particular defendant.

7         THE COURT:  I certainly would never have made such a

8    statement to the jury.  Now it sounds as if in some respects

9    the defendants are willing to go further than the inference

10   and just almost stipulate to the fact that the pedigree log

11   would have indicated that he was normal as a fact, which would

12   alleviate your concerns about the jury drawing inferences with

13   regard to the conduct of Mr. Musa in relationship to the loss

14   of the documents --

15        MS. JACOBS:  Right.

16        THE COURT:  -- but going to the heart of the fact

17   that the documents would have.  So what about that?

18        MR. HARVIS:  Well, it's just the fact that since

19   we've never seen it and it was lost and we don't know what it

20   says, for all we know it may have said something that was even

21   more helpful than apparently normal.

22        THE COURT:  How could it be more helpful than

23   apparently normal?

24        MR. HARVIS:  Full medical interview, no complaints

25   of injury, I observed the defendant, he looks completely fine.

1    I just don't know.  I agree it's, you know -- but given the

2    circumstances any benefit should be resolved in our favor.  So

3    it's not really much of a difference, but just to say it would

4    have been beneficial to the theory advanced by the plaintiff

5    and --

6              THE COURT:  What's the theory advanced by the

7    plaintiff --

8              MR. HARVIS:  That it was not there.

9              THE COURT:  -- that he was normal when he came in?

10             MR. HARVIS:  Right, but there is a difference

11   between normal and apparently normal, Your Honor, and for all

12   we know it said normal as opposed to apparently normal, which

13   is better because it's --

14             THE COURT:  For all we know it said his condition

15   was --

16             MR. HARVIS:  Normal --

17             THE COURT:  -- normal.

18             MR. HARVIS:  -- or uninjured, it could have said,

19   for example.  We're now talking about language.

20             THE COURT:  You think that apparently normal is

21   different than normal, because all we're talking about are the

22   observations of a police officer sitting at a desk who could

23   only make an observation of what is apparent to him.  He

24   didn't undertake an examination of him, he wasn't a doctor,

25   that's all they do, is look at them and say, ah, he looks

1   normal to me.

2          MR. HARVIS:  I agree.  It's just a matter of degree.

3   I'm just saying that, you know, to the extent that we don't

4   know what it said and therefore I don't want to stipulate to

5   what it said.  I don't think that we should have to do that

6   when we haven't seen it.  I just think that therefore it's

7   captured by the fact that, you know, we can assume whatever it

8   said it would have helped us.

9          THE COURT:  We can say -- the jury can draw the

10  inference that it would have supported the plaintiff's theory

11  that...

12         MR. HARVIS:  He arrived at the precinct uninjured.

13         MS. JACOBS:  Your Honor, I'm not sure that we can

14  stipulate to that, that we can agree to that.

15         THE COURT:  So what is it that you were

16  contemplating an agreement to?

17         MS. JACOBS:  I think we would agree that the

18  prisoner pedigree form, in the same way that the arrest report

19  and the command log stated, and is consistent with Officer

20  Smith who would have prepared all these documents, his

21  testimony, that it would have said he was apparently normal.

22  Which supports plaintiff's view that when he came in no one

23  made any note that he was injured.

24         MR. HARVIS:  Your Honor, I would also suggest -- I

25  just think it should also say that it was lost even though

14

1    there was a duty to maintain it.  I just think that should be

2    a part of it because that's really what's at issue here.  They

3    have an obligation to maintain the document; it was lost.

4                THE COURT:  No.

5                MR. HARVIS:  No?

6                THE COURT:  No, that's not for the jury.  The relief

7    is the inference is telling them about the inference.  It's

8    not -- I'm not going to ask this jury to start to weigh in on

9    the discovery obligations.  They don't have any idea about it,

10   they don't understand it, that's not within the province of

11   the jury.  Their job is only to weigh facts.

12               MR. HARVIS:  All right.  We just think that it is

13   evidence of the state of mind, the culpability of someone.

14               Let's say all the documents were missing, now all of

15   a sudden wouldn't a reasonable person come to the

16   conclusion --

17               THE COURT:  But they weren't all missing.

18               MR. HARVIS:  But some of them were --

19               THE COURT:  Yes.

20               MR. HARVIS:  -- that they had to maintain.

21               THE COURT:  Some of them, but they weren't all.

22   Certainly if everything was destroyed, everything wasn't.  We

23   have a document.

24               MR. HARVIS:  Two documents.

25               THE COURT:  A pedigree form and --

1          MR. HARVIS:  The central booking prisoner medical

2     screening form where they would record any complaints of

3     injury that Mr. Cortes had and how he would have described

4     those injuries.

5          THE COURT:  Right, but we can say that they were

6     lost and that they are allowed to draw the inference and would

7     come up with X, but not they were lost and defendants had an

8     obligation under the Federal Rules of Civil Procedure to

9     maintain those documents.  And in fact, they have an

10    obligation under 26F to make certain disclosures.  I mean,

11    come on.

12         MR. HARVIS:  We're not taking them to law school, I

13    agree.

14         THE COURT:  You're not.

15         MR. HARVIS:  Fair enough.  As Your Honor wishes.

16         THE COURT:  All right.  So the question then is, the

17    defendant's theory is that he came into the precinct uninjured

18    and you want apparently normal.  I'm trying to decide the

19    meaningful difference between the two.  You think that

20    uninjured -- the problem there is what, that he may have had

21    an injury which was normal to him?

22         MS. JACOBS:  I'm sorry?

23         THE COURT:  Are you concerned that he may have had

24    an injury but that was an injury that was normal to him.  I'm

25    just trying to understand why you don't want it to say

1   uninjured.

2          MS. JACOBS:  Well, in part because the language that

3   the officers used is when --

4          THE COURT:  Well, you know what they typically you

5   use, you don't what they used in this one because you guys

6   lost it.

7          MS. JACOBS:  That's correct.

8          THE COURT:  So we can't speculate.  So the inference

9   is the inference regarding their theory of the case not your

10  theory of the case.

11         MS. JACOBS:  I think if it were to say something

12  along the lines that there was no injury -- there was no

13  mention of an injury on that document or that plaintiff --

14  there's no mention on that document that plaintiff was

15  injured.  It's different than affirmatively, you know, saying

16  he was uninjured.

17         THE COURT:  So you want it to -- you would agree to

18  an inference that that document would have recorded -- would

19  have recorded that plaintiff was uninjured as opposed to that

20  plaintiff was uninjured, it would have indicated he was.

21         MS. JACOBS:  It would not have indicated any injury

22  to the plaintiff.

23         THE COURT:  No.

24         MR. HARVIS:  It's just negative language.  I think

25  we should get the benefit of the positive language.

1        THE COURT:  Yes, it is.  It would not have indicated

2   an injury to the plaintiff.

3        MR. GUTMANN:  I think the difference between that,

4   Your Honor, is that it's based on what the officer, who filled

5   out the pedigree form, would have or could have seen.  The

6   officer couldn't have affirmatively said that he's not -- that

7   the plaintiff has no injury.

8        THE COURT:  I agree with you, so we're moving away

9   from that, but the question is are we stating it in the

10  affirmative or in the negative.

11       MR. GUTMANN:  Well in some way you have to state it

12  in the negative because that's all the officer could have

13  stated, that he didn't see anything, that he saw no injury,

14  not that he was not injured.

15       THE COURT:  No, but which is why I proposed changing

16  it to the officer did not -- that you can draw inference that

17  the officer did not document any injury to the --

18       MR. GUTMANN:  The officer did not document, yes,

19  that's fine.

20       MR. PANEK:  Your Honor, I would prefer the language

21  that the arrestee reported that he was uninjured or there was

22  no report of injury, because the claim here is that Mr. Cortes

23  reported to the officer that he was injured but the officer

24  just never recorded it.  So they shouldn't be able to kind

25  of --

1          THE COURT:  How about we do this?  Propose specific

2     language that seems consistent at least with what I have

3     thought out loud, right, in terms of the parameters here, give

4     it to me, I'll play with it and I will settle on something.

5          So the plaintiff's motion regarding an inference

6     instruction is granted.  The parameters or the contours of

7     that instruction to be determined once I've had an opportunity

8     to review the proposed language by the parties.

9          MR. PANEK:  Understood.

10         THE COURT:  If you all could come up with your

11    proposed language and submit it by tomorrow end of day, that

12    would be appreciated.  All right.

13         So here we are.  Your motion *in limine* number two,

14    you seek to preclude statements regarding plaintiff's conduct

15    prior to the arrest which mentioned -- with any mention of the

16    arrest charges which were later dismissed.  And what I'm

17    understanding is that, I think, that you don't have an issue

18    with -- because it would be impossible for us to proceed and

19    have this make any sense with the jury being aware that he was

20    arrested and that the plaintiff isn't challenging the

21    lawfulness of that arrest, but that simply he was arrested.

22         MR. PANEK:  Correct, Your Honor, in cohort with the

23    fact that the charges against him were dismissed in his favor

24    eventually, which is all the record before the Court.

25         MS. RYAN:  Your Honor, we have no problem keeping

1   out the actual arrest charges, I think our bigger concern I

2   believe plaintiff seems to be asking that the narrative of the

3   arrest is withheld, am I correct?

4           MR. PANEK:  Any statements that rely on the hearsay

5   of the victim, so to speak, or the person who reported the

6   conduct of the plaintiff would be hearsay without an exception

7   in as much as he's not testifying --

8           THE COURT:  Also I don't know how it's relevant, but

9   go ahead.

10          MS. RYAN:  Well, your Honor, we would concede that

11  within the arrest report we can take out that narrative

12  section, but we would seek to enter the victim's statement

13  under the Sprint report under 803.2.  He calls 911 --

14          THE COURT:  What's the relevance?

15          MS. RYAN:  It's relevant to our theory of the case

16  is the victim claims -- so the plaintiff in this case is

17  alleging shoulder injury, a tear to his rotator cuff.  He's in

18  a bar, the victim says, this man is punching me, he's throwing

19  punches, he's throwing bottles and it's our contention that

20  that can cause the injury that he is attributing to Officer

21  Musa.

22          THE COURT:  When the victim -- the plaintiff punched

23  the victim he tore his rotator cuff, punching -- that's a

24  ferocious punch.

25          MS. RYAN:  And throwing bottles, Your Honor, yes.

1    MR. PANEK:  Your Honor, our position on that is we

2    never actually received the audio of the Sprint call so we

3    don't even know if it was accurately transcribed at the

4    outset.

5    MS. JACOBS:  Your Honor, this case was filed, the

6    audio was not maintained at that point in time.  The 911

7    audios are maintained for 365 days.  This case was filed more

8    than a year after this incident happened.  So there was -- by

9    the time this case was filed it didn't exist.

10    THE COURT:  But there's a Sprint report that sets

11    out what the victim --

12    MR. PANEK:  It's actually not -- one moment, Your

13    Honor.

14    (Pause in proceedings.)

15    MR. PANEK:  So we don't even know who it's coming

16    from, a phone number, we don't know whose phone number, we

17    don't know that it's specific to Mr. Cortes.  Again, all

18    charges against him were dropped, so for all we know this is a

19    call from someone other than the victim or complainant about

20    someone else in the bar.  So we don't know that it's

21    Mr. Cortes.  There is no -- there is nothing affirmatively

22    connecting that conduct to him without more.  That person,

23    whoever -- if someone said I saw that conduct, that would be a

24    different story, but to just introduce a statement that

25    someone in the bar is punching and throwing and this gentleman

1    was arrested and charges were dismissed, leads to prejudicial

2    inferences against the plaintiff, which are improper here.

3             MS. JACOBS:  Your Honor, this is not without

4    context.  So the Sprint report lists Mr. Cortes who called,

5    appears to be Mr. Cortes, it also records calls from another

6    individual, there is a phone number there.  That information

7    was provided to plaintiff's counsel.  They certainly could

8    have tried to figure out who that phone number was, find out

9    who that person is.  It's also connected to the information

10   the officers obtained when they got there, when they spoke to

11   people who said this is what Mr. Cortes was doing.

12            I understand that information separately may be

13   hearsay and inadmissible, as I said we're not seeking to admit

14   the narrative of the arrest report, but to pretend that we

15   have no idea of who this was --

16            THE COURT:  What are you trying to get in then?

17            MS. JACOBS:  Simply the statements in the Sprint

18   report in which someone says --

19            THE COURT:  Why are those not hearsay?  So the

20   Sprint report itself is a business record but there's hearsay

21   within it, so let's address the hearsay issue.  Why are they

22   not hearsay?

23            MS. RYAN:  The statements from the victim are-- the

24   call that purports to be from the victim saying this man is

25   punching me, it's 803.2, Your Honor, it's an excited

1    utterance.

2          THE COURT:  So he's on the phone and he's saying,

3    like as this is happening he's saying I'm being punched.

4          MS. RYAN:  I can check the exact language but I

5    believe he's saying throwing bottles, punched me, I need to

6    get him out of the bar, please send the police.  He's still

7    within the excitement of the incident.

8          THE COURT:  So what's your response to that hearsay

9    argument, specifically hearsay.

10          MR. PANEK:  Sure.  So we are now inviting a trial

11    within a trial.  There's still the burden -- you can't just

12    say this is an excited utterance without more -- without

13    producing the proponent of that statement to say this indeed

14    was an excited utterance.  You don't just get a hearsay

15    exception by attempting to characterize what you believe that

16    statement was.  You still need someone to verify that the

17    statement, yes, I made this as an excited utterance as this

18    was happening, now we've tested the mettle of the hearsay

19    statement.

20          The fact that they have a telephone number which

21    they purport to be from a certain person, we don't know if it

22    that was person on the phone and they're reporting conduct, we

23    don't know whose conduct it is.  You're also now inviting a

24    trial within a trial, because I could point to the Sprint

25    reports and say, you know, they reported that the person was

1    wearing a white shirt.  When he was arrested Mr. Cortes his

2    inventory he's wearing a blue shirt.  So we're inviting a

3    trial within a trial about things that don't matter on

4    unreliable statements where, you know, it is not enough for me

5    as an attorney to say I believe this to be an excited

6    utterance.

7          MS. RYAN:  Your Honor, if I may.  The exceptions

8    under Rule 804 require that the declarant be not available.

9    The exception under 803 does not matter if the declarant is

10   available or unavailable.  It's still -- it's fine.

11          Generally, 911 calls are admissible and the

12   plaintiff admits he was in this altercation, that the police

13   were called by the bartender for him.  We're not trying to

14   have a trial but -- within a trial, but we have a right to put

15   forward these facts to say these are activities that plaintiff

16   was doing before he came into the precinct and this is a

17   possible cause of his injury.

18          THE COURT:  Does anybody have the Sprint report

19   statements?  The fact that the declarant -- that the victim

20   isn't here to be able to testify that's what he was saying, I

21   think it's the defense point, it is often 911 transcripts come

22   in without the victim if they are authenticated through other

23   witnesses as a business record for the police department or --

24   so the notion that the alleged victim couldn't come in and

25   say, I said that, and it was an excited utterance, I think I

1    can make a determination as to whether it qualifies as an

2    excited utterance based on the utterance itself, which I don't

3    have before me.

4              MR. PANEK:  Moreover, Your Honor, that statement in

5    the Sprint report is actually inconsistent with the statement

6    given to the police by the victim.  He said that he was open

7    hand slapped by the plaintiff not that he was --

8              THE COURT:  Is that not ripe for cross-examination

9    of whoever.

10             MR. PANEK:  Yes, he was never exchanged as a witness

11   and they don't intend on calling him and they're attempting to

12   offer his statement without bringing him into Court and he was

13   never notified as a witness to us.

14             THE COURT:  But what about the officer that received

15   the statement from the victim?

16             MR. PANEK:  Again, that would be inadmissible

17   hearsay for the victim to say I was slapped.  How could I

18   cross examine the officer as to whether the hearsay of the

19   victim in a Sprint call report was inconsistent with what he

20   reported to the officer.

21             THE COURT:  I think I'm trying to follow, but

22   couldn't you ask the officer, isn't it true that when the

23   victim reported to you what happened, he reported X, Y, Z.

24             MR. PANEK:  Yes, but we're just now inviting a trial

25   about hearsay, which is frankly irrelevant.

1          THE COURT:  Well, it would be if I let it in it's

2     because it's an exception to hearsay, but go ahead.

3          MS. RYAN:  Your Honor, whether he punched or slapped

4     the victim, the point is that the plaintiff was vigorously

5     moving his arm in the direction towards --

6          THE COURT:  No, I think I understand that plaintiff,

7     there's a difference between what's necessary to punch

8     somebody and what's necessary to slap somebody.  I mean I

9     haven't done it recently, but I think it is different -- or at

10    all, I say recently.  I misspoke.

11         Does anybody have it?

12         MR. PANEK:  Sure.

13         MS. RYAN:  We don't have it, Your Honor, I'm sorry.

14         MR. PANEK:  I can affirmatively state there is no

15    indication in that report that it's referring to the

16    plaintiff.  There may have been someone else in there who was

17    punching and throwing.  All we know is that our victim claimed

18    a slap, so there is a difference.  So there is --

19         THE COURT:  All you know is your victim what?

20         MR. PANEK:  The victim, when the police came, said

21    that Mr. Cortes, I assume he identified him on site and said

22    that gentleman slapped me, which is different than someone

23    calling the police and saying there is someone here who is

24    punching me and throwing bottles at me, which is a far cry

25    from I was slapped by this person.  How do I know this was not

1    a call about someone else in the bar, that there was more

2    going on than just one slap.

3             THE COURT:  Is the police officer who arrived at the

4    scene, he is testifying?

5             MS. RYAN:  Yes, Your Honor.

6             THE COURT:  In terms of what transpired and what the

7    victim complained of, isn't the police officer capable of

8    providing that?

9             MS. RYAN:  He is, Your Honor, but I believe that

10   would only go to the effect on the listener to the extent what

11   the victim told to the officer, that is what he wrote in the

12   arrest report, which plaintiff is seeking to not introduce.

13            THE COURT:  Hold on.  The defendant was...I need

14   that Sprint report.  I need it, anybody have it?

15            MR. HARVIS:  I'm looking, Your Honor.

16            THE COURT:  The defense is saying, look, you all

17   don't have to put in this open slap hearsay statement, we're

18   fine with that.  And -- well, you all asked to preclude it,

19   but is it -- no.  I need to see it.  It's not the subject of

20   the motion *in limine*, interestingly enough, which I've already

21   ruled on.  I need to the see the Sprint report which I think

22   would have been subject to a discussion concerning exhibits

23   when we got to the JPTO, so we're going to put a pin in this

24   because I don't think we can effectively resolve it unless I

25   can see it.

1          But the point two with respect to the hearsay

2    statements in the narrative portion of the arrest report is

3    granted and unopposed by the defense.  Yes?

4          MS. JACOBS:  Yes, your Honor.  Just one issue, in

5    their initial discussion of what should be admitted

6    plaintiff's counsel said, you know, they had no problem with

7    saying plaintiff was lawfully arrested as long as there was

8    also an instruction saying that all charges against him were

9    later dismissed.  And we don't believe that that later

10   instruction should be included.

11         Simply to say something either he was arrested or

12   the arrest is not at issue here and to leave it at that

13   without giving the impression to the jury that there was some

14   sort of wrongful arrest here I think should be allowed.

15         MR. PANEK:  A favorable dismissal and a wrongful

16   arrest are two separate issues.  The officer may very well

17   have probable cause to arrest when someone said this man

18   slapped me, please arrest him and then that allegation may

19   have been totally unfounded and the jury is entitled to draw

20   whatever inference they want from the fact that there was no

21   charges against him, everything was dismissed.  He was not

22   convicted of a crime on that day and it also will go to the

23   plaintiff's state of mind as he's in the precinct that

24   evening.

25         MS. JACOBS:  But, Your Honor, this has nothing to do

1    with the excessive force claim against Officer Musa.  Whether

2    or not the charges against the plaintiff were later dismissed

3    has nothing to do with Officer Musa, who was not on the scene

4    when plaintiff was arrested in the first place.

5              THE COURT:  Right, but technically neither is the

6    fact that he was lawfully arrested, so why is it I can't say

7    the plaintiff was lawfully arrested, right, the propriety of

8    that arrest is not at issue, the charges were later dismissed.

9    Why is it that it's appropriate for me to just stop at the

10   arrest was lawful?

11             MS. JACOBS:  I think because it leads to the

12   impression by the jury that the officers, not necessarily

13   Musa, that the officers did something wrong.

14             THE COURT:  If I say they lawfully arrested him, the

15   propriety of the arrest is not at issue.  I specifically say,

16   he was lawfully arrested, that arrest is not at issue, the

17   charges were later dismissed.  Why is that not a -- why does

18   that last sentence really does not complete the contextual

19   information, which is really all that we're giving the jury,

20   that why isn't it just not completing it?

21             MS. JACOBS:  Well, our concern again is that

22   plaintiff is going to argue in some way that he should not

23   have been arrested --

24             THE COURT:  Oh, but he's not because I'm not going

25   to allow that.  You're not going to argue that, how about

1  that.

2  MR. PANEK:  I am not, Your Honor.

3  MS. JACOBS:  Then that's fine, Your Honor.

4  THE COURT:  Perfect.  We will include that the jury

5  will be instructed, and we can do it via stipulation of fact,

6  that plaintiff was lawfully arrested, that arrest is not an

7  issue in this trial, the charges, however, were later

8  dismissed.

9  MR. PANEK:  I just would ask for the language

10  favorably dismissed --

11  THE COURT:  I don't know how -- how is a dismissal

12  anything other than favorable?

13  MR. HARVIS:  It could be in the interest of justice

14  for instance, Your Honor, as opposed to a 30.30 dismissal,

15  which in the Second Circuit is, as a matter of law, favorable.

16  MS. JACOBS:  Actually, Your Honor, that's in an

17  incorrect statement of the law as it stands right now.  We

18  have decisions -- recent -- very recent decisions that --

19  MR. HARVIS:  So in the case --

20  THE COURT:  You can only talk one at a time, otherwise

21  I will get in a lot of trouble when this hearing is over.

22  MS. JACOBS:  Apologies, Your Honor.  I think just to

23  say they were later dismissed is enough in this case.

24  THE COURT:  You guys are talking about favorable

25  versus not favorable for the purposes of, say, a malicious

GEORGETTE K. BETTS, RPR, FCRR, CCR
Official Court Reporter

1  prosecution charge, which is not really what I'm talking about

2  here.  I think that introduces a legal concept that the jury

3  has no notion of.  Dismissed is fine.

4         MR. PANEK:  Sure.  I would then just ask --

5         THE COURT:  It's hot in here to me.

6         MR. PANEK:  It is.

7         THE COURT:  Is it?  Anybody else?

8         MR. HARVIS:  Yes.

9         MR. PANEK:  That in as much as the jury is being

10  instructed that the lawfulness of the arrest is not at issue,

11  that the propriety of the dismissal is not at issue either.

12  Just that it's not --

13        THE COURT:  No.  They don't know anything about what

14  you guys are talking about.

15        MR. PANEK:  Understood.

16        THE COURT:  All right.  Point three.

17        MR. HARVIS:  Before Your Honor gets into this one,

18  they're not planning on calling the complainant so I don't

19  think we're going to spend a lot of time on this.

20        THE COURT:  Okay.

21        MS. JACOBS:  Your Honor, we reached out to

22  plaintiff's counsel yesterday and said this was not an issue.

23        THE COURT:  All right.  Point three is denied as

24  moot.

25        Defendant's trial subpoena for plaintiff's unrelated

GEORGETTE K. BETTS, RPR, FCRR, CCR
Official Court Reporter

1    Worker's Compensation records should be quashed and any

2    responsive records precluded.  I'm inclined to grant this one.

3    I'll hear from the defendants.

4            MR. GUTMANN:  Your Honor, I think there's two points

5    to this one, one as to the relevance, one as to the lateness.

6            The relevance, Your Honor, this accident, as

7    plaintiff calls it, was a result of a fall at work, he slipped

8    on some sort of passive water and he fell.  He missed three to

9    six months of work.  He claims he fell upon his knees and only

10   his knees and he injured his knees only.  This was smack in

11   the middle of plaintiff's treatments for his shoulder.

12           THE COURT:  Let's talk about timing.

13           MR. GUTMANN:  Sure.  What specifically is Your Honor

14   looking for?

15           THE COURT:  Plaintiff's arguing that this is

16   belated.

17           MR. GUTMANN:  Yes, I don't have an argument on that,

18   Your Honor, it is belated.  It is late, but my only defense to

19   that is that this is not the only late thing that's been

20   exchanged in this case.  We got 40 new documents from

21   plaintiff last night.  These are things that happen in

22   litigation.  What's good for the goose is good for the gander,

23   and if we're going to let everything coming in late there is

24   no reason to specifically preclude this subpoena.

25           THE COURT:  Well, this is the only late issue in

1    terms of documents that I know that's been brought before me.

2    I don't know about the good for the goose is good for the

3    gander because I might start excluding their stuff.  We

4    haven't gotten there, right?

5              MR. GUTMANN:  Understood, Your Honor, but the

6    context because we're going to address those and --

7              THE COURT:  Well then maybe everybody is going to

8    come up short.  I haven't ruled on anything else, good for the

9    goose is good for the gander is at least a premature argument.

10             MR. GUTMANN:  That's fair, Your Honor.

11             MR. HARVIS:  May I be heard, Your Honor?

12             THE COURT:  You may.

13             MR. HARVIS:  Thank you.  So when someone -- or when

14   a litigator or an attorney for a party decides not to conduct

15   any discovery, it is at their own peril.  And one of the

16   things that may happen is that you may get to trial and

17   realize you're missing records that could conceivably effect

18   your case and there is reason why we have discovery cutoffs,

19   why people are permitted --

20             THE COURT:  I'm going to stop you there.

21             MR. HARVIS:  Yes.

22             THE COURT:  This case was filed in 2014.  There

23   was -- even, even if you all were somehow at some point in the

24   course had a lapse in your view of the case in which you need

25   four years into the case and on the eve of trial is not the

1    time for us to effectively open up discovery.  So the

2    defendant's motion is granted.

3              MR. HARVIS:  Plaintiff, Your Honor.

4              THE COURT:  Oh, yes, yes, plaintiff.

5              MR. HARVIS:  Thank you.

6              THE COURT:  Any mention of plaintiff's summons or

7    arrest over 15 years ago should be precluded.

8              MR. HARVIS:  This is another moot one.  They agreed

9    not to go into it unless we open the door.  We're not going to

10   open it and so it's a done deal.

11             THE COURT:  I like that.

12             Plaintiff's motion *in limine* number five is denied

13   as moot.  Should plaintiff open the door the Court will

14   revisit that determination.

15             Plaintiff should be permitted to examine the officer

16   witnesses through the use of leading questions.

17             Are the defendants opposing this?

18             MR. GUTMANN:  Yes, Your Honor, I think that it's a

19   little unfair in this specific scenario.  For one, one of the

20   main officers, Officer Smith, isn't an officer with the NYPD

21   anymore, hasn't been for a while.  These officers were

22   deposed, they were perfectly forthcoming.  There is no

23   specific thing that plaintiff could point to to say that they

24   are identified with the adverse party, that they are hostile.

25   There is no evidence of that.  There's no reason to believe

1    that.  So to make assumptions just because they are members of

2    the NYPD is painting them all with the same brush, it's

3    unfair.

4              MR. HARVIS:  May I, Your Honor?

5              THE COURT:  Give me just one second.

6              MR. HARVIS:  Of course.

7              THE COURT:  I have a question for plaintiff.  Why

8    isn't it the most prudent course is for you all to start your

9    examination and the moment that any officer reveals himself as

10   hostile or seemingly hostile that you then ask me then, Judge,

11   can I lead.

12             MR. HARVIS:  We don't really have any problem with

13   it except that it just seems like an unnecessary thing because

14   when you read the rule and hostile is one clause that they

15   could be, but if they are identified with an adverse party --

16   this was Musa's partner at the time of this offense and a

17   former party himself.

18             THE COURT:  Fair enough.

19             MR. HARVIS:  So it's hard to see how he's not

20   identified with the former party.

21             THE COURT:  How is he not identified as a former

22   party?

23             MR. GUTMANN:  Well, he's a former party, Your Honor,

24   he got out of this case.  Your Honor, this was a former party.

25   He was left out of this case at some point.  For all we know,

1    he may be thankful to Mr. Harvis for letting him out of the

2    case and he maybe more favorable to plaintiff.  He has not

3    been --

4            THE COURT:  That's a huge stretch.

5            MR. GUTMANN:  But I think it's a huge stretch in the

6    same way, Your Honor, to say automatically someone who hasn't

7    worked at the NYPD in a long time, who's been nothing but

8    forthcoming in this case, there were no arguments at his

9    deposition that I can see in his transcript, to just assume

10   he's going to testify in a hostile manner because --

11           THE COURT:  I agree with you and I'm not going to go

12   as far as to suggest that he would testify in a hostile

13   manner, but I think the plaintiff's argument that he's a

14   witness identified with an adverse party is a persuasive one

15   and I'm going to allow them to lead.  It's granted.

16           All right, where are we.  Defendant should be

17   precluded from offering any alternative cause for plaintiff's

18   injury.  There is no expert testimony here, right?

19           MS. RYAN:  Plaintiff is purporting to put forward an

20   expert.  We do have the right to question their expert and put

21   forward other possibilities for this injury.

22           THE COURT:  On cross-examination, but not putting

23   forth a witness to affirmatively state the plaintiff's

24   injuries were caused by X, Y, Z, that's what you're

25   suggesting.

1          MS. RYAN:  Yes, Your Honor.

2          THE COURT:  You understood that that's what -- he's

3     going to test them and say isn't it possible that this injury

4     could be caused by X, that's effective cross.

5          MR. PANEK:  Yes.  In as much as there is not going

6     to be an opening statement saying you're going to hear

7     evidence that the speculative conjecture of the attorneys,

8     you're going to hear evidence --

9          THE COURT:  Well, they can't if they're not putting

10    on a witness to affirmatively testify to the source and the

11    cause of the injuries.

12         MR. PANEK:  That's all we're seeking to preclude,

13    Judge.

14         MS. RYAN:  Your Honor, we should have the right to

15    argue that there are other possibilities here.  The jury can

16    decide what makes the most common sense.  I mean, the

17    testimony we expect to gather from this expert and just the

18    plain facts of this case and the plaintiff's job and if we go

19    into what happens at the bar, things like that, there are many

20    other possible causes for this injury and they're essentially

21    trying to preclude us from having a defense besides it didn't

22    happen.

23         THE COURT:  Well, you could have had an effort,

24    right.  You had the ability if you wanted to make an

25    affirmative case with regard to putting forward an alternative

1    theory because you don't know what you're going to get out of

2    their expert on cross, you don't know to be able to promise to

3    the jury in your opening statement versus in your closing

4    argument once you've gotten them, if you get them, I can't

5    stop you from doing it.  But in your opening statement to be

6    able to say you will hear evidence that assumes that you know

7    what that expert is going to say on cross and you can't.

8              MS. RYAN:  Yes, Your Honor, we understand that.

9              THE COURT:  I think we're all in agreement here.

10             MR. PANEK:  Yes, Your Honor.

11             MR. GUTMANN:  Just for clarity, Your Honor.

12             THE COURT:  I guess we aren't.

13             MR. GUTMANN:  I'm sorry, we may be.  If the

14   defendants were looking to put forth statements saying that

15   you will hear that this is what happened at the bar and this

16   is what happened after the bar or whenever, these are the

17   things that happened to plaintiff that night, and then on

18   summation argue that those circumstances could have caused an

19   injury as well as what plaintiff is claiming, shouldn't

20   defense be allowed to argue that?  Not have an expert

21   affirmatively state this is how plaintiff was injured, a

22   witness to affirmatively state this is what happened.

23             MR. PANEK:  Your Honor, I thought we just heard that

24   the jury is not going to hear what --

25             THE COURT:  You don't have a basis to be able to say

1    that the injuries -- unless you can get the expert to say,

2    yes, those injuries -- their expert to say in evidence, that

3    the injuries possibly could have been caused by him slapping

4    that man in the bar, but you don't have that yet.  You

5    won't -- there is no evidence that you can offer as a proffer

6    to me right now that would provide a basis for such a

7    statement in your opening beyond pure speculation and

8    conjecture.

9              MR. GUTMANN:  In the opening, Your Honor, but --

10             THE COURT:  Is that what I said?  Did I say opening?

11             MR. HARVIS:  Yes, yes.

12             MR. GUTMANN:  But in summation after hearing

13   facts --

14             THE COURT:  You can argue whatever facts come out,

15   but you're not going to be able to stand up in your opening

16   statement, promise the jury evidence that you don't have.

17             MR. GUTMANN:  Yes, Your Honor.

18             THE COURT:  All right.

19             MR. PANEK:  In as much as there is no testimony that

20   a slap could cause the shoulder injury --

21             THE COURT:  Then they can't argue it.

22             MR. PANEK:  -- they can't argue it.  They can't say

23   that there are multiple etiologies --

24             THE COURT:  They can only argue the facts -- and if

25   there is some question before you go into your close so

1   that -- I hate having to deal with objections while people are

2   closing, but if you guys are preparing your summation and you

3   have some question about how much latitude I'm going to give

4   you on that point based on the evidence as it comes in, I

5   would hope that you would raise it with the Court.

6          MS. RYAN:  Yes, Your Honor.

7          THE COURT:  All right.  Offering an alternative

8   cause of plaintiff's...the plaintiff's motion is granted

9   except to the extent that the plaintiff elicits testimony --

10         MR. HARVIS:  Defendant, right, Your Honor.

11         THE COURT:  Oh, my.  The defendant elicits testimony

12   from which they can make such arguments and presumably they

13   would be eliciting that testimony through cross-examination of

14   plaintiff's expert.  All right.

15         Testimony regarding evidence of awards and

16   commendation, that's granted.

17         MR. HARVIS:  It's another moot one anyway, we

18   already agreed on that.

19         THE COURT:  Look at that.  All right.  I

20   typically -- in my verdict sheets I typically ask a threshold

21   question in the verdict sheet as to whether they believe that

22   the conduct was, you know, whatever it is, willful or

23   whatever, and then only once they answer in the affirmative to

24   that question are they allowed to consider punitive damages.

25         MR. HARVIS:  We want to make sure that there is a

1   separation where there is a hearing on the means of the

2   defendant.

3           THE COURT:  No, I don't think that that's necessary

4   in this case.

5           MS. JACOBS:  That's fine, Your Honor.

6           THE COURT:  Good.  Plaintiff's motion number nine is

7   granted.

8           Now what's this portion of his testimony in English.

9   Is he -- my concern about switching back and forth is that it

10  creates the impression that some testimony is somehow

11  substantively different than the other testimony.  It also

12  seems like that's what you're saying in your motion will be

13  more properly presented.

14          MR. PANEK:  So just for clarity sake, where we

15  intend to ask Mr. Cortes to recount in English what he said is

16  in the exact moment where excessive force was used there was

17  verbal exchange between him and the officer which was in

18  English where the defendant did say something in English to

19  the plaintiff which he understood in English in response to

20  something the plaintiff said to him in English.

21          THE COURT:  So it's very limited.  You want to say

22  you said something to the officer, yes.  Did you say that in

23  English, yes.  What did you say?

24          MR. PANEK:  Yes.

25          THE COURT:  That's what you're asking.

1          MR. PANEK:  Please tell us in English what you said.

2          THE COURT:  Do you have a problem with that?

3          MS. JACOBS:  No, Your Honor, to the extent that's

4   what it's limited to, no.

5          THE COURT:  Perfect.  Plaintiff's motion *in limine*

6   number 10 is granted.  I'm denying 11.

7          Folks, let's take a five minute recess.

8          (Recess.)

9          THE COURT:  Okay, folks, thank you.  We get the

10  pleasure as judges to be able to swear in new citizens and so

11  I needed to step off momentarily so I could do that.  It's a

12  special day for them.

13         Defendants motion *in limine*, that's where we are.

14         MR. PANEK:  Your Honor, if I may, just before we

15  turn there, regarding the Sprint report where Your Honor said

16  she needs to actually see the report, may we also submit,

17  maybe brief it as well and submit that with our proposed

18  instruction by tomorrow, our objection.

19         THE COURT:  Three pages.

20         MR. HARVIS:  Thank you, Judge.

21         MR. PANEK:  Understood, Judge.  Thank you.

22         THE COURT:  Here we go.  Plaintiff should be

23  precluded from introducing evidence unrelated to the sole

24  claim against the remaining defendant, yes.  Certainly if it's

25  not relevant it wouldn't come in on the grounds of relevance.

1  I think that if there is specific testimony or a specific

2  witness, but how they intend to use it I'm not really clear.

3       MS. JACOBS:  Yes, Your Honor, I think that we are --

4  with regard to that we're discussing Sergeant Daly and -- I

5  apologize, Your Honor, we got a new copy of the JPTO last

6  night and we're currently reviewing it.

7       THE COURT:  Okay.

8       MS. JACOBS:  It appears Sergeant Rodeschin is no

9  longer --

10      THE COURT:  Sergeant Rodeschin.

11      MS. JACOBS:  -- it has been removed.

12      THE COURT:  Hold on.  Sergeant Rodeschin.

13      So this particular motion *in limine* is moot?

14      MS. JACOBS:  No, it's not, Your Honor.

15      THE COURT:  It's not.

16      MS. JACOBS:  It is not, Your Honor.  There was both

17  documents and witnesses on here who we believe shouldn't be

18  permitted to testify.  Specifically in terms of witnesses,

19  Sergeant Stephen Daly who was a desk officer at the time

20  had -- you know, it's unclear for what purpose he would be

21  called.

22      THE COURT:  Isn't he the person who would have

23  filled out the command log which would have indicated the

24  condition of the plaintiff at the time he arrived at the

25  station?

1        MS. JACOBS:  That's correct, but again it's not in

2   dispute that --

3        THE COURT:  It doesn't have to be in dispute for

4   them to be able to tell their story.

5        MS. JACOBS:  Understood, Your Honor.  But, again,

6   our concern here -- and again, this motion was made in part in

7   an abundance of caution to make sure we understood exactly

8   what was coming in and what was not, is that there is going to

9   be some sort of argument here that documents were improperly

10  filled out, incorrectly completed by people other than

11  Sergeant Musa, so we want to make sure --

12       THE COURT:  You want to make sure that the jury

13  doesn't hear that one of the officers changed the command log

14  to indicate that the injury occurred before the plaintiff

15  arrived at the station, that's what you're trying to keep out?

16       MS. JACOBS:  That's correct.  And in some way of

17  saying there is some sort of problem that that happened --

18       THE COURT:  There is a problem that that happened,

19  let's be clear.  There is a problem if police officers are

20  falsifying records, that's a problem.

21       MS. JACOBS:  And, Your Honor, in this case no one

22  falsified records.  I understand there is a theory that they

23  did, defendants contend no one did.

24       But what happened, just for clarity sake, in this

25  case the command log was completed, said he was apparently

1   normal.  When Sergeant Rodeschin, who is no longer being

2   called came in, what he testified at his deposition -- and

3   there's nothing to say anything other than this -- that he

4   learned from the officers that plaintiff had been injured when

5   he came in, he corrected the command log to say that.  It's

6   not a falsification, but in any case, none of these people are

7   defendants here.

8              THE COURT:  That is utter nonsense, by the way.

9   There was an officer that was stationed in the position and

10  had the responsibility of observing the plaintiff when he came

11  in.  He did his job, he made his observations.  Someone who

12  wasn't there comes back later and says, oh, I heard he was

13  okay.  You want to tell me that that there's nothing wrong

14  with that?  That's nonsense, that's nonsense.  I find the

15  notion that that log was changed to be reprehensible.  So far

16  from it's not a problem.  Now whether the fact that it was

17  changed has bearing on the issues that the jury needs to

18  decide here is another question.  But I refuse, I refuse to go

19  along with the notion that there was nothing wrong with the

20  fact that it occurred.

21             MS. JACOBS:  I --

22             THE COURT:  You see the distinction?

23             MS. JACOBS:  I do.  I, respectfully, disagree, but I

24  understand your position.

25             THE COURT:  No, you can't disagree with the fact

1    that I find it reprehensible.  That's an absolute.  I find it

2    reprehensible.

3            MS. JACOBS:  My apologies.  I understand your

4    concerns, Your Honor.  I would -- I do not necessarily share

5    them, but I understand where you're coming from.

6            But I would also say to the extent that any of that

7    happened these people are no longer defendants and --

8            THE COURT:  Right --

9            MS. JACOBS:  -- there is no evidence.

10           THE COURT:  -- but there is still the chronology of

11   what occurred and was documented and how the plaintiff's

12   condition was documented.  You don't get the ability to just

13   excise out the facts that are difficult and uncomfortable and

14   problematic.  I mean, this is how it happened.  You just told

15   me that it was a non-issue, that it was -- I was about to say

16   something I shouldn't, but anyway, that it was a non-issue,

17   perhaps it wasn't an issue, perhaps the jury won't receive it

18   as problematic, but they are simply the facts as they

19   transpired.

20           There is a document that was created, in part, the

21   purpose of that document is to log the condition of people

22   when they come in, it's a recordkeeping function that.  That

23   record was changed at some point and his condition is at issue

24   here, so why would I find that not relevant?

25           MS. JACOBS:  Again, to the extent his condition is

1    at issue, the defendants do not dispute that the documents say

2    when he came in he was apparently normal --

3              THE COURT:  Okay.  But it's inconvenient that other

4    document was somehow changed and you think it's prejudicial

5    for the jury to hear that, in fact, someone changed it to

6    later say that he wasn't.

7              MS. JACOBS:  It is prejudicial towards this

8    particular officer because there's no evidence to suggest,

9    through anything other than speculation, that he had anything

10   to do with that change.  He was not there -- he was not even

11   in the precinct when that change was made.

12             THE COURT:  So how is it that some other officer,

13   which I think the notion that he was changing it to make it

14   accurate, again, I think is just not credible but that's not

15   my job to assess credibility, but how is it germane to the

16   issues.

17             MR. PANEK:  So the defense of this case, Your Honor,

18   is in part going to be that at the scene of the arrest the

19   arresting officer alleges that although he recorded this

20   nowhere at any time that Mr. Cortes said I have a shoulder

21   injury that's predating our contact right now, that that was

22   reported to him, it didn't make into his memo book, it didn't

23   make it into the command log, it didn't make it into the

24   prisoner pedigree form, and then defense wants to profit --

25             THE COURT:  I'm sorry, an officer other than Musa?

1      MR. PANEK:  Yes.  But the defense now wants to

2  profit from that position and say, look, everything was done

3  correctly.  He came in with this injury preexisting, but you

4  can't test the mettle of the notion that he reported this to

5  the officer but the officer didn't record it anywhere until

6  after EMS came and took him away when Mr. Cortes reported that

7  he was assaulted on his way to the bathroom by Officer Musa.

8      THE COURT:  Wait a minute, because I'm a little

9  confused.  The ability to test the officer's statements about

10  whether Cortes did or did not report the injury to him is

11  separate from me trying to deal with whether a separate

12  officer changed the command log.

13      MR. PANEK:  Well, it's the documentation of his

14  condition and it's the position of the defense is that it

15  changed because it was told to Smith sometime earlier in the

16  night but he just never thought to record it anywhere and then

17  after Mr. Cortes said I was assaulted being brought to the

18  bathroom by Officer Musa, that suddenly all of these changes

19  took place.

20      THE COURT:  Right, but at the end of the day what

21  we're trying to test here is whether the plaintiff in this

22  case was subjected to excessive force and whether that

23  excessive force resulted in the injuries that the plaintiff

24  complains of.

25      If the evidence is coming in that the command log

1    originally indicated that there was no injuries to him or he

2    was normal and then we also have the other inference with

3    regard to the other pedigree form that he was normal, I'm

4    trying to understand specifically how the fact that another

5    officer later made a change in the command log to say that he

6    wasn't normal when he came in, which to me certainly may go to

7    whether people are trying to escape the culpability for the

8    act, but I'm trying to understand how it's necessary for that

9    to come in for the plaintiffs to prosecute their case --

10            MR. HARVIS:  Sure.

11            THE COURT:  -- without it being extremely

12    prejudicial to the sole remaining defendant.

13            MR. HARVIS:  Right.  So as Your Honor said, so there

14    is a recordkeeping function.  The question here -- the

15    question is excessive force and one of the best ways to figure

16    out if there was excessive force is to figure out was he

17    injured when he got there or was the injury happen while he

18    was there.  So what evidence do we have to decide that.  And

19    the main -- there are a few documents, one of which was lost,

20    but the one we do have, one of the ones we have is a command

21    log.  That was a document, and everyone will testify including

22    Musa and anyone who is asked, that that's -- you record how

23    the person presented and what they say.  So in order for the

24    jury to decide whether he was injured when he got there, they

25    would need to the see the record that shows --

1          THE COURT:  But there is two versions of the command

2     log, right?  One that says that he was normal and then one

3     that's changed.

4          MR. HARVIS:  No, Your Honor, no, there is a little

5     confusion there.

6          THE COURT:  Oh.

7          MR. HARVIS:  There is one command log entry, okay,

8     that's the one document that we have and it reflects a

9     scratch-out of the physical condition section.  So there is no

10    second document that was created.

11         THE COURT:  So it's not the case -- I for some

12    reason, I thought I had two versions of the same document.

13         MR. HARVIS:  That's the Medical Treatment of

14    Prisoner Form, Your Honor, that's a separate question.  They

15    created two Medical Treatment of Prisoner forms, one that says

16    it's an old injury, one that says it's a new injury.  That's

17    not what we're talking about now.  We're talking about the

18    form that's created when you walk into the precinct.

19         THE COURT:  Right.

20         MR. HARVIS:  We want to call the author of --

21         THE COURT:  So we had two different pedigree forms?

22         MR. HARVIS:  Two different Medical Treatment of

23    Prisoner forms.

24         THE COURT:  Medical Treatment of Prisoner forms.

25         MR. HARVIS:  Correct.

1          THE COURT:  And --

2          MR. HARVIS:  A change in command log.

3          THE COURT:  -- a revised command log.

4          MR. HARVIS:  Correct.

5          THE COURT:  But the revised command log, there is

6   only one existing version of that document.

7          MR. HARVIS:  Yes.

8          THE COURT:  You want me to not allow that document

9   to come in?

10          MS. JACOBS:  Your Honor, I think that it's

11   irrelevant.  I think the officers --

12          THE COURT:  Oh.

13          MS. JACOBS:  But more to the point I think it's more

14   prejudicial than probative, let me correct that.

15          THE COURT:  Yes.

16          MS. JACOBS:  It is -- to the extent it says

17   apparently normal is relevant and it's not disputed that is

18   what it says when he came in.

19          THE COURT:  Does it say that right now?

20          MR. HARVIS:  It's crossed out.  So it says it and

21   it's crossed out.

22          THE COURT:  So then the command log is absolutely

23   relevant, it comes in but it says -- it no longer says he's

24   apparently normal, don't you think the plaintiff should be

25   able to explore and elicit why it says he's not apparently

1    normal when, in fact, he was documented as apparently normal?

2              MS. JACOBS:  Except, Your Honor, to the extent any

3    of that information is prejudicial to this defendant, he had

4    nothing to do with completing that document.

5              THE COURT:  The most I'll do is to issue a curative

6    instruction which will specifically say that Officer Musa was

7    not responsible for the change and that the command log --

8              MR. HARVIS:  Well, I just want to say that the

9    technical question, he may not have made the change himself

10   but it's a little bit of a stretch to say he was not

11   responsible for it, we just don't know.

12             THE COURT:  He didn't make the change.

13             MR. HARVIS:  Yes, that seems reasonable.

14             MS. JACOBS:  Your Honor, at this point this is

15   essentially allowing them to say -- to speculate completely

16   that Officer Musa somehow convinced someone to change this

17   command log when there is no testimony in this record.

18             THE COURT:  They're not going to be able to do that,

19   I promise you that's not going to happen.  That's not going to

20   happen, Folks?

21             MR. HARVIS:  We don't plan on doing that, Your

22   Honor.

23             MS. JACOBS:  Okay.

24             THE COURT:  The command log is coming in though.

25             MR. HARVIS:  Thank you.

1          THE COURT:  All right.  But I don't know if I

2     actually dealt with the motion, again, *in limine*.

3          MS. JACOBS:  So I believe one of the questions is

4     whether -- is regarding Sergeant Daly and whether or not it

5     is -- he is the person who filled out the command log and said

6     that this was -- he was apparently normal.  So the question

7     is, is it necessary for him to come in and testify and --

8          THE COURT:  If they want to call him.  They would

9     think it's necessary it's their case to prosecute and it is

10    relevant, so it's coming in or he can testify.

11         Now, again, you all are not going to be able to put

12    before the jury speculative theories.

13         MR. HARVIS:  No.

14         THE COURT:  We're not going to allow that.

15         MR. HARVIS:  Wouldn't try, Your Honor.

16         THE COURT:  Good.

17         MS. JACOBS:  Your Honor, in addition, there is

18    some -- there are these two Medical Treatment of Prisoner

19    forms, which again none of which were completed by the

20    defendant in this action, we do think are, for the most part,

21    consistent in terms of what his injury was.  There is one

22    change that was made between them, one says it was an old

23    injury, one says it was a new injury.

24         THE COURT:  That's a pretty big thing.

25         MS. JACOBS:  I think that the officer explained what

1   that means, because none of them were completed by the

2   defendant in this case.  There's no evidence that he had

3   anything to do with completing those.

4          THE COURT:  So then I'm just trying to -- I want to

5   be clear.  Is it the position of the defense that only

6   documents in a case that are actually completed by a defendant

7   in a particular case can come in?

8          MS. JACOBS:  No, but again to the extent that the

9   idea here is that these were altered in some way because of

10  what Officer Musa did, we don't want --

11         THE COURT:  I'm not going to allow that to be

12  suggested to the jury in any way, but the fact that these are

13  the documents that record his condition, they're relevant.

14  The fact that the police decided to -- and I understand it's

15  not Officer Musa but decided to engage in these tactics, is

16  unfortunate for you as you defend this case, but it's

17  certainly not a means or bases for the Court to exclude the

18  evidence that's relevant.

19         MS. JACOBS:  To that extent, Your Honor, we would

20  just ask for a curative instruction with regard to those

21  documents.  Assuming there is no evidence that Musa completed

22  these, that there is any implication that they were changed in

23  some way, if there is no evidence that Officer Musa changed

24  them, we would ask for a curative instruction on them.

25         THE COURT:  I'm a little bit confused.  The folks

1   that are -- I thought there was going to be testimony in the

2   case from the people who did it, so it's going to be clear who

3   did it.  So why do I -- I mean they are going to testify, I'm

4   the one who wrote this, I'm the one who wrote that, none of

5   those people are Musa.  They weren't channeling him, right?

6           MS. JACOBS:  That's right.

7           THE COURT:  Okay.  To be quite honest, I'm not --

8   I'm going to just, for the purpose of clarity, I'm going to

9   say I'm denying the defense motion.  Of course we're going to

10  address certain witnesses and certain exhibits when we get to

11  the JPTO, but based on the representations from counsel as to

12  the contours of this motion as it stands it's denied.

13          All right.  Nonparties who are cumulative or

14  irrelevant.  I'm going to deal with all witnesses when we get

15  to the JPTO.  I think that I would say I think that the

16  defense has had a different viewpoint of what's relevant than

17  the Court has and you may want to take that into consideration

18  when we walk ourselves through the JPTO.

19          Okay.  This is what we're going to do.  Can I

20  have -- we're going to take -- forgive me -- a short recess in

21  this, I need a criminal matter to come forward and then we'll

22  take things up again with respect to the Cortes case.

23          (Recess.)

24          THE COURTROOM DEPUTY:  The parties on Cortes.

25          THE COURT:  A glimpse to the other side.

1          Where we were, folks.  Where were we?  Point three.

2          MS. JACOBS:  Yes, Your Honor.

3          THE COURT:  Stein.  So I have to tell you,

4    plaintiff, I am inclined to grant this motion but I'll hear

5    from you.  I read his report, there seems to be no connective

6    tissue with regard to the conclusion and the methodology, I

7    just don't see it.

8          MR. HARVIS:  So, well it's fairly straightforward,

9    Your Honor.  He's a board certified orthopedist, his specialty

10   is diagnosing injuries, including injuries of the shoulder.

11   So he's looked at Mr. Cortes physically, he's done an

12   examination of him.  He's reviewed the relevant records,

13   including the operative report of the surgeon who actually did

14   the surgery on Mr. Cortes' shoulder.  It is well within his

15   medical expertise for him to be able to conclude, based on his

16   review of the individual, the symptoms of the person, which is

17   all in his report, and the actual operative records whether

18   the injury was caused by the mechanism that he described.

19          I don't know -- you know, when a doctor reviews

20   someone and makes a decision to a reasonable degree of medical

21   certainty about causation, I don't know what -- this isn't

22   some esoteric question of skid marks on a highway and we need

23   to talk about what computer was used.  This is a doctor in his

24   specialty examining a person and opining that his evaluation

25   of the injury and the records is consistent with the causal

1    mechanism.

2         THE COURT:  I had it, is it in here, the actual

3    doctor's report?

4         MR. HARVIS:  It was an exhibit.

5         THE COURT:  No, I've looked at it, I just need to

6    look at it again.

7         MR. HARVIS:  While that's happening, if I just may,

8    Your Honor, if this does in another way come back to the

9    question of diligence and the way the case was litigated,

10   because they got this report in March of 2016, discovery

11   wasn't even over until September of 2016 and so if they wanted

12   to take his deposition --

13        THE COURT:  There was no deposition of Dr. Stein?

14        MR. HARVIS:  No deposition.

15        MS. JACOBS:  There was no deposition of this, Your

16   Honor, as we noted.  Frankly, we got this report which has

17   absolutely -- it says nothing other than I examined him, I

18   looked at the records and this is what this was caused.  There

19   is not an obligation to depose the expert.

20        THE COURT:  He's getting my copy of it, my clerk,

21   I'll give it back to you.

22        MR. HARVIS:  If I may, Your Honor.  Basically our

23   position is we don't believe there is any, under these

24   circumstances, any defect in the methodology.

25        THE COURT:  But what was the methodology?

1          MR. HARVIS:  Evaluating the individual, looking at

2     all these tests that you see about his range of motion,

3     looking at his shoulder, how high he can lift it, where the

4     injury happened.  Because the shoulder is -- you know, I mean

5     just like any part of the body it has a specific biology and

6     when an injury happens to a certain part of the shoulder that

7     can either be consistent with the way somebody described

8     themselves as being injured or inconsistent.  And the entire

9     specialty of orthopedics --

10          THE COURT:  But I guess my question is this:  He

11     looked at medical records from Elmhurst Hospital where the

12     plaintiff's complaint was shoulder pain and neck pain and

13     there are -- I think you have it, is it here.

14          MR. HARVIS:  He lists everything he looked at.

15          THE COURT:  Right.  There is also some mention in

16     there regarding distress, et cetera, there's some stuff in

17     there.  Anyway, so there is self-reported neck pain and

18     shoulder pain, there is no, if I'm correct, diagnoses --

19          MR. HARVIS:  There is surgery, Your Honor.

20          THE COURT:  There is surgery in 2015.

21          MR. HARVIS:  Correct.

22          THE COURT:  That's two years later.

23          MR. HARVIS:  Right, but there is no evidence that

24     there was any intervening cause or other shoulder injury or

25     some preexisting and that's just not in the record.  So all we

1   have is a direct injury, a focal injury and then appropriate

2   surgery.  I mean it doesn't happen the next day and there is

3   no gap in treatment of any kind.  And I just want to say --

4            THE COURT:  Well, no gap in treatment of any kind?

5            MR. HARVIS:  Right.

6            THE COURT:  Well, there's treatment on the night of,

7   then the next treatment is a year and four months later.

8            MR. HARVIS:  No, I don't think that's correct.  I'm

9   not -- I have to look at the report to see what records he

10  reviewed.

11           THE COURT:  Elmhurst Hospital's medical records --

12           MR. HARVIS:  Right.

13           THE COURT:  -- that's the night of.

14           MR. HARVIS:  Yes, the next morning.

15           THE COURT:  And which included x-rays --

16           MR. HARVIS:  Right.

17           THE COURT:  -- that said normal, but x-rays don't

18  reveal everything.

19           MR. HARVIS:  Right, and shoulder injury.

20           THE COURT:  So you say there was no interruption of

21  treatment, the next thing we have is on the 14th of 2014, so a

22  year and four months later he gets an MRI.

23           MR. PANEK:  Your Honor, there's treatment that

24  Dr. Stein didn't review, things like physical therapy that

25  wouldn't --

1          THE COURT:  Why didn't he review it?

2          MR. PANEK:  It doesn't reveal the nature of the

3     injury.  The way the injury is diagnosed is through MRI and

4     then through the operative report where the surgeon notates

5     their actual findings inside of the shoulder.  And it's our

6     position that that's a sufficient basis for him to say, hey,

7     I'm aware of what the injury to the shoulder was based on the

8     MRI and the operative report, this is consistent or

9     inconsistent with how the mechanism was reported by the

10    plaintiff of what happened to him.

11         MR. HARVIS:  Your Honor, our position is that to the

12    extent that they had any issue with any aspect of this and if

13    we had been provided with any sort of indication about that

14    before three years later, we could have cured it.  We could

15    have had -- we would have known, oh, there is a problem here.

16         THE COURT:  They don't have to do that.  They could

17    Daubert your expert without telling you we're going to do that

18    and that's what they're doing.

19         MR. HARVIS:  Sure.  But if you have a board

20    certified orthopedist, you have an operative report with an

21    MRI and you have the records of his immediate treatment, I'm

22    not aware of any reason why that orthopedist would not be able

23    to testify to the core practice of his specialty.  It just

24    strikes me as -- otherwise a doctor would never be able to

25    testify.  I don't understand what the standard would be.  He

1   has to review every physical therapy note?  I don't think that

2   that's what Daubert requires.  I think it just requires a

3   reasonable degree of medical certainty, which he's indicated

4   he has, about the causal connection and that would -- you

5   know, it would be one thing if he hadn't reviewed the records

6   or hadn't examined him, for example.

7          THE COURT:  But he doesn't have to review every

8   medical record, but it's certainly the pertinent relevant ones

9   and you're telling me that there were some that weren't

10  reviewed.

11         MR. HARVIS:  Not to be pertinent to that opinion

12  about causation because it has to do with which part of his

13  shoulder received the focal injury, whether or not the

14  surgical intervention was consistent with that part of his

15  shoulder being injured.  You know, a review of his actual

16  physicality of his movement of his shoulder, which is what he

17  specializes in, and again, you know, we had him review all the

18  records, we had him examine the plaintiff and we had someone

19  whose specialty is this specialty say that to a reasonable

20  degree of medical certainty there is causation.  I just think

21  it would create a difficult precedent if that weren't

22  sufficient because that just strikes me as what do we do.  And

23  if you really wanted to mount an argument that it's

24  insufficient, I think you would get your own expert, you would

25  depose our expert, you'd let us know that there was some

1    problem with the report.  You wouldn't just wait for the last

2    possible second and say, oh, he can't say causation because we

3    say so.

4              MS. JACOBS:  Your Honor, if I may?

5              THE COURT:  You may.

6              MS. JACOBS:  First of all, part of the requirement

7    of what an expert has to put forth to survive a Daubert motion

8    are not secret.  So to say we had some obligation here to let

9    him know whether or not these are proper is a little

10   confusing.

11             But I would say, look, under Daubert we're not

12   arguing about his qualifications, we're arguing that the

13   report isn't reliable.  And under the reliability standard he

14   has to essentially show his work, right?  He can't just say I

15   looked at this and I find that there is causation.  He has to

16   explain in the report, not just the facts and data, but the

17   principles and methods that he uses, and there is nothing

18   there.

19             And just for a reference point as plaintiff has

20   brought up some kind of concern about a precedent, our office

21   has recently received a decision from Judge Matsumoto

22   excluding an expert report, which I believe is actually

23   somewhat more comprehensive than this in similar

24   circumstances, and in that case they essentially say -- the

25   opinion -- Judge Matsumoto says the opinion is conclusory and

1   just like in this one, the report skipped from plaintiff's

2   recent medical history to the positive causation opinion.  So

3   for the same reasons this should be excluded, he should be

4   excluded.

5           MR. HARVIS:  Your Honor, this is not his recent

6   medical history.  These are the documents of his initial

7   treatment at Elmhurst, the surgery that followed, which is

8   completely consistent with the methodology and in terms of

9   showing his work, we have all the test results right there.

10          THE COURT:  No, that's not his work.

11          MR. HARVIS:  In examining him?  I mean, that's what

12  an orthopedist does.  He's not a records reviewer.  He's a

13  doctor who uses his clinical experience to examine someone, to

14  look at their operative report and to form a medical

15  conclusion as to whether or not what they're saying happened

16  is consistent to a reasonable degree of medical certainty with

17  what the evidence shows.  And I just -- I don't understand

18  what he would have needed to say in order to have -- to

19  satisfy the standard that the City is trying to articulate

20  here.  He looked at the operative report, he looked at MRIs,

21  he looked at the records from the hospital, he examined the

22  person, and he said, this looks like an injury, in my

23  reasonable medical opinion, that would have been caused the

24  way he describes.  And so what could he have said -- I mean,

25  he's not a -- what's the word I'm looking for -- a human

1    mechanics expert.  He does not do reconstruction of car

2    accidents where we need to figure out the velocities.

3         I mean, this is about could you have been pushed

4    into bars in a way that would have caused this injury.  And we

5    have a board certified orthopedist, who by the way went to

6    Columbia University, highly credentialed, they are not

7    questioning that and he said, yes, I will say with my medical

8    degree and my reasonable degree of medical certainty, yes, it

9    was.  And we gave them the report, we never heard anything.

10   They elected not to test it or to depose him and I don't think

11   they've a sufficient basis to come in here and say this is

12   insufficient now and we're not going to let him testify about

13   the key of the issues of the case that the plaintiff had

14   reason to believe they had evidence.  It's just --

15        THE COURT:  What's the New York Hospital Medical

16   Center of Queens medical records, what records are those?

17   Forgive me.

18        MR. HARVIS:  Excuse me, those are -- I believe those

19   are the record -- I think that they were hundreds of pages of

20   medical records that he looked at.  I have to go back in the

21   correspondence to figure out the exact Bates range.  I have to

22   look on my phone.

23        These are records of his treatment, intervening

24   treatment.  I don't want to represent what the Bates range was

25   because it's not here, but I can go back and I can easily see

1   what records he's referring to but I believe what was produced

2   in the beginning of our --

3            THE COURT:  I'm sorry, forgive me.  My on-top-of-it

4   clerk pointed out to me that in March I ordered a supplemental

5   expert report, is that --

6            MR. HARVIS:  No, no, we were going to get another

7   testifying expert to talk about after the second surgery --

8            THE COURT:  I see.

9            MR. HARVIS:  -- but then we ended up not doing that,

10  that's it.  I don't think the -- it was actually our request

11  to do that, it wasn't Your Honor requiring that.

12           THE COURT:  Okay.

13           MR. HARVIS:  But in any event, what I believe it

14  was --

15           THE COURT:  Forgive me, hand up Judge Matsumoto's

16  opinion, please.

17           MR. HARVIS:  May I hand it up to Your Honor?  What I

18  think it was --

19           MS. JACOBS:  Your Honor, I have the expert report

20  from that case as well.

21           MR. HARVIS:  I can answer this right now, Your

22  Honor.

23           THE COURT:  Okay.  What are you answering?

24           MR. HARVIS:  I'm answering what records he looked at

25  when he says New York Hospital Queens, I'm going to tell Your

1    Honor what that refers to.

2                THE COURT:  Okay.

3                MR. HARVIS:  One second, Your Honor.

4                Your Honor, yes, so -- I'm sorry.  I'm waiting for

5    my phone to load the Dropbox file that I need right here.

6    Just another moment.

7                THE COURT:  That's fine.

8                MR. HARVIS:  Exactly.  Yes.

9                THE COURT:  Ouch.

10               MR. HARVIS:  Please don't blame us, Your Honor.

11               THE COURT:  Who gave this to me?

12               MS. JACOBS:  I apologize.

13               MR. HARVIS:  So, Your Honor, that's actually not

14   every record, it's 131 pages of records like that.  Those are

15   the Queens Hospital records and those I think document a

16   substantial period of time of his treatment because he's a

17   hotel worker so he sees a union doctor, and so that's

18   another -- that's just one part of what Dr. Stein reviewed.

19               For the record, I think those are P40 through around

20   P131.

21               THE COURT:  I hear your arguments, I'm still where I

22   was when we started, which is my inclination to exclude

23   Dr. Stein.  I'm truly -- I am curious, have you read Judge

24   Matsumoto's -- I'm just now seeing it for the first time but

25   have you read this memorandum opinion which apparently was

1   filed by my colleague in December?

2          MR. HARVIS:  I haven't read that opinion, Your

3   Honor, but I would just say I mean it sounds like from the way

4   it was described by counsel that the initial records in that

5   case were not reviewed by the doctor.  Whereas, here the

6   initial records at Elmhurst Hospital were reviewed, the

7   relevant MRI was reviewed, the operative report was reviewed,

8   all the records I just handed Your Honor were reviewed.  I'm

9   not sure what else would have been reviewed.

10         MS. JACOBS:  Again, the concern is not what was or

11  was not reviewed, it's that there is no -- there's nothing in

12  that report to show how he reached his conclusions.

13         MR. HARVIS:  He reached them by examining the

14  plaintiff, hearing from him and reviewing the pertinent

15  records that describe the medical pathology that he has the

16  expertise to understand.

17         THE COURT:  Well, hospital -- I mean, this is the

18  report in the Matsumoto case.  There's at least some reference

19  to review of past medical records, for the record.

20         MR. HARVIS:  Okay, but certainly -- I mean, we're

21  not going to just -- this case isn't -- this report would be

22  entitled to its own analysis, not --

23         THE COURT:  You made a statement that I asked you if

24  you saw the opinion in the Matsumoto case, and --

25         MR. HARVIS:  I said I have not.

1    THE COURT:  -- you said no, but you said you believe

2  that one of the distinctions here is that in that case the

3  expert hadn't reviewed the underlying medical records and I'm

4  saying I don't think that's a distinction.

5    MR. HARVIS:  The early records.  I think that was

6  how I heard counsel describe the opinion, at least the passage

7  that I thought was just quoted it said that the initial

8  records related to the injury were not reviewed in that case,

9  which would be a distinction.

10    MR. PANEK:  Your Honor, may we review the decision

11  along with the report for a few minutes and confer back with

12  you?

13    THE COURT:  Well, how about, you guys have already

14  given me -- you're giving me a submission tomorrow --

15    MR. PANEK:  Yes.

16    THE COURT:  -- I'm going to give you a total of five

17  pages and now you can add this Stein expert.

18    MR. HARVIS:  Thank you, Your Honor.

19    THE COURT:  Right?  Why don't we do it that way and

20  certainly against the backdrop, I said my inclination is to

21  grant this motion.  I haven't seen the Matsumoto opinion but

22  I'm going to be reading it closely now so you all should too.

23  All right.  So I'll reserve a decision on that.

24    MR. HARVIS:  Thank you, Your Honor.

25    THE COURT:  Thank you.

1          I'll reserve on that.  I do look forward to your

2   submissions in that case.

3          The caption should be amended to remove the City of

4   New York.

5          MR. HARVIS:  No, opposition to that.

6          MR. PANEK:  Your Honor, in the interest of

7   respecting the Court's time as well, we did review your

8   decisions on these kind of four motions from the Jennings

9   case, we have no op to the remaining motions.

10         THE COURT:  Good, because they were all going to be

11  granted.  Look at that.  I appreciate you all paying

12  attention.

13         MR. PANEK:  Cite to Your Honor's previous rulings.

14         THE COURT:  Okay.  So the motions *in limine* have

15  been resolved.

16         You all have the JPTOs.  You guys are going to file

17  it, it's supposed to be tomorrow.  Should I anticipate that

18  we're going to have, in light -- you guys have a sense of kind

19  of what I think about things, are we going to have a lot that

20  we're going to need to discuss by way of objections for

21  evidence and witnesses, which usually takes up most of the

22  time.

23         MR. PANEK:  Based on the City's motions concerning

24  relevance, I don't know how much further they intend to go

25  with that argument given Your Honor's rulings and endings

1    today, in as much as that's not the case, I anticipate not,

2    but if it is the case then I anticipate there being a lot to

3    hash out.

4              THE COURT:  I think it's really going to be the ball

5    is going to be in the defendant's court, I'll say defendant as

6    opposed to the City, we'll get in the practice of that now.

7    You all didn't think certain witnesses were relevant so you

8    know that I clearly think that they are, so do you believe

9    that in light of against that backdrop that we're going to

10   have much to discuss by way of the JPTO?

11             MS. RYAN:  Can we have a moment, Your Honor?

12             THE COURT:  Sure.

13             MR. GUTMANN:  Your Honor, there are three issues

14   remaining and they're all fairly brief.

15             THE COURT:  Preview them for me.

16             MR. GUTMANN:  The first is that plaintiff intends to

17   call two separate EMTs who were there on the night of the

18   incident.  We think it's cumulative.  Pretty basic argument.

19   I don't know if --

20             THE COURT:  Isn't there some inconsistencies on

21   what's reported of the one -- am I misremembering that?  The

22   one says it's apparently normal, something else says -- is

23   this another case?

24             THE LAW CLERK:  The medical treatment form.

25             THE COURT:  Okay.

1          MS. JACOBS:  That is this case, Your Honor, but this

2   was a different form.  That was not completed by the EMTs,

3   that was completed by the police officers.  The EMTs completed

4   other forms.  They didn't -- the EMTs had their own forms that

5   were completed.  They came to the precinct about I think 7:30

6   or 8 that morning.

7          THE COURT:  I thought there was some discrepancy

8   between --

9          THE LAW CLERK:  It was only the police records.

10          THE COURT:  It was only the police records.

11          MS. JACOBS:  Yes, correct.

12          MR. PANEK:  Yes.

13          THE COURT:  In any event, just in terms of the

14   interest of time.

15          MR. PANEK:  Yes, so that was just protectively.  I

16   haven't heard from the EMTs as to their availability.  They're

17   both --

18          THE COURT:  An EMT is going to testify.

19          MR. PANEK:  One will testify --

20          THE COURT:  Good.

21          MR. PANEK:  -- but I noticed both.

22          MR. GUTMANN:  Can I ask, Your Honor -- if this is

23   inappropriate that's fine, but are there any other witnesses

24   that are just for protective that aren't going to be called?

25          MR. PANEK:  No, it's just the two EMTs, and I

1    believe a spare too is the scribner of the report, that's the

2    EMT that I would prefer to call.

3              MR. GUTMANN:  I think that resolves that issue, Your

4    Honor.

5              The other two concern documentation.  The first,

6    there is a number of documents I referenced earlier that have

7    been produced to us in the last week, some photographs and

8    photographs of the plaintiff's post-surgery, his shoulder, a

9    photograph of the plaintiff at his community college

10   graduation.  We would have other objections to that, but first

11   and foremost as Your Honor is familiar --

12             THE COURT:  His community college graduation?

13             MR. PANEK:  I'm not bringing it in, judge.

14             MR. GUTMANN:  Essentially we ask for any documents

15   that have been produced in the last week.

16             THE COURT:  To exclude?

17             MR. GUTMANN:  Yes.

18             THE COURT:  I mean, you know, now the good for the

19   goose is good for the gander argument is going to be

20   appropriate.

21             MR. PANEK:  Certain documents -- and, Your Honor, we

22   don't have any excuse, they were exchanged this week because

23   we just got them or just found out about them.

24             Yes.  What counsel is referring to are just

25   intraoperative photographs from his surgery meaning

1   photographs taken inside of his shoulder during the surgery.

2   It was recently discovered that they even exist and as soon as

3   we got them, we got them yesterday we exchanged them the same

4   day.

5              THE COURT:  How is it four years later you guys are

6   just now discovering that they exist?  I mean the same thing

7   that I said to them, and -- by the way, you argued it, right?

8              MR. PANEK:  Yes.

9              THE COURT:  So why does it not apply to the

10  defendants -- in this case to you?

11             MR. PANEK:  So, by way of how we just discovered it

12  exists, I came into this case late in the game, Your Honor,

13  and I do have some prior expertise from other cases about

14  these types of surgeries.  I was inclined to believe that

15  these photographs probably did exist, but the facilities just

16  didn't give them to us, so we went on a hunt for them and

17  found that they did in fact exist.  That's the only -- that's

18  the candid rationale behind it.

19             THE COURT:  I appreciate your candor, it's just not

20  a basis for me to be able to allow them.

21             MR. PANEK:  I understand, Your Honor.

22             Your Honor, with respect to Dr. Stein, in as much as

23  the Court has indicated its inclination given the motions *in*

24  *limine* and his report, plaintiff would respectfully request a

25  brief continuance to supplement that report and if the City

1   wishes, we produce him for a deposition.  This is germane and

2   goes to the heart of plaintiff's case, the causation of his

3   injuries.

4          The first time we learned about this was in motions

5   *in limine*.  We obviously would have sought to cure this if we

6   had time to do so previously had the City noticed, hey, this

7   is insufficient for us, when are we going to depose him.  It

8   would have been cured at a deposition if the City elected to

9   take one.

10          So we would request a brief continuance, if that's

11   the Court's inclination, to supplement the report and offer a

12   deposition of Dr. Stein to the City and I'll do that on an

13   expedient basis.

14          THE COURT:  Just as a process point for the Court in

15   terms of the effective administration of the Court proceeding,

16   what a horrible precedent that would set for me.  You could

17   get that, right, because we exclude -- in this courthouse

18   experts are excluded all the time --

19          MR. PANEK:  I understand, Your Honor.

20          THE COURT:  -- on the eve of trial because lawyers,

21   we count on their experience and to be able to prepare them

22   and sometimes they come in and sometimes they don't, but the

23   trial still goes on.

24          I understand it wouldn't be ideal for the

25   prosecution of your case, but -- and also, by the way, it

GEORGETTE K. BETTS, RPR, FCRR, CCR
Official Court Reporter

1    would also mean this case would not be tried probably until

2    2020, that's what my trial calendar looks like.  I don't know

3    if I'm willing to have this case sit around for another year,

4    it's been here since 2014.

5           This is the thing, if I ultimately determine that

6    it's not coming in as an expert report, I just don't think

7    that -- I don't know, I just don't feel that conclusion would

8    be all that shocking.  I know you believe it would be all that

9    shocking, I just don't.  It's thin, it's light on methodology

10   as far as I'm concerned.

11          MR. HARVIS:  It's just giving the notice, Your

12   Honor, that's really the issue.

13          THE COURT:  But there is no notice requirement for a

14   Daubert motion.

15          MR. HARVIS:  It's not that it's required, it's just

16   that the Court is permitted certainly to consider the equity

17   of the circumstances.  And when you're in repose and you've

18   given someone something in March of 2016 and the first time

19   you learn that they're going to take an issue with it is --

20          THE COURT:  It's a great strategy.  You know what?

21   They gave us -- I'm just saying, this is not my view of the

22   world, wow, look, what an awful expert report.  This is -- no

23   way this is coming in.  Okay, good, we're good.  I mean, it's

24   trial strategy.

25          MR. HARVIS:  Right.  Yeah, I -- it's not that we

1    were asking the Court to consider that in the question of the

2    Daubert question, we were asking the question of what

3    Mr. Panek is referring to.

4              THE COURT:  It's not a question of equity when there

5    is no obligation that they telegraph for you that they intend

6    to make a Daubert motion.  It seems to me that when you're

7    preparing an expert report you say to yourself -- just like

8    when you prepare your exhibit list, you say, hmm, I'm going to

9    anticipate that this might be an objection to this document

10   and you prepare a response to those objections, you keep those

11   objections in your mind as you're preparing your exhibit list.

12   If I were preparing an expert report I would anticipate what

13   might be the potential challenges to this, so that I'm

14   anticipating them.  That's just what you're supposed to do.

15   When you're preparing the report you're supposed to try and

16   make it Daubert-proof.

17             MR. HARVIS:  Right.

18             THE COURT:  So I'm not inclined to grant that.  I

19   think it was the right request to make, I just don't know if I

20   can grant it.

21             MR. PANEK:  We're just making the request, Your

22   Honor, because we do believe that it's germane to plaintiff's

23   case and it's important testimony for the jury to hear in

24   order to make --

25             THE COURT:  I know --

1           MR. PANEK:  -- the correct decision.

2           THE COURT:  -- but if it's so important, more time

3    should have been done on making sure that it was unassailable.

4           MR. PANEK:  Understood, Your Honor.

5           THE COURT:  I'm going to look at it though, you guys

6    are going to brief it.

7           MR. PANEK:  Your Honor, for the record we would

8    consent to take the next availability on your trial calendar,

9    be it now or sometime in 2020.  In terms of the timing

10   obviously that's at the Court's discretion, but we're fully

11   apprised of the schedule going forward and we're willing to

12   supplement the report --

13          THE COURT:  I get it.

14          MR. PANEK:  -- and produce him for the deposition.

15          THE COURT:  I think this is the case where I held

16   the defense's feet to the fire about the trial date.  I think

17   one of them had a vacation planned and I said too bad, so sad.

18   Right?

19          MS. JACOBS:  Yes.

20          MR. PANEK:  But this --

21          THE COURT:  Who had it?

22          MS. JACOBS:  That was me.

23          THE COURT:  I said, too bad, so sad.

24          MS. JACOBS:  Yes.

25          THE COURT:  Bad assumption by you, that's what I

1   said, right?

2           MR. PANEK:  Well, we're certainly sensitive to the

3   personal schedules of attorneys, my concern is my client,

4   Mr. Cortes, who has one and only one opportunity to have his

5   case heard fully on the merits.  That's why I'm making that

6   application.

7           THE COURT:  I appreciate the request.  Again, if I

8   were in your shoes I would make the same request.  I just

9   don't think that what you've given me is grounds to grant it.

10          MR. PANEK:  May we include that in our briefing on

11  the matter that we submit to you?

12          THE COURT:  You want another page?

13          MR. PANEK:  If Your Honor says don't spin your

14  wheels, I won't spin them.

15          THE COURT:  I mean, you know, I'm not going to stop

16  you from making the argument, but...

17          MR. PANEK:  I don't know that my argument is on

18  paper.

19          THE COURT:  I don't know if you're going to get the

20  outcome that you want by making it, but say what you want.

21          Is it hot in here?

22          MR. GUTMANN:  Yes.

23          MR. PANEK:  Your Honor, if we're still in advance of

24  the trial, if I could supplement the report and produce him

25  before the trial, I don't --

1          THE COURT:  You mean advance of the trial that

2     starts Monday?

3          MR. PANEK:  Yes.

4          MR. HARVIS:  Wednesday, Your Honor.

5          THE COURT:  The trial starts Wednesday?

6          MR. HARVIS:  No, I'm saying today is Wednesday.

7          If we could provide a supplement on the methodology

8     by tomorrow, we don't know if it's possible or not, they

9     didn't depose him and I understand that may have been

10    strategic, but nevertheless and then, you know, at least give

11    us that shot.

12         THE COURT:  But with that supplement -- if that

13    information were there, they may have been inclined to depose

14    him.

15         MR. PANEK:  And we'll still give them the option to

16    depose him pending his --

17         MR. HARVIS:  On Friday.

18         MR. PANEK:  Well, I don't know his surgical

19    schedule.

20         THE COURT:  Right, but -- I'm sorry, we're starting

21    to talk about prejudice, there is no question that's

22    prejudicial to the defense.

23         MR. PANEK:  Understood, which is why my first

24    proposition was a longer continuance to let this happen in due

25    course.

1    THE COURT:  I'm not likely to grant that.  I'm going

2    to consider your submissions with respect to the Daubert

3    motion and we'll take it from there.

4    MR. PANEK:  Understood, Your Honor.

5    THE COURT:  Yes.

6    MR. GUTMANN:  And the last issue, Your Honor, there

7    are three, I believe three -- two medical-related

8    illustrations or exhibits that are included in the JPTO that

9    we have not yet seen, presumably for use with the expert.  We

10   haven't seen these documents, we don't know what use they're

11   being produced.

12   THE COURT:  Are these the photos that you were

13   just --

14   MR. PANEK:  No, these would be demonstrative aids

15   that show the anatomy of the shoulder or the surgical

16   procedures that took place.

17   THE COURT:  You actually should share and talk about

18   it --

19   MR. PANEK:  Yes.

20   THE COURT:  -- and if you have an objection to the

21   demonstrative -- first of all, I don't know if there's going

22   to be a witness for the demonstrative to use it, but if there

23   is a witness for the demonstrative to be used with, come to an

24   agreement on it and if you have an objection to it I'll

25   address it.

1              MR. GUTMANN:  Thank you, Your Honor.

2              MR. PANEK:  Your Honor, with respect to the JPTO, we

3    did receive notice that has impeachment exhibits, first I

4    believe it was three of the initial complaints in this matter

5    were listed as exhibits with which to impeach the plaintiff.

6    They are unverified complaints.  We take issue with the use of

7    legal documents to impeach the plaintiff's testimony on the

8    stand.  And there was also a letter penned by Mr. Harvis

9    related to this case which was listed as an impeachment

10   document for the plaintiff.

11             THE COURT:  Well, you can't be impeached for

12   somebody else's statement.

13             MR. PANEK:  Exactly.

14             MR. GUTMANN:  Even if it's your own attorney, Your

15   Honor, making it on your behalf?

16             THE COURT:  Talk to me, what?

17             MR. GUTMANN:  To be blunt, Your Honor, there is --

18   plaintiff was provided with photographs to identify the

19   officer who used force on him in this case.  Plaintiff was

20   given those photographs with names and indicated in -- or did

21   not indicate in letters and complaints thereafter that this

22   individual was who they already had a photograph of was the

23   individual who assaulted him.  Essentially saying that that

24   person was still out there.  Then later on, there was sort of

25   changed, let's wait, no, this isn't the individual who

1    assaulted him.  We think that's appropriate impeachment.

2              THE COURT:  That's not appropriate impeachment.

3    You're going to impeach with a non-affirmative statement?

4              Did he say Officer Musa is not the person, Officer

5    Musa did not assault me?  He just didn't -- what?

6              MS. RYAN:  Your Honor, I believe in -- the

7    photographs were provided, is my understanding of the

8    timeline.  A number of officers were named and then it was put

9    forward to the Court that now we've named everyone who was at

10   plaintiff's arrest but we still haven't found the assailant,

11   and Officer Musa was part of that group of individuals

12   identified as being at the scene of the arrest but not the

13   assailant.  Then in subsequent filings the force was

14   attributed to I believe seven officers.

15             THE COURT:  What filings?  What are you saying?

16   What filings?

17             MS. RYAN:  The complaints and letters that they just

18   raised.

19             THE COURT:  The complaints pre-discovery, which

20   didn't -- you're saying the complaints pre-discovery didn't

21   identify Officer Musa as the assailant?

22             MS. RYAN:  No, the first complaint, Your Honor, was

23   just John Does and then as the parties went through discovery

24   officers started getting named.  Officer Musa was originally

25   named as being part of the arrest and being on scene and in a

1    further statement was made to the Court that, okay, now here

2    are the people who were on the scene, including Officer Musa,

3    but none of these people were the assailant.  So Officer Musa

4    was not identified as the assailant and we're trying to show

5    that there is an identification question here.

6              THE COURT:  You were shaking your head no.

7              MR. HARVIS:  I wanted to point out, so first of all,

8    whatever they're talking about in that letter, which is

9    certainly not being correctly characterized, is something,

10   Your Honor, I wrote in English, and nothing that our

11   Spanish-speaking client ever even saw or could ever reasonably

12   be attributed to him.  It doesn't say that Musa had nothing to

13   do with it, what I said to the Court was we've now gotten to

14   the point -- by the way, after motion practice we got the

15   photos, they weren't given to us, I just want to say that.

16   But so we know now who was at the scene, now we need to figure

17   who pushed him.

18              So what do we do in order to do that?  We took video

19   depositions of all of these officers, creating hours of video.

20   We had Mr. Cortes, in a very rigorous process, review all that

21   stuff and he came to a certainty that it was Officer Musa who

22   assaulted him.

23              There was a substantial amount of colloquy about

24   this issue at the plaintiff's deposition.  I'll tell you what

25   you may -- I'll just tell you what Judge Levy said about this

1    when we called him during the deposition.  He said this, he

2    said:  It is hard enough for people to identify from photo

3    array individuals, but if we don't even know if the photo was

4    contemporaneous -- because these are just photos on a green

5    background of officers, it doesn't even show how tall they are

6    or anything.  And he says, if we don't even know if the photo

7    was contemporaneous, it doesn't seem fair.

8              Then Ms. Jacob's and I speak to the Court and then

9    the Court says, you are going to have to brief this.  I have

10   to tell you I'm concerned if the photos weren't

11   contemporaneous especially if the photos wasn't the way the

12   person looked at the time.

13             THE COURT:  You're talking about the fact that

14   certain photos were put before the plaintiff at his

15   deposition.

16             MR. HARVIS:  They weren't actually, they wanted to

17   and --

18             THE COURT:  What are you guys talking about?

19             MR. HARVIS:  So in this context we're arguing about

20   my motion for a protective order to prevent the defendants

21   from basically giving him a photo array at his deposition.

22             THE COURT:  I got it.

23             MR. HARVIS:  Okay?  And one of things that Judge

24   Levy said in that context, he says, I have tell you, I'm

25   concerned if the photos weren't contemporaneous --

1          THE COURT:  Right.

2          MR. HARVIS:  -- especially if the photos wasn't the

3    way the person looked at the time.  The person could have had

4    a different haircut, could have had different facial hair,

5    there is no way to know if there is any accuracy to it.  I

6    can't imagine that it would be admissible without a proper

7    foundation.

8          THE COURT:  I'm trying to figure out how any of this

9    could allow for the impeachment of the plaintiff?

10         MS. JACOBS:  Because, Your Honor, plaintiff is now

11   saying I am sure -- we anticipate he'll say I'm sure it was

12   Sergeant Musa who did this.  Yet back in 2015 and '16 he

13   looked at photographs and the photographs -- Officer Musa can

14   testify to what that photograph was, that photograph was an

15   academy photo taken at some point in 2012, he looked at a

16   photograph and said I can't identify anyone who assaulted me.

17         I think that's fair game for impeachment.

18         THE COURT:  No, I disagree.

19         MR. PANEK:  Your Honor, there is no affirmative

20   statement by the plaintiff that -- a sworn statement that they

21   are referring to.  They're characterizing the complaint

22   drafted by Mr. Harvis and a letter drafted by Mr. Harvis to

23   impute whether or not plaintiff could make an ID.

24         THE COURT:  We're talking about complaints that were

25   amended because, presumably, of discovery.  That's the whole

GEORGETTE K. BETTS, RPR, FCRR, CCR
Official Court Reporter

1    point.

2              MR. PANEK:  Correct.

3              MS. JACOBS:  Yes, I understand that, Your Honor.

4    But the point here is that even -- plaintiff had photographs

5    of this officer that he looked at before the complaint was

6    amended --

7              THE COURT:  These are the same photographs that were

8    the subject of discussion?

9              MR. HARVIS:  Correct.

10             MS. JACOBS:  Correct.

11             MR. PANEK:  I assume so.

12             THE COURT:  So Magistrate Judge Levy denied the

13   protective order, allowed you to put the photographs before

14   him?

15             MR. PANEK:  No.

16             MS. JACOBS:  No.

17             MR. HARVIS:  No, he granted it.  He said that there

18   should be further briefing if the City wanted to present a

19   photo array and they never --

20             MR. PANEK:  To be clear --

21             THE COURT:  So when did he see these photographs

22   that the protective order was granted on.  One at time.

23             MS. JACOBS:  First of all, just as an aside we

24   almost always -- or at least at this time we always objected

25   to providing photographs of officers.  I understand Mr. Harvis

1    made some comment which was done in the motion to compel.

2    There are security concerns --

3            THE COURT:  I don't care, I just want an answer to

4    my question.  When did -- what photographs did the plaintiff

5    see if the protective order was granted?

6            MS. JACOBS:  The protective order was -- before his

7    deposition his -- through counsel, presumably, he was provided

8    with I believe it was about 40 photographs of officers who we

9    had identified as potentially being in the precinct.  What

10   his -- through a collaborative process with Mr. Harvis where

11   we went through the roll call and determined who he thought

12   could potentially be there.  We provided all of those

13   photographs, he looked at all of those photographs and after

14   that he said -- there was a letter to the Court saying we

15   still are unable to determine who are these five people.

16           THE COURT:  When were those photographs from?

17           MS. JACOBS:  The photograph of Officer Musa was his

18   academy -- it's from an academy photograph in 2012.

19           THE COURT:  No, no, we're not impeaching the

20   plaintiff because he couldn't identify him from his academy

21   photo.  You couldn't identify me from my photo when I became a

22   judge.  Do you know how different I looked?

23           MR. HARVIS:  Thank you, Your Honor.

24           THE COURT:  That was only three years.

25           MS. JACOBS:  Your Honor, this is just a one-year

1    difference.  He was in the academy in 2012.

2              THE COURT:  No.  No.

3              Anything else?

4              MR. PANEK:  In the JPTO we listed Dr. David Capiola

5    who is the plaintiff's current treating surgeon with respect

6    to his shoulder as a witness who is going to testify at trial.

7    We take issue with the fact that they object to his ability to

8    comment on causation because he's a treating physician.  This

9    is not Dr. Stein, not an expert but a treating doctor,

10   Dr. Capiola, would be entitled to opine as to causation.

11             THE COURT:  What?

12             MR. PANEK:  So --

13             THE COURT:  I know this is in the JPTO.  We have the

14   treating physician, he's testifying, he's providing his

15   opinion not as an expert but as the treating physician.

16   You're going to object to that, I know we don't have it, you

17   intend to object to the treating physician providing his

18   opinion.

19             MS. RYAN:  About causation, Your Honor.  He's not an

20   expert, so he can testify about the treatment he gave to

21   plaintiff but to go further and opine as to the causation

22   would broach into expert territory.  He was not provided as an

23   expert.

24             THE COURT:  You know, I'm going to look at this a

25   little differently.  I don't think -- you're probably going to

1    come in second on this one.  I'll look at it.  I have all the

2    stuff in front of me so I'll look at it.

3                 Add another page, add it in there.

4                 MR. PANEK:  Sure, Your Honor.

5                 THE COURT:  And look at you, you have a treating

6    physician.  Add it.  How many pages are we at now?

7                 MR. HARVIS:  Five, Your Honor.

8                 THE COURT:  Five.

9                 MS. RYAN:  For clarity sake, we can address all of

10   these issues as well in filing?

11                THE COURT:  Absolutely.

12                MS. RYAN:  Thank you, Your Honor.

13                THE COURT:  I'd appreciate it, it will help me.

14                MS. RYAN:  Thank you.

15                MR. HARVIS:  Your Honor, our filing is due tomorrow.

16   I know you said the end of the day, I'm a litigator so I don't

17   know if that's the close of business --

18                THE COURT:  You guys get it on the ECF filing by

19   midnight.  I want everybody's stuff.  Just tell me, right.

20   This doesn't need to be responsive, you all know what the

21   issues are, shoot your shot.

22                MR. HARVIS:  Right, will do.

23                THE COURT:  Yes?

24                MR. HARVIS:  I was just standing.

25                MR. PANEK:  I was just saying thank you, Your Honor.

1    I wanted to wish my condolences to you and your family.

2                THE COURT:  Thank you.  I appreciate that.

3                MR. PANEK:  Have safe travels.

4                THE COURT:  Thank you.

5                All right.  This has been productive, delayed a bit,

6    but productive nonetheless.  I think I next see you all on

7    Monday morning.  Let's convene at 9 o'clock.

8                MR. PANEK:  I do have one issue with respect to

9    plaintiff's proposed voir dire questions.  One question was

10   omitted which was, in my view, extremely important and that's

11   that plaintiff will be testifying through the use of a Spanish

12   interpreter and just whether or not a juror has any issue with

13   that or would find that testimony to be less credible based

14   solely on that fact alone.

15               THE COURT:  I'm assuming you don't have a problem

16   with that?

17               MR. PANEK:  Thank you, Judge.

18               THE COURT:  Okay.  Just so you know the way voir

19   dire will work.  I will voir dire the jury myself.  I have

20   considered your voir dire questions.  Once I am done asking my

21   questions I will have us all convene at the sidebar, ask you

22   if there are any additional questions I should ask, I'll

23   consider your question, but I'm not going to guaranty that I

24   will ask it.  It's my hopes that whatever I do the parties

25   deem sufficient.  But you should certainly bring to my

1    attention any you believe I have left out.

2            I will give you the proposed jury charge.  I'll

3    probably post it -- well, I'm leaving, probably I will seek to

4    post it on ECF so that you have it.  If not, you will get it

5    by hand along with the proposed verdict sheet on Monday

6    morning.  My request is that you review it, be able to tell me

7    if you all anticipate that there's going to be lots for us to

8    discuss and then we'll have a charging conference hopefully

9    the next morning, but I'd like to have a preview.

10           How many witnesses do we have total?

11           MR. PANEK:  If I may just do a quick count.

12           THE COURT:  Yes, that's fine.

13           MS. JACOBS:  Your Honor, I have that the plaintiff

14   has nine witnesses.  If there is only one EMT, it would be

15   eight --

16           THE COURT:  Eight.

17           MS. JACOBS:  -- and that would depend on Your

18   Honor's rulings as far as the expert witness.

19           THE COURT:  Okay.

20           MR. PANEK:  Also, Your Honor, I did inform my

21   adversaries that with respect to medical records I would

22   obviously need to call custodians if they won't consent.

23           THE COURT:  For authentication?

24           MR. PANEK:  Right.

25           THE COURT:  Please don't make us deal with

1    authorizations.

2              MS. RYAN:  Your Honor, we don't foresee an issue but

3    we haven't seen the actual versions they're planning to --

4    until we see them and verify they're certified and complete,

5    we just can't stip, but we don't foresee an issue.

6              MR. PANEK:  The only issue with that is I have my

7    office working now to go get certified copies from all the

8    providers.  Everything that we do intend to offer is already

9    exchanged and Bates stamped, so I can refer to it there, but

10   in terms of getting the certification from providers, that's

11   what I'm working on.  If they give me a hard time I will have

12   to call a custodian in as much as they won't consent, but

13   hopefully we can work that out.

14             THE COURT:  Okay.  I hope you can work it out.

15   Nobody hates authentication testimony more than I do.  Maybe

16   the jury.  They might hate it more than I do.

17             MR. PANEK:  The attorneys have to worry about the

18   custodian making it here timely.

19             And the last issue is with respect to both Dr. Stein

20   and Dr. Capiola due to their operative days and schedules they

21   both asked that Wednesday be their testimony day and I do

22   assume with the length of witnesses that we will maybe get to

23   Wednesday.

24             THE COURT:  It sounds like that's probably right.

25   My hope is to be able to pick a jury by noon, one o'clock,

1  which is my usual speed in a civil case and then we proceed to

2  opening statements, you have the witnesses that you have.

3          This is what I'm going to tell you folks about your

4  case and everybody needs to prosecute your case in the most

5  effective manner that you believe possible and in the interest

6  of your clients.  You all should be mindful that we're in the

7  middle of a government shutdown and all that the jurors have

8  heard is jurors aren't getting paid.  Now the truth of the

9  matter is, jurors don't typically get paid on the day they

10  show up.  There is a delay.  The plan is they will get paid.

11  Remember, that this is the backdrop, this is the atmosphere

12  that we are all operating under and so I wouldn't want, if I

13  were any of you, to make any juror feel like their time is

14  being wasted.  So proceed -- and I don't want them to ever

15  feel that way, I certainly don't want to them to feel that way

16  if they feel particularly burdened by coming in in the midst

17  of a government shutdown.

18          MR. PANEK:  Will the jurors be paid presumably when

19  the government reopens?

20          THE COURT:  Yes, my understanding is that they will

21  get the money just like furloughed employees.

22          MR. PANEK:  Because I would have asked a voir dire

23  question like, are you okay with potentially not getting paid.

24          THE COURT:  No, no, no.  I don't want to raise that,

25  by the way, in the voir dire.

1    My understanding is that there's a delay in payment

2  and I also think that the delay may not be a very real delay

3  because they don't get a check on their way out the door, but

4  people may have it.

5    Now, a juror may ask the question and I will make

6  sure that my answer for them is more certain than the one I

7  just gave you.

8    MR. PANEK:  Understood.

9    THE COURT:  But I do think that we should be mindful

10  of the jurors and try not to waste their time.

11    MR. PANEK:  Understood.

12    THE COURT:  And that means make responsible

13  objections.  Don't have us unnecessarily go to sidebar.  Those

14  are the things that really irritate jurors.  That's going to

15  make them think that their time is being wasted.  So this

16  means you guys need to be the best lawyers you've ever been in

17  terms of presenting this case because they will be annoyed

18  with you.

19    MR. PANEK:  Absolutely.

20    THE COURT:  Okay.

21    MR. PANEK:  Yes.  Thank you, Judge.

22    MS. JACOBS:  Since we're discussing a little bit of

23  scheduling, I believe also Sergeant Daly and Trooper Smith are

24  unavailable on Wednesday actually, so to the extent that they

25  could go either Monday or Tuesday.

1      MR. PANEK:  I would assume that my plan, even though

2  we haven't discussed it, the doctors would come in last on

3  Wednesday and that would probably be the end and then go from

4  there.

5      THE COURT:  Okay.  That works out well then.

6      Anything else administratively?

7      I typically have the trial that goes until 4 --

8  4 o'clock, Winnie?

9      THE COURTROOM DEPUTY:  Yes, Judge.

10      THE COURT:  'Til 4 o'clock.

11      I ask the jurors to arrive at the courthouse 9:15 so

12  we can commence at 9:30.  We obviously will take an hour lunch

13  break, two 15-minute breaks in the morning and one in -- two

14  15-minute breaks, one in the morning, one in the afternoon.

15      I think that that's it.

16      MR. PANEK:  Should we be here 9 o'clock Monday?

17      THE COURT:  Be here quarter to nine so that, you

18  know -- but yes, let's plan to start at 9 o'clock on Monday.

19      MR. HARVIS:  Is it the struck method, Your Honor,

20  that you'll be using?

21      THE COURT:  Yes.

22      Okay, anything else?

23      MR. HARVIS:  No.

24      MS. RYAN:  No, thank you, Your Honor.

25      THE COURT:  Thank you all.

GEORGETTE K. BETTS, RPR, FCRR, CCR
Official Court Reporter

1          (Matter concluded.)

2

3                    *     *     *     *     *

4

5     I certify that the foregoing is a correct transcript from the
      record of proceedings in the above-entitled matter.

6

7     s/ Georgette K. Betts              January 25, 2019

8     GEORGETTE K. BETTS                 DATE

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25