<pre>
 1   UNITED STATES DISTRICT COURT

 2   EASTERN DISTRICT OF NEW YORK
     ---------------------------------------x
 3   GONZALO CORTES,

 4                        Plaintiff,

 5        versus                            14 CV 3014 (LDH)

 6   CITY OF NEW YORK; SERGEANT JONCRIS
     RZONCA, Shield No. 2960; POLICE OFFICER
 7   MATTHEW SMITH, Shield No. 9407; POLICE
     OFFICER CHRISTOPHER MUSA, Shield No.
 8   9064; POLICE OFFICER DOMINIC RUGGIERO,
     Shield No. 20894; POLICE OFFICER SHAUN
 9   RYAN, Shield No. 10960; POLICE OFFICER
     JOHN CESTARO, Shield No. 9553; POLICE
10   OFFICER ANDREW SCHULZ, Shield No. 5758;
     SERGEANT STEPHEN DALY, Shield No. 944;
11   POLICER OFFICER MARIO CAPPUCCIA, Shield
     No. 19046; SERGEANT PETER ROSESCHIN,
12   Shield No. 3411; and JOHN and JANE DOE
     7 through 10, individuall and in their
13   official capacities (the names John and
     Jane Doe being fictitious, as the true
14   names are presently unknown),
                                          U.S. Courthouse
15                        Defendants.      Brooklyn, New York
     ---------------------------------------x
16                                         August 6, 2019
                                           11:00 a.m.
17

18        Transcript of Civil Cause for Pretrial Conference

19   Before:      HONORABLE LASHANN DEARCY HALL,
                               District Court Judge
20

21                       APPEARANCES

22   Attorney for Plaintiff:
     ELEFTERAKIS, ELEFTERAKIS & PANEK
23   80 Pine Street, 38th Floor
     New York, New York 10005
24   BY:  RAYMOND PANEK, ESQ.
          GABRIEL P. HARVIS, ESQ.
25        BAREE N. FETT, ESQ.
</pre>

Cortes v. City of New York

```
 1    Appearances (continuing):

 2    Attorney for Defendants:
      NEW YORK CITY LAW DEPARTMENT
 3    Office of the Corporation Counsel
      100 Church Street
 4    New York, New York 10007
      BY:  ERIN T. RYAN, ESQ.
 5         BRACHAH GOYKADOSH, ESQ.
           ELISSA B. JACOBS, ESQ.
 6
      Official Court Reporter:
 7    MICHELE NARDONE, CSR
      USDC/EDNY
 8    225 Cadman Plaza East
      Brooklyn, New York 11201
 9    Phone:  718-613-2601
      Email:  Mishrpr@aol.com
10
      Proceedings recorded by mechanical stenography.  Transcript
11    produced by computer-aided transcription.

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

MICHELE NARDONE, CSR -- Official Court Reporter

Cortes v. City of New York

1        (In open court.)

2        THE CLERK:  All rise.

3        THE CLERK:  Civil cause for pretrial conference,

4    docket number 14 CV 3014, Cortes versus the City of New York.

5        Counsel, state your appearances, starting with the

6    plaintiff.

7        MR. PANEK:  For Plaintiff Gonzalo Cortes, Raymond

8    Panek, by Elefterakis, Elefterakis & Panek, 80 Pine Street,

9    New York.  New York.  Good morning, Your Honor.

10        THE COURT:  Good morning.

11        MR. HARVIS:  Gabriel Harvis, also of Elefterakis,

12    Elefterakis & Panek, also for the plaintiff.  Good morning,

13    Your Honor.

14        THE COURT:  Good morning.

15        MS. FETT:  Good morning, Your Honor.  Baree Fett, also

16    for the plaintiff, from Elefterakis, Elefterakis & Panek.

17        THE COURT:  Good morning.

18        THE CLERK:  For the defense?

19        MS. RYAN:  Good morning, Your Honor.  Erin Ryan, on

20    behalf of Officer Musa.

21        MS. GOYKADOSH:  Brachah Goykadosh, also on behalf of

22    Defendant Officer Musa.  Good morning, Your Honor.

23        THE COURT:  Good morning.

24        MS. JACOBS:  Elissa Jacobs, also on behalf of Sergeant

25    Musa.  We are all from Corporation Counsel.  Good morning.

MICHELE NARDONE, CSR -- Official Court Reporter

Cortes v. City of New York

1    THE COURT:  All right.  You can all be seated.  Good

2  to see you all again.  It's been a while.

3    I think we have a decent amount of ground to cover

4  this morning.  So we will try and march our way through as

5  expeditiously as possible, but there are a number of issues

6  that have lingered from the last premotion or pretrial

7  conference -- excuse me -- as well as some new issues that have

8  been raised in your most recent letters.

9    So, why don't we start with the lingering issues from

10  the last pretrial conference.  Now, you all submitted to the

11  court letters on the 24th of January with respect to a couple

12  of those issues, and one was with respect to the proposed

13  language for an adverse inference.  Notwithstanding my best

14  hopes, it was not a joint submission.

15    So why don't we start with the plaintiffs.  Your --

16  wait a minute.  Okay.  I'm looking at your letter.  The

17  plaintiffs have proposed the following language:  Two documents

18  relevant to this case were lost:  The Prisoner Pedigree Form

19  and the Central Booking Medical Screening Form.  I instruct you

20  that you may conclude that the Prisoner Pedigree Form would

21  have reflected that at the time of his arrest Mr. Cortes stated

22  that he had no injuries and that no injuries were observed by

23  the arresting officer.  I further instruct you that you may

24  conclude that the Central Booking Medical Screening Form would

25  have reflected that at the time he arrived at central booking

MICHELE NARDONE, CSR -- Official Court Reporter

Cortes v. City of New York

1    Mr. Cortes reported that his shoulder was injured by an officer

2    in the precinct while he was being taken to the bathroom.

3         The defense has suggested a far more streamlined

4    approach.  With respect to the Prisoner Pedigree Form, they

5    propose:  The Prisoner Pedigree Form would reflect that no

6    injuries for Mr. Cortes were observed by the arresting officer;

7    and, with respect to the Central Booking Medical Screening

8    Form, they proposed that it states:  The Central Booking

9    Medical Screening Form would have reflected that Mr. Cortes

10   stated that he was injured.

11        Let's start with the prisoner pedigree form.  To the

12   defense, I'm assuming you have reviewed the plaintiff's

13   proposed language; and let's just limit the discussion right

14   now only to the Prisoner Pedigree Form.  Tell me your objection

15   to the language as it's proposed by plaintiff.

16        MS. RYAN:  Yes, Your Honor.  So the pedigree form is

17   filled out by the arresting officer.  It would not have a

18   portion for Mr. Cortes stating whether or not he had injuries.

19   It would be based on the officer's observation of plaintiff

20   standing at the desk.  So to read in that plaintiff stated he

21   had no injuries would not be proper for this form.

22        And that no injuries were observed by the arresting

23   officer, the language the officer would use would be normal or

24   apparently normal.  We would be open to apparently uninjured,

25   but it should be limited to the officer's point of view.

MICHELE NARDONE, CSR -- Official Court Reporter

Cortes v. City of New York

1    THE COURT:  Well, normal or not normal is not part of

2    the language you proposed, or apparently normal you don't

3    suggest.

4    MS. RYAN:  No.  That's fine, Your Honor.

5    THE COURT:  So it does sound to me -- and I will tell

6    plaintiffs I did give some pause with respect to the language

7    that you included regarding statements that Mr. Cortes may have

8    stated.  It didn't seem to me to be, as I recalled, what would

9    have been or part of what would have been included.

10    MR. PANEK:  Sure.  So, Your Honor, part of what goes

11    into these determinations, as we glean from the depositions, is

12    that the officers don't just do a visual inspection but they

13    ask about injuries, they ask about what the physical state is

14    in coming to that conclusion of no injuries.  If they are

15    injured but they don't want medical attention, there is a

16    conversation where they put injured, refused medical attention,

17    et cetera.

18    So this is not just, you know, an eyeball scan, I

19    don't see an injury.  There is more interface with the officer,

20    and at the scene there is an interface about whether or not,

21    sir, are you injured, do you require medical assistance?

22    THE COURT:  I understand, but the purpose of this

23    exercise is not to kind of provide a fulsome explanation to the

24    jury as to what goes on the form but rather to kind of replace

25    what would have been on the form.  So what I hear from you is

MICHELE NARDONE, CSR -- Official Court Reporter

Cortes v. City of New York

1    that you are saying, well, what would have informed the

2    officer's notation would have been an inquiry of Mr. Cortes or

3    whomever is under arrest, but what is documented is the finding

4    or the determination; and that's what I think the sentence is

5    saying.

6          MR. PANEK:  Additionally, we don't know if that was

7    documented on the form because it's been lost and we have never

8    seen it, and now the defense wants to benefit from the fact

9    that this has been lost.  We don't know what's on the form.

10         THE COURT:  That's the inference.  I'm trying to

11   remedy that by giving you the inference, that it would have

12   said he had no injuries, but it's the inclusion of the

13   additional language that he stated X, Y, Z that seems to go a

14   step too far.

15         MR. PANEK:  Okay.  Then I think that's fine, Your

16   Honor.

17         THE COURT:  All right.  So let's talk about the

18   central booking form.  Again, the plaintiffs propose:  I

19   further instruct you that you may conclude that Central Booking

20   Medical Screening Form would have reflected that at the time he

21   arrived at central booking Mr. Cortes reported that his

22   shoulder was injured by a police officer in the precinct while

23   he was being taken to the bathroom.

24         In this instance, it seems that the defense agrees

25   that the document would have reflected statements by

MICHELE NARDONE, CSR -- Official Court Reporter

Cortes v. City of New York

1  Mr. Cortes, and you want to limit that to simply that he would

2  have stated that he was injured as opposed to that he stated

3  that he was injured by the police officer in the precinct while

4  he was being taken in the bathroom.

5        MS. RYAN:  Yes, Your Honor.  We think that's a bit too

6  far.  Plaintiff would presumably, if he had complained, said,

7  my shoulder hurts, but anything further, to say that plaintiff

8  talked about the causation of that injury in this form.

9        MS. JACOBS:  Your Honor, I mean, beyond that, I think,

10  looking at the contemporaneous records where Mr. Cortes makes

11  complaints, they are not that specific.  He says five officers

12  took him down or, you know, a number of different things to the

13  doctors, to the EMTs.  He does not state in any of those forms

14  an officer, an officer injured me while I was going to the

15  bathroom.

16        So, I think, to allow this kind of recreation is,

17  again, when it's not reflected anywhere else in the

18  contemporaneous records.

19        THE COURT:  Give me an example of what he does say,

20  because perhaps we can use that as our basis.

21        MR. PANEK:  Your Honor, if I may, from the ambulance

22  call report, Mr. Cortes reported, and I quote, Patient states

23  that police department took him down when he went to the

24  bathroom; and, when he went to the hospital he is more

25  specific, and he says he was assaulted and thrown into bars by

MICHELE NARDONE, CSR -- Official Court Reporter

Cortes v. City of New York

1  an officer going to the bathroom.  So my understanding --

2          THE COURT:  Can I see that?

3          MR. PANEK:  Oh, sure.  May I approach, Your Honor?

4          THE COURT:  Yes.

5          MR. PANEK:  I just direct the court's attention to the

6  narrative paragraph there.

7          THE COURT:  I'm sorry.  Remind me what am I looking

8  at.

9          MR. PANEK:  That is the ambulance call report from the

10 actual precinct.

11         THE COURT:  So the ambulance arrives at the precinct.

12 He reports this to the EMTs?

13         MR. PANEK:  In the precinct in front of police

14 officers.

15         (Pause.)

16         THE COURT:  Took him down is worse than injured when

17 he went to the bathroom.  I'm just saying.

18         MS. JACOBS:  I understand what you are getting at,

19 Your Honor, but, I think, to say that he would have reported

20 exactly what they have now come to as their theory of the case.

21         THE COURT:  Isn't that what he reports here to the

22 EMT, which is their theory of the case?

23         MS. RYAN:  Your Honor --

24         MR. PANEK:  I also have, Your Honor, the Elmhurst

25 Hospital record where he states, quote, The patient complains

MICHELE NARDONE, CSR -- Official Court Reporter

Cortes v. City of New York

1   of right shoulder pain from an altercation with NYPD.

2          THE COURT:  May I have that?

3          MS. RYAN:  Your Honor, I would ask that they also

4   include the next page of that Elmhurst record, where he states

5   he was pushed against the bars, which is different than being

6   taken down.  I think that's Ms. Jacobs' point, that the story

7   has changed.

8          THE COURT:  Right, but the language they used is, I

9   think, far more innocuous than take down.  They just said

10  injured on the way to the bathroom.

11          I think what you all had objected to was the notion

12  that he would have stated how the injury came about at all, and

13  it seems that he quite consistently stated at least his version

14  of how the injury came about.  He does.

15          MS. JACOBS:  He quite consistently says it was -- he

16  was being injured by the NYPD.

17          THE COURT:  While he was going to the bathroom, at

18  least in one instance.

19          MS. JACOBS:  Yes, at least in one instance, but not in

20  all of them.  The number of people changes.  Exactly how it

21  happened changed.

22          THE COURT:  So if this language says he reported that

23  his shoulder was injured by the police in the precinct when he

24  was taken to the bathroom?

25          MR. PANEK:  That's fine, Your Honor.

MICHELE NARDONE, CSR -- Official Court Reporter

Cortes v. City of New York

1          MS. JACOBS:  Just one second, Your Honor.

2          (Pause.)

3          MS. RYAN:  That would be fine with us, Your Honor.

4          THE COURT:  He was injured by the police in the

5     precinct when he was being taken to the bathroom.  All right.

6     Good.

7          I'm going to return this to you because, if not, I

8     will lose it.

9          MR. PANEK:  Thank you, Your Honor.  Thank you.

10          THE COURT:  All right.  The SPRINT report.  I would

11     like to hear from the plaintiff first, and then I will hear

12     from the defense on the SPRINT report.

13          MR. PANEK:  First, to get it out of the way, with

14     respect to statement one, as referred to in our letter, unknown

15     condition, anonymous male caller asking for police location,

16     difficult to hear, loud music playing in the background, line

17     disconnects, the cell phone corroborates that call was made by

18     the plaintiff.  So we will concede.

19          To the extent that they claim that's a party

20     admission, we have no objection to the statement attributable

21     to Mr. Cortes, which is statement one, coming into evidence

22     respond.

23          THE COURT:  All right?  So then the other two

24     statements?

25          MR. PANEK:  Statement two, I don't see any relevance

MICHELE NARDONE, CSR -- Official Court Reporter

Cortes v. City of New York

1  on it.  We don't know who the caller is.  We don't know what

2  the substance of the call is.  This is a statement that we --

3  another male caller is hysterical, unable to understand male

4  caller, states location Roosevelt Avenue.

5         MS. RYAN:  Your Honor, referring back to our arguments

6  from the letter, we contend that this entire SPRINT report is a

7  business record.  The fact that it's noting that this caller is

8  hysterical, it goes to our argument that it's an excited

9  utterance.  It's a present-sense exception.  It falls within

10 the exception to hearsay.  The whole thing should be admitted.

11        THE COURT:  Give me a second.

12        (Pause.)

13        MR. PANEK:  Our position, Your Honor, would be that

14 there is no statement.  That observation that someone who is

15 hysterical called, there is no hearsay even admitted.

16        THE COURT:  I'm trying to figure out what -- to be

17 honest, I was trying to figure out that exact question, what is

18 the statement.  I understand that the SPRINT report itself

19 is -- well, okay.

20        The SPRINT report, the document itself, you would

21 agree, is a business record?

22        MR. PANEK:  Correct, Your Honor.

23        THE COURT:  So, there is -- if there is no statement,

24 we don't have a hearsay problem then.

25        MR. PANEK:  Well, it's still --

MICHELE NARDONE, CSR -- Official Court Reporter

Cortes v. City of New York

1        THE COURT:  If it's not a statement, it's not an

2  out-of-court statement for the matter asserted.

3        MR. PANEK:  So now it's a hearsay statement of the

4  SPRINT call scribner, who is characterizing the caller as

5  hysterical.

6        MS. RYAN:  Which would count under 803.6, Your Honor,

7  as a business record.

8        MR. PANEK:  The SPRINT call scribner, who is

9  characterizing the male caller as hysterical; and, if the

10  scribner is acknowledging they are unable to understand the

11  male caller, how are we even certain that he is -- there is

12  still a question of testing the mettle for, number one, the

13  relevance and then the veracity of the statement; and this is

14  just an outside call from anyone for any purpose that there was

15  a hysterical male caller.

16        It's not the same number that my client called from.

17  It's not the same number the bartender called from.

18        THE COURT:  And they therefore wouldn't be able to say

19  that it was your --

20        MR. PANEK:  Or anyone.

21        THE COURT:  They would say someone called.

22        MR. PANEK:  What's the relevance of someone calling

23  who can't be understood?

24        THE COURT:  Let's move to statement three.

25        MR. PANEK:  Sure.  With respect to statement three,

MICHELE NARDONE, CSR -- Official Court Reporter

Cortes v. City of New York

1   Your Honor, it's plaintiff's position that this fails under --

2   although, as we stated, the ambulance call report itself is a

3   business report this is now a hearsay statement within that

4   record, attributable presumably to this caller Peter.  This

5   would only qualify under, and it's only argued as potentially

6   an excited utterance or a present-sense impression.

7           In looking at one of the cases that defendants cited,

8   that's United States versus Steele, when you perform this

9   analysis of looking at excited utterance or present-sense

10  impression, the court still tests the mettle of the statement

11  to see if it's actually buttressed by other facts in the

12  record.  Here, in the determination, there are no facts in the

13  record that buttress this statement in any capacity.

14          In fact, the only fact that we have in the record is

15  that ultimately all charges against Mr. Cortes were dismissed.

16  He denies any of this particular conduct actually occurring,

17  and now what we are doing is --

18          THE COURT:  Can you all read this statement out loud

19  for me so I can understand what it says.

20          MR. PANEK:  Sure.  In shorthand, no weapons and

21  injuries.  Perp male wearing white shirt, dot dot, irate, dot

22  dot, throwing items around location, dot dot, hit bartender in

23  the face.  Wants male removed from location.  SMC.

24          MS. RYAN:  If I may, the MH in the first line is male

25  Hispanic.  SMC would be states male caller Peter.

MICHELE NARDONE, CSR -- Official Court Reporter

Cortes v. City of New York

1      THE COURT:  What's the last part?

2      MS. RYAN:  They are identifying that he identified

3  himself as Peter and he is a male caller.

4      THE COURT:  Thanks.  Wants ML removed.

5      MS. RYAN:  Male.  He wants the male who he identified

6  as the mail Hispanic wearing a white shirt removed from the

7  location.

8      MR. PANEK:  And, Your Honor, just so we are clear, he

9  wants a male wearing a white shirt removed from the location.

10  Mr. Cortes, when he was arrested, is noted to be wearing a blue

11  shirt.  So, again, we are inviting a trial within a trial of

12  unreliable hearsay.

13      THE COURT:  Isn't that something that is subject to

14  cross-examination?

15      MR. PANEK:  I can't cross-examine a piece of paper,

16  Your Honor.

17      THE COURT:  Because it's just a document coming in by

18  itself.  How is the document coming in?  Who is it coming in

19  with?

20      MS. RYAN:  Your Honor, we believe it would come in

21  through Officer Smith, who was the arresting officer who

22  responded to the call that was generated, these 911 calls.

23      THE COURT:  How can he get the document in?

24      MS. GOYKADOSH:  Sorry, Your Honor.  If I may, I think

25  he can testify that he received a radio run to respond to the

MICHELE NARDONE, CSR -- Official Court Reporter

Cortes v. City of New York

1  bar because of this bar fight.  So he can respond to the

2  content of the document.

3          THE COURT:  He can't respond to the content of the

4  document because he received a call.  He can talk about the

5  call he received and that he responded to that call, based on

6  whatever information that was relayed to him; but I don't see

7  how he gets this document in.  He didn't prepare the document.

8  He how does he -- how can he authenticate this document?  How

9  can he get it in?

10         MS. GOYKADOSH:  I think that, based on my experience

11 in the past with Judge Matsumoto, for instance -- we had a

12 trial in January -- she allowed the officer who responded to

13 the 911 call to be the one who the document was introduced

14 through.  So that's what we have done in the past.

15         THE COURT:  That's an interesting theory, and I

16 respect Judge Matsumoto but I don't base my rulings on hers.

17         So I would like you to refer me to the rules and tell

18 me, consistent with the Federal Rules of Evidence, how it is

19 that this officer can get this document in.

20         MS. GOYKADOSH:  I don't believe that there are any

21 authenticity issues with this document in and of itself.  It is

22 an NYPD document.  It is prepared -- I mean, to the extent the

23 court wants somebody from the NYPD.

24         THE COURT:  It's not the court that wants somebody.

25 It's the federal rules.  I'm not making this up.  These aren't

MICHELE NARDONE, CSR -- Official Court Reporter

Cortes v. City of New York

1  Judge DeArcy Hall's rules.

2          MS. GOYKADOSH:  I understand, Your Honor; but, to the

3  extent that somebody from the NYPD tapes and custodian of the

4  records would be the one who needs to authenticate the

5  document, that can certainly be arranged.  It's been arranged

6  in the past.  But I do believe that this is a document that is

7  authenticated already and doesn't need to be introduced through

8  a custodian of records.

9          THE COURT:  You have the officer who received the

10 call, that relayed this information?

11         MS. GOYKADOSH:  Yes.

12         THE COURT:  All right.  Let's just have him testify

13 to it.

14         MS. GOYKADOSH:  Thank you, Your Honor.

15         THE COURT:  You won.

16         MR. PANEK:  Thank you.  Well, my concern, on the heels

17 of that, is Officer Smith then just gets to say, I responded to

18 a call, not I responded to a call of what the hearsay statement

19 was.

20         THE COURT:  Yes, he can, because it's not being

21 offered for the truth; but it would be offered, in that

22 instance, to be able to indicate why it was that he did what he

23 did.

24         MR. PANEK:  But there is no dispute why he did what he

25 did was proper.

MICHELE NARDONE, CSR -- Official Court Reporter

Cortes v. City of New York

1        THE COURT:  It doesn't have to be in dispute for it

2  not to be hearsay.  For that purpose, it's not being offered

3  for the truth of the matter asserted, but it's to be able to

4  show the effect on the listener, which is that he then went off

5  to have Roosevelt Avenue or whatever.

6        MR. PANEK:  Right.

7        MS. GOYKADOSH:  Just to clarify, Your Honor, Officer

8  Smith can testify to the fact that he went to Roosevelt Avenue

9  because he got a call about a bar fight and that he did observe

10  the victim, as it says there.

11        THE COURT:  He is not going to say verbatim this

12  information.  He is going to rely -- he can relay what was said

13  to him that --

14        MR. PANEK:  So then he is going to say that there is

15  no indication of a bar fight.

16        THE COURT:  I don't know what he is going to say.  I

17  don't know what information was relayed to him in the 911 call.

18        MR. PANEK:  Right.

19        THE COURT:  It's about this document.

20        MR. PANEK:  Because we are not getting into these

21  underlying facts, if it's hearsay and the jury can't hear it,

22  he can't then back door in that hearsay.

23        THE COURT:  It's hearsay if it's being offered for

24  truth of the matter asserted.  It's not hearsay if it's offered

25  for the effect on the listener.

MICHELE NARDONE, CSR -- Official Court Reporter

Cortes v. City of New York

1      So if he received a 911 call -- which, by the way, I'm

2   assuming that what was relayed to him is somewhat different

3   than what was written down here.  He received some information.

4   I don't know what that testimony will be.  But he is allowed to

5   say what made him go to the location.

6      MR. PANEK:  Now, so probable cause, first, is not in

7   dispute, Your Honor; and then, beyond that, what defense is

8   trying to do here is their position on this is that the

9   shoulder injury was caused in a bar fight; that there is no

10  indication or no evidence that ever happened.

11     So what they are trying to do is have the officer

12  testify to the fact that he was responding to the bar fight.

13  So then use that as the truth of the matter asserted, with no

14  other evidence whatsoever to say Mr. Cortes' injury came from a

15  bar fight that the jury is hearing no evidence about; that

16  there is no one to testify to that it ever happened.

17     THE COURT:  What exactly did the 911 dispatcher say to

18  the officer that prompted him to go to Roosevelt Avenue?  I'm

19  assuming it's Roosevelt Avenue.

20     MS. GOYKADOSH:  Yes.  So he received a 1010, which

21  means that there has been an incident at the location.  So he

22  went to the location because of that.  When he arrived there,

23  when he arrived at the bar, he was informed that there was a

24  bar fight.

25     THE COURT:  Okay.  So let's stop.  So he received a

MICHELE NARDONE, CSR -- Official Court Reporter

Cortes v. City of New York

1   1010.  That's why he went there.  That's what will be said.

2        Now, in terms of testimony, once he arrived there,

3   that's a whole different discussion.  We haven't gotten there.

4   I don't know what that discussion would be.  But he certainly

5   is going to be permitted to testify as to what the dispatcher

6   told him, which prompted him to go, which does not sound like

7   includes information concerning a bar fight.

8        MR. PANEK:  Correct, which is why I took issue with

9   that and got a little bit worked up over it.

10       THE COURT:  So we are all on the same sheet of music?

11       MR. PANEK:  Currently, yes.

12       MS. GOYKADOSH:  Yes.

13       THE COURT:  The dispatcher doesn't talk about a bar

14  fight.  That's not going to come in, based on this ruling here.

15  I don't know what other kind of testimony they are going to try

16  to elicit and whether that has any hearsay implications or not.

17       MR. PANEK:  In our prior hearing on January 23, the

18  court already ruled that the narrative information, which is

19  the statement and the only statement as to what happened, which

20  is a bartender saying he slapped me in the face or he hit me in

21  the face with an open hand, has already been precluded.  So no

22  testimony about the conduct that took place at the bar is

23  coming into trial.

24       MS. GOYKADOSH:  The narrative has been precluded, but

25  not the facts.  So Officer Smith has his own observation of

MICHELE NARDONE, CSR -- Official Court Reporter

Cortes v. City of New York

1    what he saw when he got there, which would be indicative of a

2    bar fight.

3         For instance, he saw bottles and ice on the floor of

4    the bar.  He also saw redness on the victim's face.  These

5    things are not hearsay.  They are the officer's own

6    observations.  So he should be allowed to testify as to those

7    facts.

8         MR. PANEK:  Your Honor, first, we are using the term

9    "bar fight."  The allegation in this case was an open-handed

10   slap in the face of a bartender.  That's what Officer Smith

11   said he arrested Mr. Cortes for.

12        So I have an additional motion in limine to preclude

13   the use of the term "bar fight" in its entirety because it's

14   entirely unsupported anywhere in the record, including from

15   their own witnesses.  So that characterization is so

16   prejudicial and so belies the actual record before the court

17   that it's believable that that's what they are trying to argue.

18        Beyond that --

19        THE COURT:  The facts in this case -- is he correct

20   that the facts in that case show that the officer arrested

21   Mr. Cortes based on the belief that Mr. Cortes had slapped the

22   victim in the face?

23        MS. GOYKADOSH:  Yes, Your Honor.

24        THE COURT:  That's the sum total of -- that's not a

25   bar fight.

MICHELE NARDONE, CSR -- Official Court Reporter

Cortes v. City of New York

1    MS. GOYKADOSH:  Well, there was also ice and bottles

2    on the floor.  So, which he threw, I do believe.

3    MR. PANEK:  There is no statement of that.

4    MS. GOYKADOSH:  According to the complainant, there

5    was also an order of protection issued for the plaintiff.

6    THE COURT:  That doesn't make it a bar fight.  Bar

7    fight conjures up like biker gangs, or at least it does in my

8    mind.  I don't know.  It doesn't sound like a slap in the face.

9    So it doesn't sound to me that there is evidence that

10   supports the notion that there was a bar fight.  There was an

11   assault at the bar by the slap in the face.

12   MS. JACOBS:  I think it was not a bar fight in terms

13   of there were multiple people who were tussling with each

14   other.

15   I think it was, according to what the complaint said,

16   which is supported in part by Officer Smith's observations, you

17   know, the plaintiff threw bottles and ice and then slapped the

18   complainant.

19   THE COURT:  All right.  I think the concern here is

20   since this case is about the source and the cause of the

21   particular injury, if you suggest that there was a bar fight it

22   sounds like everybody was getting knocked and shoved around,

23   and perhaps that could be the source of the injury.  It doesn't

24   seem like there is any evidence here that that happened.

25   It sounds like the only physical interaction or

MICHELE NARDONE, CSR -- Official Court Reporter

Cortes v. City of New York

1    conduct or engagement was a slap by Mr. Cortes, allegedly, of

2    the victim and perhaps Mr. Cortes throwing bottles around.  I

3    think -- I don't want to create an impression of anything more

4    than it was because certainly a bar fight could result in a

5    rotator cuff injury, reasonably.

6           The jury may give greater pause as to whether

7    Mr. Cortes slapping someone or throwing a bottle could have

8    resulted in his injury, yes.

9           MR. PANEK:  I just want to point out for the record

10   there is no nonhearsay basis.  There is nothing in the arrest

11   narrative.  There is nothing from Officer Smith about the fact

12   anyone reported that he was throwing bottles, based on the

13   police documentation.

14          So that's, again, just trying to pull in the hearsay

15   of the SPRINT call and say that this person was now

16   additionally --

17          THE COURT:  The SPRINT call is not coming in.

18          MR. PANEK:  Right.  So beyond the SPRINT call, there

19   is no indication in the record of throwing bottles.  The fact

20   that an officer goes to a bar and sees ice and bottles on the

21   floor at 3 o'clock in the morning at a bar is welcome to

22   virtually any bar in New York City.

23          But there is no statement by anyone.  There is no

24   allegation of this conduct except for in this 911 call that

25   says it's a guy in a white shirt, when our guy is wearing a

MICHELE NARDONE, CSR -- Official Court Reporter

Cortes v. City of New York

1   blue shirt.

2          MS. GOYKADOSH:  If I just may respond to that, Your

3   Honor.  There is a statement in the record, and that statement

4   is Officer Smith's deposition testimony, where he testified

5   that there was ice and bottles on the ground.  So he can

6   certainly to that, and the jury can make whatever inference

7   they want based on that testimony.

8          To the extent that the word "bar fight" is

9   inflammatory, if we should limit it to "assault" at the bar,

10  that we can certainly instruct our clients, and we can make

11  sure that we don't say bar fight.

12         But I just want to be sure about what we can say.  Can

13  we say there was an assault the at bar?

14         MR. PANEK:  That goes to the charge, Your Honor.

15  Plaintiff would happily stipulate and suggest that the court

16  arrive at this happy medium.  It is undisputed that Mr. Cortes

17  as arrested at the scene due to the allegation that he slapped

18  a bartender the face with an open hand.  I'm fine with that.

19  That's what the record supports.  I will confront that fact.

20         But, inviting hiding behind the word assault or bar

21  fight, let's call it for what it is and let's deal with it for

22  what it was.  He was arrested because someone said that he

23  slapped them in the face.

24         MS. GOYKADOSH:  Your Honor, I think this is becoming

25  an issue of semantics.  He was arrested for assault.

MICHELE NARDONE, CSR -- Official Court Reporter

Cortes v. City of New York

1   THE COURT:  So then you don't have a problem with the
2   plaintiff's suggestion?

3   MS. GOYKADOSH:  That's right, Your Honor.

4   THE COURT:  What was it?

5   MR. PANEK:  It is undisputed that Mr. Cortes was
6   arrested at Friends Tavern due to the allegation that he
7   slapped a bartender with an open hand by the bartender.

8   THE COURT:  Okay.

9   MR. PANEK:  That solves everything, judge.

10  THE COURT:  Good.  All right.  Here we go.

11  So Dr. Stein is a nonissue at this point, correct?
12  Dr. Stein was whom?  Remind me.

13  MR. PANEK:  He is plaintiff's retained causation and
14  prognosis expert, nontreating.

15  THE COURT:  Nontreating expert.  Is he still
16  testifying?  Where did we end up?  Is he still testifying?

17  MR. PANEK:  Yes, he is still testifying.

18  THE COURT:  What transpired after I allowed you all to
19  do this expert discovery?  Someone catch me up.

20  MR. PANEK:  So there was contemplation that
21  Dr. Stein's initial report didn't show his work enough and was
22  conclusory.  So he was asked to write a more thorough, show
23  your work, do your calculations analysis.

24  THE COURT:  Yes.

25  MR. PANEK:  Then he provided a much more toothsome

MICHELE NARDONE, CSR -- Official Court Reporter

Cortes v. City of New York

1   report that indeed showed all of his work and connected all of

2   the dots.

3              THE COURT:  Okay.  All right.  So then I have resolved

4   all of the issues that were left outstanding and raised in the

5   January 24 letters.

6              MS. RYAN:  Your Honor, there was one other issue.

7              THE COURT:  There was?

8              MS. RYAN:  Yes.  Plaintiff wanted the treating

9   physicians to be able to testify as to causation, Dr. Capiola

10  and Dr. Quach.

11             MR. PANEK:  Your Honor, to make very short work of

12  this, I don't intend to offer duplicative testimony and waste

13  the jury's time.  Dr. Stein will give an opinion as to

14  causation.  Treating doctors will talk about the treatment.

15             THE COURT:  Great.

16             MS. RYAN:  That's fine, Your Honor.

17             THE COURT:  Okay.  So does that then take care of all

18  of the motions in limine that were raised prior to our

19  adjournment in January?

20             MR. PANEK:  Yes, Your Honor.

21             THE COURT:  Okay.  Good.  So now I have motions

22  in limine that were made since our adjournment by the defense.

23  Right.  I have got that right.  Let me find it in my tab.

24  Okay.

25             I don't want to address point one right now.  I would

MICHELE NARDONE, CSR -- Official Court Reporter

Cortes v. City of New York

1    rather address the exhibit -- we have got to go to the exhibits

2    on the JPTO.  Same with point two.  I have to go through this.

3    All right.  Maybe that's where we are.  But there was another

4    letter.  Maybe the best way to do this is to go through the

5    exhibits, I think.  All right.  Let me see, where is my JPTO?

6    All right.

7            I have the JPTO that was filed on June 10.  I want to

8    make sure we are all operating off of the same document.

9    Correct?

10           MR. PANEK:  Yes, Your Honor.

11           THE COURT:  All right.  Okay.  Let's talk about the

12   witnesses.  As for the plaintiff, obviously, the defense has no

13   objection to the plaintiff being called; and then we have

14   Officer Musa, to which the defendants have no objection.

15           There are then 11 additional witnesses.  The first is

16   Trooper Matthew Smith.  Now, Trooper Matthew Smith is whom in

17   relation to the events?

18           MR. PANEK:  He is the arresting officer, Your Honor.

19           THE COURT:  Musa was not the arresting officer, right?

20           MR. PANEK:  Correct.

21           THE COURT:  Musa was only at the scene.  Why is there

22   an objection?

23           MS. JACOBS:  Your Honor, at this point we retained our

24   objections that were dealt with previously in the January

25   conference.  We made our objections.  They were overruled by

MICHELE NARDONE, CSR -- Official Court Reporter

Cortes v. City of New York

1    Your Honor.

2              THE COURT:  I went through all these already?

3              MS. JACOBS:  We did.  There were only, in accordance

4    with Your Honor's rulings after the trial was adjourned, we

5    were only supposed to make changes relative to the experts.

6              THE COURT:  Yes, you were.

7              MS. JACOBS:  Those were the only changes that we made.

8              THE COURT:  Forgive me then.  Someone walk me through

9    these witnesses.  For some reason I thought we didn't go

10   through this.

11             MR. PANEK:  Sure.  So just to bring you up to speed,

12   Your Honor, at the last conference the motion in limine counsel

13   is referring to was a motion in limine to blanket preclude kind

14   of all of the paperwork by people other than Musa.  As the

15   court might remember, there is some high strangeness in that

16   paperwork, in terms of what his condition was when he entered

17   the precinct and whether or not certain paperwork was

18   manufactured afterwards.  The command log was changed.

19             THE COURT:  Yes.

20             MR. PANEK:  Things of that nature.

21             THE COURT:  I recall that.

22             MR. PANEK:  So these are witnesses who speak to the

23   uncomfortable documentary evidence of the NYPD that day.

24             THE COURT:  So where are we, because you all did me no

25   favors by keeping all the objections in, if I resolved them.

MICHELE NARDONE, CSR -- Official Court Reporter

Cortes v. City of New York

1          MS. JACOBS:  We --

2          MR. PANEK:  Trooper --

3          THE COURT:  Only one.

4          MR. PANEK:  Trooper Smith, we do intend to have

5    testify.

6          THE COURT:  I have resolved that as an objection?

7          MR. PANEK:  Right.

8          THE COURT:  All right.

9          MS. JACOBS:  Yes.

10          THE COURT:  As for Espiritu?

11          MR. PANEK:  Yes.  So I do intend to call Espiritu, the

12    EMT.  That will be maybe five to ten minutes of testimony; and

13    I will not be calling Butler, who is his companion, and the

14    City has agreed to produce him.

15          THE COURT:  Daly?

16          MR. PANEK:  Daly, we will call him.

17          MS. GOYKADOSH:  Your Honor, he needs to be properly

18    subpoenaed by FDNY.  I cannot produce him.

19          MR. PANEK:  That's news to us.

20          MS. JACOBS:  I believe we sent you an e-mail about it.

21          MR. PANEK:  We will do it, a subpoena.

22          THE COURT:  All right.  A subpoena will issue.

23          MR. PANEK:  Okay.  So I just want to be clear.

24    Trooper Smith you are producing?

25          MS. JACOBS:  Again, we will arrange for him to be

MICHELE NARDONE, CSR -- Official Court Reporter

Cortes v. City of New York

1    there.  He does need a subpoena, but you can e-mail that to us,

2    and we will make sure he appears.

3          MR. PANEK:  Sure.  That's fine.

4          THE COURT:  So you will arrange for the appearance of

5    Officer or Trooper Smith.  You will -- I'm trying to

6    understand.  Are you -- will be you arrange for the appearance

7    of Daly so long as they issue the subpoena?

8          MS. JACOBS:  Yes.

9          THE COURT:  Okay.  Good.  Sadiq.

10         MR. PANEK:  Officer Sadiq, Your Honor, we have a

11   question mark right now as to whether or not we are even going

12   to call him at this point, in preparing the trial and kind of

13   paring down the presentation.  So a determination will be made

14   of that within the next 24 hours.

15         He is an NYPD officer.  So I assume that if we provide

16   you a subpoena, you will produce him; but we will be happy to

17   let you know he if we are not going to call him.

18         THE COURT:  Okay.  Good.  Now it looks like we are

19   getting to doctors.

20         MR. PANEK:  Yes.

21         THE COURT:  I think you just spoke to -- Stein is

22   going to speak to causation?

23         MR. PANEK:  Correct, Your Honor.

24         THE COURT:  Quach?

25         MR. PANEK:  Quach, Your Honor, we may not call.  He

MICHELE NARDONE, CSR -- Official Court Reporter

Cortes v. City of New York

1  was listed on the initial JPTO in an overabundance of caution

2  as a treating physician who would speak to causation.  So

3  inasmuch as Dr. Stein speaks to the causation and surgeries in

4  his report, Dr. Quach is kind of duplicative as well.

5          THE COURT:  Good.  Let's streamline things.

6          Capiola is currently treating?

7          MR. PANEK:  He is currently treating, and he will come

8  in and talk about his current condition.

9          THE COURT:  All right.  That all makes sense.

10          MR. PANEK:  Your Honor, before we shift gears, while

11  we are on Dr. Stein, the court might remember Dr. Stein has his

12  family vacation planned for Tuesday.  Meaning he is leaving

13  either Monday night or early Tuesday morning.

14          I just wanted to get a sense of how late we can expect

15  to go Monday afternoon with the trial because I do have to take

16  Dr. Stein out of turn, given those considerations.

17          THE COURT:  We can go to 5:00 o'clock, which, because

18  you are going to -- there was some back and forth about his

19  testimony and the plaintiff needing to testify first.

20          How long is the plaintiff's testimony expected to go?

21          MR. PANEK:  I would say --

22          THE COURT:  I mean we are not talking about a lot of

23  events.

24          MR. PANEK:  Correct, but there is a Spanish

25  interpreter, which does slow things down considerably.

MICHELE NARDONE, CSR -- Official Court Reporter

Cortes v. City of New York

1        THE COURT:  It does, doesn't it?

2        MR. PANEK:  So I would think it would be impossible to

3   get the plaintiff -- assuming that jury selection takes place

4   in the morning, and then afternoon comprises opening statements

5   and then witnesses, it would be impossible to safely fit any

6   portion of the plaintiff's testimony after opening statements

7   before Dr. Stein testifies without risking going beyond

8   five o'clock.  I just don't want to run into that issue.

9        THE COURT:  What you are asking me is to put the

10   expert on as your first witness.

11        MR. PANEK:  Yes, subject to connection of the

12   plaintiff.  I mean, the connecting underlying testimony is

13   essentially the mechanism of injury and how he was hurt.  So

14   that very limited purpose is what's going to be subject to

15   connection.

16        The rest of the medical records he relied on will

17   presumably be in evidence by stipulation at that point.  So

18   it's subject to connection on very limited injury mechanism

19   information.

20        THE COURT:  Did you discuss the in evidence by

21   stipulation with the defense?

22        MR. PANEK:  Yes.  We have worked to get them all of

23   the medical record certifications so that they have no

24   authenticity objections.  So inasmuch as evidence opens, I

25   intend to move those medical records into evidence immediately.

MICHELE NARDONE, CSR -- Official Court Reporter

Cortes v. City of New York

1    MS. GOYKADOSH:  Your Honor, may I be heard?  So, there

2    are two issues.  The first is the stipulation for the medical

3    records.

4          We have informed counsel a number of times over e-mail

5    that while they have provided us with certain certifications

6    and we will not be objecting on authenticity, we are not

7    stipulating to any records being admitted into evidence unless

8    there is a foundation that's properly laid and they are either

9    admitted through an expert or through a doctor or, if it's

10   appropriate, for impeachment.  So we are not stipulating to any

11   exhibits just being entered into evidence.  We are not

12   challenging.

13         THE COURT:  You are not challenging authenticity, but

14   you are saying you need to go through the normal places to get

15   it admitted?

16         MS. GOYKADOSH:  For most.  There are a few we have a

17   few remaining authenticity issues with, but, for many, we are

18   not raising those issues.

19         With regards to the order of witnesses, we would

20   object to Dr. Stein being called before Mr. Cortes.  There are

21   a couple of reasons for this.  The first is the jury needs to

22   hear the foundational testimony and the fact testimony before

23   an expert testifies.  And the second --

24         THE COURT:  But I am permitted to allow them to go out

25   of turn, subject to connection.  Am I not?

MICHELE NARDONE, CSR -- Official Court Reporter

Cortes v. City of New York

1          MS. GOYKADOSH:  Correct, Your Honor.  I think under

2    Rule 611 the court has the discretion.

3          THE COURT:  So in this case what real prejudice is

4    there if I allow them to go out of course?

5          Look, this trial was supposed to happen on January 24.

6    You both asked me to adjourn it.  The adjournment put us in the

7    middle of August, which is sacred vacation time in New York.

8    We all know that.

9          So you all told me, at the time you asked me for the

10   adjournment, that the reason why you wanted that adjournment,

11   if my recollection serves, is that you wanted this case to be

12   tried on the merits.  You wanted the jury to be able to get all

13   of the facts.  So now here we are.

14         This doctor has a vacation planned, and the only way

15   to get his testimony in practically is to take him out of turn.

16   Wouldn't it undermine the parties' efforts to have the jury

17   decide this case on the merits if I didn't allow him to testify

18   out of turn, subject to connection?

19         MS. GOYKADOSH:  I think there are two issues, and the

20   first is that plaintiff is going to be in the courtroom.  He is

21   going to be hearing Dr. Stein's testimony, and there is a

22   concern that he might alter his own testimony, based on what

23   Dr. Stein testifies to.  So that's number one.

24         THE COURT:  I don't share that concern.

25         MS. GOYKADOSH:  Okay.  The second issue is just

MICHELE NARDONE, CSR -- Official Court Reporter

Cortes v. City of New York

1    plaintiff informed the court on, I believe it was June 4, that

2    Dr. Stein would be traveling on August 12.  So they have

3    certainly had enough time to ask Dr. Stein to readjust his

4    vacation plans.  I understand that August is sacred vacation

5    time, but this is something that they have known about far in

6    advance as well.

7        Sixty days should be enough time for someone who is

8    very important to their case to arrange their own vacation

9    plans.  So I think that that's something that could have or

10   should have been dealt with.

11       THE COURT:  Did you make any attempts to have him

12   adjust his schedule?

13       MR. PANEK:  Yes, Your Honor.  Make no mistake about

14   it, my preference would be to have to Mr. Cortes testify first.

15       When we initially wrote the court, we actually asked

16   that, subject to the court's availability and scheduling, jury

17   selection be conducted on a date prior, then we reconvene so

18   that we can get foundational testimony.  They objected to that.

19   So they are trying to have their cake and at it too and not

20   have this case tried on the merits, when we are asking for a

21   scheduling concern to be consented to in that regard.

22       I do, as I stand now, intend to make one more

23   in-the-interests-of-justice pitch to Dr. Stein, but my

24   indication so far is these are his plans, he is going away with

25   his family, there is nothing I can do about it.  That's the

MICHELE NARDONE, CSR -- Official Court Reporter

Cortes v. City of New York

1    hand that I have been dealt here; and, in terms of him being a

2    retained expert for trial, he is under really no obligation.

3    This is not a treating patient of his.  He is participating

4    voluntarily in this litigation.  So my hands are kind of tied

5    with this.

6         MS. GOYKADOSH:  Your Honor, I do have one more

7    concern, if I can raise it at this time.  I think that if

8    Dr. Stein is allowed to testify before plaintiff testifies that

9    compromises our cross-examination of Dr. Stein.  So, for

10   instance, should plaintiff have testified first, he might say

11   certain things when I cross-examine him.  But if --

12        THE COURT:  I didn't follow that last part, but go

13   ahead.

14        MS. GOYKADOSH:  Sure.  To the extent plaintiff

15   testifies first, he will testify to certain facts.  He will say

16   this happened in this way.  We will not be able to ask

17   Dr. Stein about plaintiff's own testimony if plaintiff

18   testifies after Dr. Stein.

19        MR. PANEK:  Your Honor, I could argue on the other

20   side of the coin.  Now they will have the benefit of cross

21   examining the plaintiff with Dr. Stein's statements, and they

22   could always pose a hypothetical, assuming that the plaintiff

23   says this; and then if they get it, they get it.  They can ask

24   a hypo.

25        THE COURT:  In terms of the foundational requirements

MICHELE NARDONE, CSR -- Official Court Reporter

Cortes v. City of New York

1    and why it is you would typically have an expert testify after

2    the foundational facts have been into evidence doesn't really

3    go to the concerns you are raising.  That's not why it is that

4    we typically order the witnesses in that way.  So, okay, but

5    that's not -- it doesn't really go to the issue of why it is

6    that you would have the foundational testimony come in.

7          At the end of the day, it is not my preference.  I'm

8    going to ask the plaintiff to go back to the expert and see if

9    he can rearrange his schedule.  I would suggest that you tell

10   him that this could potentially severely compromise your case,

11   if he does not.

12         MR. PANEK:  Your Honor, in that vein, I would just ask

13   that inasmuch as I use tools at my disposal, i.e., offering to

14   pay for travel plans and arrangements like that, that that be

15   precluded from cross-examination, if I can elicit that

16   agreement out of the doctor.  Obviously, his ordinary --

17         THE COURT:  He is saying if he pays for the travel to

18   be switched around that you guys not use that as a basis for

19   cross.

20         MS. JACOBS:  That's fine, Your Honor.  We can agree to

21   that.

22         THE COURT:  Go to your toolbox.  Let's see if we can

23   resolve this.

24         MR. PANEK:  It would be my preference, Your Honor.  So

25   I am going to work diligently to do so.

MICHELE NARDONE, CSR -- Official Court Reporter

Cortes v. City of New York

1          THE COURT:  Okay.  Yes.  I think it would be

2     everyone's preference.  I really do think it would be

3     everyone's preference.  I don't think the plaintiff wants to

4     proceed this way either.

5          MR. PANEK:  We could still pick a jury tomorrow, Your

6     Honor, and then start Monday morning.

7          THE COURT:  What day of the week are we at anyway?

8          THE CLERK:  Tuesday.

9          MR. PANEK:  I just know it's a weekday and it's not

10    Friday.  So I would be amenable to selecting a jury any day.  I

11    mean, obviously that's wishful thinking, but that would --

12         THE COURT:  It is.  To be honest, I know that I don't

13    want to disrupt the administration of the courthouse and I will

14    look into it, but I think it's doubtful.  I wouldn't put any

15    money on that.

16         MR. PANEK:  You said go to my toolbox, and here it is.

17         THE COURT:  Yeah, your toolbox, not mine.  All right.

18    Talk to the doctor.

19         MR. PANEK:  I will, Your Honor.

20         THE COURT:  Today.

21         MR. PANEK:  Okay.

22         THE COURT:  Inform the court tomorrow.

23         MR. PANEK:  I have a meeting scheduled with him

24    tomorrow.  So I would ask that I just be able to do it then.

25         THE COURT:  Let me know by end of the day tomorrow in

MICHELE NARDONE, CSR -- Official Court Reporter

Cortes v. City of New York

1   writing, and then we will see where we are.

2          MR. PANEK:  Sure.

3          THE COURT:  All right.  Okay.  So are there any issues

4   with respect to the three witnesses that are proposed by the

5   defense?

6          MR. PANEK:  No, Your Honor.

7          THE COURT:  So all of these are fine.  Okay.  Good.

8          Now, with respect to the exhibits, apparently I was

9   far more productive at the last pretrial conference than I

10  recall and, just quickly, starting at 1 for the plaintiff's

11  just -- I mean the defendants' -- no, plaintiff's.  Okay.

12         Where there are issues, none with Exhibit 1, correct?

13         MS. RYAN:  Well, Your Honor, the issue that we have

14  run into recently, we asked plaintiff last week for their final

15  exhibits premarked, as required by Your Honor's rules, and some

16  of the exhibits we received are not what are designated in the

17  JPTO.

18         THE COURT:  That's problematic.

19         MS. RYAN:  So Exhibit 1 they designated Bates 3 and 4,

20  which is the printed-out arrest report.  We were given a

21  handwritten scratch copy, which is a different document.  And

22  Your Honor's rules were that we would stick with the exhibits

23  in the JPTO.  There have been a number of changes.  We are

24  trying to resolve that, but to date we still have some issues.

25         THE COURT:  Yes, my order was clear, that changes to

MICHELE NARDONE, CSR -- Official Court Reporter

Cortes v. City of New York

1   the JPTO would only be limited to those changes with respect to

2   experts and exhibits related thereto.

3           MR. PANEK:  Sure.  So the arrest report that we are

4   referring to, I correctly named the exhibit in the JPTO as the

5   arrest report.  It's not the Omni form report, which is what

6   they are referring to.  However, it was my mistake, and I Bates

7   stamped the Omni form, which is a different form; but it's the

8   same form.  It's just whether it's handwritten or computer

9   typed out.  And we intend to use the handwritten form.  But it

10  is the exact same form, not a different document.

11          The scratch copy, the officer checks the boxes and

12  writes in his handwriting at the scene.  It's a more

13  contemporaneous record.  Then he goes back to the precinct,

14  plugs it into the computer and creates the Omni form.  I listed

15  the arrest report, which is hand-scratched copy, but the Bates

16  stamp range matched the Omni form, which was my mistake.

17          So there is no discernible difference between the

18  documents in terms of their content.  So I'm admitting the

19  arrest report that I listed on the form.

20          MS. RYAN:  Your Honor, I have both.  The Bates numbers

21  in the JPTO are the typed arrest report.

22          The scratch copy is a draft.  It's not the finalized,

23  official arrest report.  They are both prepared at the

24  precinct.

25          THE COURT:  How are they different?

MICHELE NARDONE, CSR -- Official Court Reporter

Cortes v. City of New York

1        MS. RYAN:  One, for example, is handwritten.  It

2    doesn't get typed in.  Changes can be made from one to the

3    other.

4        THE COURT:  Have changes been made?

5        MS. RYAN:  I would have to look at them side by side,

6    Your Honor.

7        Permission to approach.

8        THE COURT:  Yes.  Thank you.

9        MS. RYAN:  Your Honor, we note that the typed-out copy

10   is the copy that was provided to us in January as the exhibit

11   being used for the trial.

12       THE COURT:  If they are the same, plaintiff, why is it

13   that you prefer to use the handwritten version?

14       MR. PANEK:  Because it has more of an effect and it

15   leads to the absence of mistake, where the witness, if he is

16   cross examined on the document, can't say, well, I don't know,

17   this isn't my initial notation.

18       THE COURT:  Well, in that case, then we pull this one

19   out, right?

20       MR. PANEK:  I would be happy to put them in together,

21   Your Honor, and put them both in, in the interests of

22   completeness.  If they are saying that it's the typed version

23   and there are no changes between the two.

24       THE COURT:  But other than your concern that the

25   officer may somehow say on the stand that some notation in here

MICHELE NARDONE, CSR -- Official Court Reporter

Cortes v. City of New York

1   was not his, what other reason do you have for wanting the

2   handwritten copy?

3        MR. PANEK:  Sure.  There is, in my view or experience,

4   be it right or wrong, jurors lend more credence when you can

5   actually see the pen strokes and see what was done as opposed

6   to a cold, computerized form.  These were his observations on

7   the scene.  He checked those boxes.  It wasn't done on a

8   computer.  It was done on a form with pen my him.

9        MS. RYAN:  Your Honor, to clarify, the scratch copy is

10  not completed on the scene.  It's completed back at the

11  precinct, before being typed into the computer.

12       Your Honor made the rulings already in January that we

13  would stick to the designated exhibits based on the JPTO, which

14  is Bates numbers 3 and 4.

15       THE COURT:  Yes.  We are going to stick with what was

16  designated as 3 and 4.  However, to the extent the officer

17  tries to walk back anything in the typed-up version, the

18  plaintiff is free to use the handwritten copy to either refresh

19  his recollection or impeach him.

20       MR. PANEK:  Yes, that's fine.

21       THE COURT:  Okay.  All right.  Photographs, number 2.

22       MS. RYAN:  Yes, Your Honor.

23       THE COURT:  Any do we have any issues here?

24       MS. RYAN:  No, Your Honor.

25       THE COURT:  Okay.  The medical treatment prisoner

MICHELE NARDONE, CSR -- Official Court Reporter

Cortes v. City of New York

1  form, D-211?

2          MS. RYAN:  No, Your Honor.

3          THE COURT:  Number 4, D-258 we are okay?

4          MS. RYAN:  Yes, that's fine, Your Honor.

5          THE COURT:  Trooper Smith's memo book?

6          MS. RYAN:  No issue, except the copy we were provided

7  had some additional redactions that were not proposed to us

8  first.

9          THE COURT:  The redactions are -- were included to

10  redact hearsay statements.

11          MR. PANEK:  Yes, Your Honor.

12          THE COURT:  Did you take a look at the -- I'm assuming

13  you have a nonredacted copy of that.

14          MS. RYAN:  We do, Your Honor.

15          THE COURT:  You all should confer and figure out if

16  you have any issues.

17          MR. PANEK:  All right.

18          MS. RYAN:  Yes.

19          THE COURT:  Yes?

20          MS. RYAN:  For number 6, the copy of the command log

21  designated in JPTO we have no issue with.  The copy we were

22  provided this week is, during discovery a second version of the

23  command log was produced confidentially, to provide the names

24  of other arrestees in the precinct.  Plaintiff has put forward

25  that copy as his proposed exhibit, which, again, is not in the

MICHELE NARDONE, CSR -- Official Court Reporter

44

Cortes v. City of New York

1   JPTO; but also there is 160.50 concerns, privacy concerns of

2   these other individuals who happened to be arrested at the same

3   time as plaintiff.

4        MR. PANEK:  Your Honor, those concerns are only valid

5   if they know those arrests to be sealed.  We were provided by

6   defendants today a copy of the pages of the command log that

7   has our pertinent information.

8        I already informed counsel that I'm happy to put in

9   exhibits -- pages 41 through 47, as initially redacted, along

10  with this page, and we will just take out the pedigree

11  information of the people who were arrested; but I still want

12  this to have the effect of showing that you don't just cross

13  things out in the command log and write over them.

14       MS. RYAN:  Your Honor, this exhibit is six pages of a

15  book that's probably a good three inches wide.  The pages 41

16  through 47, the arrest stamps for other people are fully

17  redacted.  It doesn't have just their pedigree information.

18       So they are proposing changing redactions that were

19  done in discovery because we provided them with a full-size

20  color.  We thought it would be easier to show plaintiff's

21  arrest stamp.

22       THE COURT:  What is this new version that you are

23  trying to get in?

24       MS. RYAN:  This is a color copy of plaintiff's arrest

25  stamp.  This is the normal size of the command book.  We

MICHELE NARDONE, CSR -- Official Court Reporter

Cortes v. City of New York

1   thought it would be easier to read.

2          MS. JACOBS:  Essentially, Your Honor, what our

3   proposal is that we would redact that, as D-41 through 47 were

4   redacted, just to have it be a larger size and a color copy so

5   it's a little clearer for everyone to use.  Again, this was the

6   document as it was proposed in January.  The only change is

7   that it's a slightly better copy, but, otherwise, with those

8   same redactions as they were proposed in January with those

9   Bates stamps in January.

10          MR. HARVIS:  Your Honor, I would just say the

11   redactions that were made during discovery doesn't necessarily

12   govern, when we are here to have a trial on the merits, and the

13   jury should see what relevant evidence there is.  So we now

14   have this form.  We are happy to deal with the redactions that

15   relate to privacy or sealing interests.

16          But to then go forward and just black out the boxes of

17   this that have no basis for redaction, we think, is taking it

18   too far.

19          THE COURT:  Why isn't it simply redacting any

20   information that might tread on privacy issues not sufficient?

21          MS. JACOBS:  Again, Your Honor, I might think our view

22   of what are not privacy issues -- first names, last names --

23   that is one issue.  I think we should redact out the whole name

24   of people to the extent we are dealing with privacy issues, but

25   I think --

MICHELE NARDONE, CSR -- Official Court Reporter

Cortes v. City of New York

1    THE COURT:  I don't think the plaintiff has an issue

2    with that.

3    MR. PANEK:  We don't.

4    MS. JACOBS:  That's fine.  Beyond that, again, this is

5    going back to at our conference in January Your Honor stated

6    that we could not make changes.

7    THE COURT:  This is the same document blown up?

8    MS. JACOBS:  But the redactions they are proposing are

9    different.  I understand that those redactions do not

10   necessarily, you know, the reasons for those redactions may be

11   different now.  Again, they were provided with two copies of

12   the command log, one during discovery.

13   They chose which one they wanted to use for the trial

14   in January, with redactions on it, and now they are trying to

15   change that; and I don't think that should be permitted.

16   MR. PANEK:  Listing the documents on the JPTO does not

17   preclude us from seeking to redact the redactions at trial.

18   That's a redaction.

19   MS. JACOBS:  Again, that wasn't addressed at our final

20   pretrial conference in January.

21   THE COURT:  Yes, but thank God we are having another

22   one today.  Just redact the information that has the privacy.

23   I don't want any privacy concerns to be raised.  So the full

24   name is going to come out.  If there are other privacy

25   concerns, that's my concern.

MICHELE NARDONE, CSR -- Official Court Reporter

Cortes v. City of New York

1          MS. JACOBS:  Understood, Your Honor.

2          THE COURT:  So nothing that treads on anyone else's

3    privacy concerns.

4          MR. PANEK:  No intention.  Names and addresses out.

5          THE COURT:  Perfect.  All right.  Next.

6          MS. RYAN:  No issue with Exhibit 7, Your Honor, or

7    Exhibit 8.

8          THE COURT:  Okay.

9          MS. RYAN:  Exhibit 9, we did not receive a

10   certification from plaintiff on these, but we are not going to

11   raise an authenticity objection on these records.

12         MR. PANEK:  I have one, if you want anyway.

13         MS. RYAN:  Okay.  Great.

14         THE COURT:  10.

15         MS. RYAN:  10, there was some confusion.  They

16   provided us a certification with no records attached, so we

17   weren't sure what --

18         THE COURT:  They were certifying?

19         MS. RYAN:  What was certified and what wasn't, but

20   they appear authentic.  We are not going to raise an issue on

21   these.

22         MR. PANEK:  I can explain that, if the court is

23   interested in hearing.

24         THE COURT:  Not really.

25         MR. PANEK:  All right.

MICHELE NARDONE, CSR -- Official Court Reporter

Cortes v. City of New York

1          THE COURT:  I mean you all resolved it.  All right.

2   11?

3          MS. RYAN:  Yes.  So 11 had some issues as far as the

4   final exhibits we received last week.  Our understanding of --

5   we had a conversation with plaintiff, that they had provided us

6   complete records for certifications but were going to use the

7   Bates-stamped version as long as the Bates-stamped pages were

8   in the certified complete copy.

9          However, the final version of Exhibit 11 we received

10  had no Bates stamps on it.  So we have been trying to match

11  them up ourselves.

12         MR. PANEK:  Last night, did you get the Dropbox link?

13         MS. RYAN:  We got that at 11:00 p.m.  So we haven't

14  had a chance.

15         THE COURT:  Did you fix the problem?

16         MR. PANEK:  Yes.  So the confusion, Your Honor, was

17  counsel was telling me we will not agree to the authenticity of

18  any records unless they are complete and certified.  So I took

19  that to mean, okay, you want me to put into the evidentiary

20  exhibits complete, certified records, which is what I did.

21         Then they turned around and said, well, it doesn't

22  match the Bates stamps; and I said, well, you asked for

23  complete certified records, which is what I gave you, and then

24  I said if your concern was just one of generally are these

25  authentic and contained in the universe of the certified

MICHELE NARDONE, CSR -- Official Court Reporter

49

Cortes v. City of New York

1   records, I will revert it back and keep it to the Bates-stamped

2   initial copies, which is what I did then provide them last

3   night.

4          THE COURT:  All right.  You all review that.

5   Presumably the issue has been resolved and we are in good

6   shape.

7          MS. RYAN:  Yes, sure.  For Exhibit 12, Dr. Batilova

8   appears to be a provider from Queens Health Center.  So we are

9   not raising authenticity issues although I notice that the

10  records show up in other exhibits randomly as well.

11         MR. PANEK:  Exactly.  They are contained in other

12  exhibits, which was part of the confusion with all of the

13  certifications, because he gets treatment at a union health

14  center that compiles all of his records in addition to the

15  individual providers.

16         THE COURT:  All right.  So do we have an issue?

17         MS. RYAN:  We will.

18         THE COURT:  Are we okay with 12?

19         MS. RYAN:  We should be fine with 12, Your Honor.

20         THE COURT:  Okay.  Good, Dr. Capiola, number 13.

21         MS. RYAN:  We did not receive a certification for

22  these.  I assume Dr. Capiola will be able to authenticate them

23  if he is testifying.

24         MR. PANEK:  That's why I didn't put them in.

25         THE COURT:  Okay.  Jean Paul Toussant.

MICHELE NARDONE, CSR -- Official Court Reporter

Cortes v. City of New York

1          MS. RYAN:  We do object to these.  There is no

2    certification.

3          MR. PANEK:  I will take them out.

4          MS. RYAN:  There is no certification.  Okay.

5          THE COURT:  Okay.  Quach, he is going to testify --

6    no, he is not testifying anymore.

7          MR. PANEK:  No, no -- yes, correct, Your Honor.

8          However, I just want to note in the e-mail I sent

9    late, late last night, I made a mistake.  11 and 15 are the

10   same records.  They are contained in Queens Hospital and

11   Dr. Quach, because he is out of the hospital.  It's the same

12   universe of records.

13         THE COURT:  You are speeding up again.

14         MR. PANEK:  That's okay.

15         THE COURT:  I'm going to slow you down so by the time

16   you get before the jury they can understand what you are

17   saying.

18         MR. PANEK:  So, with respect to those records, it's

19   going to be 11 and 15 will be reflected as one exhibit.

20         THE COURT:  Are you saying they are identical, or 15

21   is contained in and subsumed by 11?

22         MR. PANEK:  They are identical, and both are subsumed

23   in the others.  It's just the manner in which the records

24   appear.  If you get them from Dr. Quach's office they appear

25   different than the hospital.  If you get them from the

MICHELE NARDONE, CSR -- Official Court Reporter

Cortes v. City of New York

1   hospital, they appear different than Dr. Quach.  However, they

2   are the same records, so we are just going with the

3   Bates-stamped ones.

4           THE COURT:  Which is 11?

5           MR. PANEK:  Which is 11.

6           THE COURT:  No more 15?

7           MR. PANEK:  More 15.

8           THE COURT:  I'm not going to try to pronounce this

9   doctor's name.

10          MS. RYAN:  I believe it's Senevirante.  We had

11  indicated to counsel last night there was a bunch of confusion

12  as to the Bates numbers and the certified copy.  The certified

13  copy we received was very different than the previously Bates

14  version.  We can only authenticate about ten pages of the 60 or

15  so that they designated.  I know counsel indicated he may have

16  fixed some of these problems last night, but that's where we

17  are at this moment.

18          THE COURT:  So confer.  We will address it early

19  Monday morning.

20          The MRI films, 17?

21          MS. RYAN:  No issue, as long as they are properly --

22  the foundation is properly laid with them with the doctors.

23          THE COURT:  Okay.  Nothing.  18 is fine.

24          MS. RYAN:  18 is fine.

25          MR. PANEK:  Your Honor, when you say the foundation is

MICHELE NARDONE, CSR -- Official Court Reporter

Cortes v. City of New York

1  properly laid, they are certified records.  They go into

2  evidence.  There is no further foundation.  These are now

3  certified records related to Gonzalo Cortes.  So they go into

4  evidence.  There is nothing further I need from a custodian or

5  doctor to make them admissible per se.

6          THE COURT:  I think she is saying that is there a

7  doctor who can say I ordered this MRI.  I think that's what you

8  are talking about.

9          MS. RYAN:  Yes, Your Honor.  They are not going to try

10 to bring in the MRI on plaintiff or a police officer.

11         THE COURT:  How did the MRIs come about?

12         MR. PANEK:  In the course of his ordinary treatment.

13         THE COURT:  Through whom?

14         MR. PANEK:  Twenty to thirty union hall doctors, who

15 ordered his treatment and those records, ordering MRIs are

16 going into evidence.

17         THE COURT:  Are any of the doctors testify to -- one

18 of them is a treating physician?

19         MR. PANEK:  Sure.  I only intend to use medical

20 records with medical doctors, if that's the concern.  I'm just

21 confused.

22         THE COURT:  I think that's good.  I think that's it.

23 Right?

24         MS. RYAN:  Yes, Your Honor.

25         MR. PANEK:  I don't intend to show Mr. Cortes an MRI

MICHELE NARDONE, CSR -- Official Court Reporter

Cortes v. City of New York

1   and ask him to become a radiologist.

2            MS. RYAN:  That should be fine, Your Honor, as long as

3   it comes in with the doctors.  It's not just an MRI film on a

4   screen with no doctor.

5            THE COURT:  The concern here, I think, was that you

6   were just going to put them in evidence; that there was not

7   going to be a witness that was going to lay a foundation for

8   the documents before they came in.  Presumably you are going to

9   talk about them with a doctor.

10           MR. PANEK:  Well, I'm just -- perhaps it's my

11  misunderstanding.  The foundational elements of making the

12  records admissible into evidence is met by the certification,

13  meaning that they are Mr. Cortes' records, they are certified

14  to be complete, and this is what a custodian would give me.

15           THE COURT:  That's authentication.

16           MR. PANEK:  Correct.

17           THE COURT:  She is talking about foundation.

18           MR. PANEK:  How I use them is not a question of -- I

19  guess it's, doctor, are you capable of interpreting an MRI is

20  what we are talking about, which is the foundational

21  requirements.

22           THE COURT:  Did he look at these MRIs before?

23           MR. PANEK:  Yes.

24           THE COURT:  I'm certain that when you ask him about

25  that, he is going to be able to lay a foundation for them.

MICHELE NARDONE, CSR -- Official Court Reporter

Cortes v. City of New York

1    Right?

2            MS. RYAN:  Yes.  I agree authenticity and foundation

3    are two separate issues.

4            MR. PANEK:  But it doesn't have to be the person who

5    ordered the MRI.

6            THE COURT:  He is concerned that you are going to

7    demand that the person who ordered the MRI come in.  You are

8    not saying that.

9            MS. RYAN:  We just require the proper foundation to

10   prove relevancy on the stand.

11           MR. PANEK:  Sure.

12           THE COURT:  All right.  Now, the illustrations of the

13   surgery.

14           MS. RYAN:  Yes, Your Honor.  We did have an issue with

15   this.  We received them last week for the first time.

16           They have plaintiff's name on them.  We asked counsel

17   where they were from, and we were told it's of no moment where

18   they came from.  So we do have some concerns as to the

19   foundation and who made these.

20           MR. PANEK:  I later told them they were done by a

21   medical illustrator, and I agreed that a proper foundation has

22   to be laid for their admissibility.

23           THE COURT:  What's a medical illustrator?

24           MR. PANEK:  A medical illustrator is someone who will

25   help a jury understand injuries by illustrating them

MICHELE NARDONE, CSR -- Official Court Reporter

Cortes v. City of New York

1   anatomically.  I'm happy to show Your Honor the exhibits so you

2   can have a better understanding.

3        THE COURT:  Uh-huh.  Is this illustrator coming into

4   the courtroom?

5        MR. PANEK:  No, but the doctors will authenticate that

6   they are fair and accurate; that they would assist the jury in

7   understanding the anatomy; that the demarcations on --

8        THE COURT:  Slow down.  That they are fair and

9   accurate what?

10        MR. PANEK:  A fair and accurate representation of the

11   anatomy and fair and accurate illustrations of the plaintiff's

12   actual injuries, as documented through his medical records, and

13   that these demonstratively would assist the jury in

14   understanding without having medical training.

15        THE COURT:  Okay.  Stop.  So you want to use this as a

16   demonstrative.  You are not suggesting that it's coming in as

17   evidence?

18        MR. PANEK:  Correct.

19        MS. RYAN:  Your Honor, we have been told that -- we

20   don't have the name of the medical illustrator.  We don't know

21   what their credentials are.  I understand a doctor may be able

22   to say the anatomy looks right; but they also proposed an iPad

23   app as a demonstrative and a handheld shoulder as a

24   demonstrative.  So it's a bit cumulative to have all three,

25   especially when we don't know where these came from.

MICHELE NARDONE, CSR -- Official Court Reporter

Cortes v. City of New York

1    THE COURT:  You all have a medical expert as well,

2    right?  Have you shown these illustrations to your medical

3    expert to see?

4    MS. RYAN:  No, Your Honor, because we were just

5    provided with these last week.  So we sent them over, but he

6    wasn't able to look at these when preparing his expert report.

7    THE COURT:  Okay.  So, I'm clearly no doctor.  But it

8    seems to me, for the purposes of using them as a demonstrative,

9    that you would need to -- that you should, the defense, show

10   these to your expert.  Let's see if they accurately reflect the

11   injury itself.  Right?

12   This case is, in large measure, about the causation of

13   the jury as opposed to whether the injury exists.  So if your

14   doctor says, yeah, this reflects the type of injury that he --

15   accurately reflects the type of injury that he has, then it may

16   actually be helpful as a demonstrative, not as evidence.  And

17   then, we can address your concerns regarding whether the

18   demonstratives are cumulative separately.

19   Everyone can decide what they think will be helpful,

20   but it would not be used for the purpose of evidence.  See if

21   your doctor has an issue with it.  Maybe it's helpful.

22   MS. RYAN:  We will discuss it.  Thank you, Your Honor.

23   THE COURT:  All right.  Thank you, but, again, I need

24   to be clear, not as evidence, only as a demonstrative; and

25   that's number 19.  Right?

MICHELE NARDONE, CSR -- Official Court Reporter

Cortes v. City of New York

1          MS. RYAN:  Yes, Your Honor.

2          MR. PANEK:  Yes, Your Honor.

3          THE COURT:  Okay.  Is this the same as 20?  Is this

4    another version?

5          MR. PANEK:  Yes, Your Honor.

6          MS. RYAN:  20?  I thought 20 was the iPad.

7          MR. PANEK:  20 is just -- it's an app that shows

8    anatomy.  Just so that -- I mean, it's prepared by Stanford

9    Medical School.  It's called Shoulder Pro, and it essentially

10   shows bones and what the names of those bones are, so that the

11   jury can understand the shoulder; and it assists them, as

12   demonstratives, in understanding the ligament structure and

13   understanding the causation of the injuries.

14         THE COURT:  I really don't want to take this jury to

15   medical school.  I just don't, and I don't think you do either.

16         MR. PANEK:  So in this particular case, Your Honor,

17   it's vital to understanding and corroborating the manner in

18   which Mr. Cortes describes being injured versus what was

19   actually found inside of his shoulder because the injury is

20   important corroborating evidence that speaks to the manner in

21   which his shoulder was injured.

22         So in some respects the jury must go to medical school

23   to understand just that this injury was caused by this

24   mechanism and why.

25         THE COURT:  I would rather have them take a class.  I

MICHELE NARDONE, CSR -- Official Court Reporter

Cortes v. City of New York

1    don't want them to come out with degrees.

2              MR. PANEK:  Yes.

3              THE COURT:  So we have -- this is the cumulative

4    question, I guess.  How is this any different, these two.

5              MR. PANEK:  This --

6              THE COURT:  How much time do you intend to spend on

7    these?

8              MR. PANEK:  Five minutes.

9              THE COURT:  Have you shown -- have they looked at this

10   app?

11             MR. PANEK:  I gave them a link to it.

12             MS. RYAN:  We were given a link and told we could buy

13   it, if we wanted.  We also asked, if they are going to be

14   permitted to use it, that we be allowed to use the same app,

15   the same iPad.

16             THE COURT:  Yes is the answer.  Let's figure out a way

17   for them to be able to have access to this now.  I would like

18   you to also pass, you know, show this to your doctor.

19             If we are not talking about a lot of time and if

20   everybody thinks it's actually helpful, because, heck, your

21   doctor may decide they want to use it.  I don't know.

22             MR. PANEK:  Or, Your Honor, you know what.  I also

23   sent them a link to a physical, little like plastic shoulder

24   model.  I will just use that and not the app, to streamline the

25   process; and the doctor, if he can come down and say this is a

MICHELE NARDONE, CSR -- Official Court Reporter

Cortes v. City of New York

1    shoulder, this is this, this is that, that's fine too, judge.

2         THE COURT:  I don't have a preference.  I just want to

3    make sure it's not necessarily complicated and duplicative for

4    the jury.  If you prefer the shoulder.  I don't know.

5         MR. HARVIS:  I'm sorry.  Speaking of medical issues, I

6    have to run to the bathroom.  I don't mind if everyone else

7    handles it.  Is that okay?

8         THE COURT:  Just go ahead.

9         MR. HARVIS:  Thank you very much.  I will be right

10   back.  They can handle it.

11        (Mr. Harvis left the courtroom.)

12        THE COURT:  All right.  If you don't want to use the

13   app anymore, but the thing is I'm not -- what I would like for

14   you to do is to make them all available to the defense.  Let

15   the defense take a look at all of them.  I don't want to, by

16   default, you know, put the defense in a position where they are

17   stuck with a shoulder model.  Let them see them all.  You all

18   talk it out, figure it out.  How about that?

19        MR. PANEK:  Sure.  I will make a determination by this

20   evening as to what I'm going to use and will provide it to

21   them.

22        Just my just concern is this is a paid application

23   that costs money, and I don't know, other than saying borrow my

24   iPad that's connected to every case in my office, how to give

25   it to them, so to speak.

MICHELE NARDONE, CSR -- Official Court Reporter

Cortes v. City of New York

1      THE COURT:  So that's why you are saying never mind

2  with that.

3      MR. PANEK:  Yeah.

4      THE COURT:  Okay.  Never mind with the iPad then.

5      MR. PANEK:  I don't know that I can do that.

6      THE COURT:  Fair enough.  No iPad.

7      MR. PANEK:  Sure.

8      THE COURT:  Okay.  Good.  So number 20 was the iPad.

9      MS. RYAN:  Yes, Your Honor.

10      THE COURT:  So that's out.  The shoulder you guys are

11  going to talk about.

12      MS. RYAN:  Yes.

13      MR. PANEK:  Yes.

14      THE COURT:  Again, as a demonstrative, not as

15  evidence.

16      MR. PANEK:  Correct.

17      THE COURT:  Okay.  Prisoner holding pen roster.

18      MS. RYAN:  Yes, Your Honor.  We don't object --

19      THE COURT:  Oh, I don't know why I read that that way.

20  I read it as a prisoner holding a pen roster.  I'm sorry.

21  Okay.

22      MS. RYAN:  We don't object to the document itself.

23  Version we received from counsel has no redactions of the other

24  arrestees' names.  So we would have those privacy concerns.

25      THE COURT:  You will address that.

MICHELE NARDONE, CSR -- Official Court Reporter

Cortes v. City of New York

1        MR. PANEK:  Sure.  Okay.

2        THE COURT:  Okay.  All right.  23.

3        MR. PANEK:  Not an issue.  Not used, Your Honor.

4        THE COURT:  Okay.  That's out.

5        MS. RYAN:  24 we don't fully understand.

6        THE COURT:  So it's not a document.

7        MS. RYAN:  Yes.

8        THE COURT:  Correct.  So it's a nothing.

9        MR. PANEK:  In my experience, Your Honor, when doctors

10 come in to testify about a patient they are treating, they

11 ordinarily will bring their chart from their office in.  I'm

12 just reserving my right to move that chart into evidence; but

13 if the court so precludes it, then I will not do so.

14        THE COURT:  Right.  It's out.  Okay.

15        The expert report itself is not evidence.

16        MR. PANEK:  We listed that in an overabundance of

17 caution.  We don't intend to offer it.

18        THE COURT:  Okay.  Good.  And we still have a lot

19 more.

20        MS. RYAN:  Yes, Your Honor.

21        THE COURT:  Geez.

22        MS. RYAN:  Some of them can be grouped together.

23        MR. PANEK:  I think there is only three more.

24        MS. RYAN:  26, the intraoperative photos, we have made

25 a motion in limine on this, that these should be precluded.

MICHELE NARDONE, CSR -- Official Court Reporter

Cortes v. City of New York

1   They were not properly provided.  Your Honor had previously

2   precluded them because they had not been provided during

3   discovery, and now he added it back onto his JPTO.

4           THE COURT:  In connection with his expert?

5           MR. PANEK:  Correct, and the court explicitly stated

6   that exhibits related to expert discovery would be reopened.

7           These exhibits were provided more than six months

8   prior to their retention of an expert.  They elected to not

9   show them to their expert, even though they were aware, in

10  Dr. Stein's report that Dr. Stein was relying on them in his

11  report, and they elected to do so at their own peril.

12          (Mr. Harvis entered the courtroom.)

13          MR. PANEK:  Both parties agreed we wanted a trial on

14  the merits, as the court has stated.  These are photographs of

15  the inside of plaintiff's shoulder when the surgery was taken

16  that show his surgery.  How could anything be more on the

17  merits than those actual photographs?

18          MS. RYAN:  Your Honor, if I may, a few issues.  I

19  think this is a way for plaintiff to back door around your

20  Honor's ruling from January.  You precluded these photos.  They

21  showed them to their expert in an attempt to bring them in

22  through their expert.

23          They are also not certified.  And I don't know -- as

24  Your Honor said, we are not taking the jury to medical school.

25  They don't need to see 20-something photos of the inside of

Cortes v. City of New York

1  plaintiff's shoulder.  Some jurors may also be squeamish and

2  may not want to see the inside of plaintiff's shoulder.

3        THE COURT:  Well, they will have to get over that.

4        This is the deal.  We opened up discovery to allow

5  expert discovery.  The plaintiff had to have the ability to

6  provide the experts with whatever it is that they wanted him to

7  rely on.  You all agreed to reopening expert discovery.

8        I don't understand how this isn't fair game.  Doesn't

9  the fact that I reopened expert discovery, notwithstanding -- I

10  understand that absent the use of these photographs with an

11  expert I had said no, I wish I could recall my rationale right

12  now.

13        MR. HARVIS:  It was the imminence of trial, Your

14  Honor.  It's very clear from the transcript.  We were only five

15  days before the trial when Your Honor issued the prior ruling.

16        MS. RYAN:  Your Honor, you precluded these photos and

17  workmen's comp documents on the same grounds, that they were

18  not provided during discovery.

19        THE COURT:  Right, but then we reopened up, to a

20  certain degree, but not -- we reopened expert discovery.  How

21  is this not fair game?

22        MS. RYAN:  Your Honor, we took it Your Honor had

23  precluded these as not for discovery.  So we didn't use this.

24  We presumed that plaintiff would follow the same rulings.

25        THE COURT:  But my ruling was to exclude them but to

MICHELE NARDONE, CSR -- Official Court Reporter

Cortes v. City of New York

1    allow expert discovery.  I think that the plaintiff is right,

2    that at a minimum, I think, it should have resulted in a

3    conversation, a question to the court, and not necessarily a

4    presumption.

5         Because I don't know how I can open up expert

6    discovery and then tie one hand behind plaintiff's back in

7    terms of how it is that their expert prepares their opinion.

8    Right?  Because in the normal course they would provide their

9    expert with whatever it is that their -- that they believe

10   their expert needs.  They have to then append to the report a

11   list of all of the materials that the expert relied upon.  I'm

12   assuming that they did so.

13        MR. PANEK:  We did.

14        THE COURT:  Effectively, you are saying that by my

15   ruling, which was based on the timing of trial, which was then

16   adjourned at your request, joint request, that they were not

17   going to be able to give their expert all of the information

18   that they believed their expert would need to be able to

19   formulate an informed opinion?

20        MS. RYAN:  That was our understanding, Your Honor,

21   that they weren't provided during discovery, which was the

22   basis of Your Honor's ruling; not the closeness of trial, but

23   that they had not been requested and properly provided so they

24   were out.  We considered them out of the record, as we did the

25   workers' comp documents.  Maybe that was our misunderstanding

MICHELE NARDONE, CSR -- Official Court Reporter

Cortes v. City of New York

1    of Your Honor's ruling, but we understood your rationale as if

2    it wasn't properly provided during the case it was not part of

3    the record.

4          MR. HARVIS:  Your Honor, if I may.  It's very

5    important to bring up the fact that during the entire discovery

6    phase of this case there were never document demands served by

7    the defense.  They never served Rule 34 requests at all.

8          So for them to now come and try to compare a workman's

9    compensation record that they never even made an attempt to

10   obtain during discovery, was something that we learned about in

11   January, the existence of these photos -- what I would say is

12   it's apples and oranges, in our view, because we are talking

13   about you reap what you sow to a certain extent.  When it comes

14   to not making document requests and not getting things, that's

15   one situation; as opposed to utter diligence, where as soon as

16   you have things on a voluntarily basis with no demands you are

17   producing them.

18         THE COURT:  You all didn't make any discovery

19   requests?

20         MS. GOYKADOSH:  Your Honor, I was not involved in

21   discovery.

22         MS. JACOBS:  Your Honor, I was, and I did not.  I have

23   fallen on the sword a number of times in front of Your Honor.

24         THE COURT:  I'm sorry.  I don't mean to revisit this.

25         MS. JACOBS:  It is fine, Your Honor.  This case is not

MICHELE NARDONE, CSR -- Official Court Reporter

Cortes v. City of New York

1   my finest hour in discovery, but we are here where we are now;

2   and that is, where we are now is that they had these records,

3   and the fact that these illustrations existed, should -- was

4   obvious from the records they did provide during discovery.

5           THE COURT:  What are these photographs of?

6           MR. PANEK:  They are photographs of the inside of

7   plaintiff's -- I never knew this, but apparently during

8   arthroscopic surgery there are photographs taken when the

9   surgery is performed, and a doctor looking at those photographs

10  can tell a lot about the nature of the injury.  So before the

11  last pretrial conference we sent all these photographs over to

12  them.  And then said -- they came in, and there was a lot of

13  good for the goose, good for the gander was the phrase we kept

14  using in the prior conference, and an equivalence developed

15  between documents that they didn't get, the photographs, which

16  we didn't know about and were never requested, and workers'

17  compensation records that they never subpoenaed during

18  discovery, even though they had every reason to do that.  It

19  came up at his deposition.

20          MS. GOYKADOSH:  Your Honor, if I may be heard?

21          THE COURT:  Let them finish.  Were you finished?

22          MR. HARVIS:  Well, I mean, I was going to have --

23  Mr. Panek was going to show you photographs.

24          MR. PANEK:  Importantly, we reopened expert discovery.

25  This is part of expert discovery.

MICHELE NARDONE, CSR -- Official Court Reporter

Cortes v. City of New York

1          MR. HARVIS:  There were defects in the report that

2     prevented --

3          THE COURT:  Only one of you at a time.

4          MR. HARVIS:  I'm going to sit down.

5          THE COURT:  He is doing a good job.  Let him do it.

6          MR. HARVIS:  I agree.  Thank you.

7          THE COURT:  I'm squeamish, by the way, and these are

8     fine.  When were the expert reports exchanged?

9          MR. PANEK:  We exchanged our report in, I believe,

10    March, March 6; and they exchanged their report two and a half

11    or close to three months later, May 28.

12         MR. HARVIS:  I believe it was March 25 for our report

13    and May 28 for their report.  Ours was before the deadline.

14         THE COURT:  He has it.

15         MR. HARVIS:  You said March 6.

16         THE COURT:  Good enough.  Good enough.  All right.

17         And you provided them with a list of the documents you

18    relied upon?

19         MR. PANEK:  And they are explicitly addressed in my

20    experts reports as well.

21         THE COURT:  How many documents were there?

22         MR. PANEK:  That my expert reviewed in total?

23         THE COURT:  I'm just curious.

24         MR. PANEK:  Maybe ten or twelve, Your Honor.

25         THE COURT:  Uh-huh.  Okay.  Yes.

MICHELE NARDONE, CSR -- Official Court Reporter

Cortes v. City of New York

1          MS. JACOBS:  Your Honor, may I be heard?  A couple of

2     issues.

3          The first is I know this has been raised a number of

4     times, about the discovery requests, but I do think that the

5     fact that discovery requests may or may not have been made

6     doesn't have to do anything with plaintiff using documents as

7     part of their case in chief.  That's required under Rule 26.

8          Putting that aside, there have been a number of

9     representations made about plaintiffs just -- plaintiff just

10    learning about these intraoperative photos in January and

11    letting us know as soon as he learned about those photos.

12    However, the medical records indicate that -- plaintiff's own

13    medical records indicate that there were these photos.  They

14    are black and white, but they certainly could have or should

15    have known that images of the surgery existed.  So --

16          MR. PANEK:  Those are not --

17          THE COURT:  Stop, stop.

18          MR. PANEK:  Those are not those though documents.

19          THE COURT:  Hold on.  Go ahead.

20          MS. GOYKADOSH:  So I'm not really understanding why

21    they are saying that they learned about this for the first time

22    in January, because these medical records, which are

23    plaintiff's own medical records, show that there were clearly

24    some interoperative photos taken.

25          MR. PANEK:  Those medical records were received in

MICHELE NARDONE, CSR -- Official Court Reporter

Cortes v. City of New York

1   response to them saying they wanted certified records from

2   every provider.  Those are Dr. Senevirante's records.  We got

3   records from his office initially, and when they wanted

4   certified records I went to the surgical care center where he

5   was also seen and obtained those certified records for the

6   first time, in an overabundance of caution, to make sure I had

7   everything, and that's when those came up.

8           Those were discovered last week.  I'm not seeking to

9   admit those.  Those they had since January, and they chose to

10  ignore during expert discovery.

11          THE COURT:  Yes.  I opened up expert discovery.  They

12  relied on them as part of the discovery.  I opened it up.  I

13  can't imagine how I can open it up and then tie their hands

14  behind their back.  I suggest that you provide your expert with

15  a copy of those today and allow him to review it.

16          The information that is depicted in those photographs

17  presumably is consistent with the opinion testimony of their

18  expert and hope, presumably, consistent with the medical

19  records.  So there should be no surprise here.  It's not as if

20  this is trial by ambush with those documents in light of the

21  expert report and the opinion testimony that was provided to

22  the defense.  All right.

23          Where are we?

24          MS. RYAN:  Exhibit 27, Your Honor.

25          THE COURT:  Okay.

MICHELE NARDONE, CSR -- Official Court Reporter

Cortes v. City of New York

1        MS. RYAN:  This was addressed in our letter that we

2   filed last week.  This appears to be a June appointment for

3   plaintiff with Dr. Capiola.  And as we discussed, it should be

4   precluded.  As Your Honor said, this doesn't have to do with an

5   expert.  I don't know how plaintiff can, in good faith, argue

6   this is part of expert discovery; and it was just provided to

7   us maybe six weeks after the appointment, only when we asked

8   them to provide it to us.

9        THE COURT:  Aren't these records consistent with the

10   plaintiff's ongoing obligation to supplement?  I mean, I'm

11   talking about a June treatment.  It couldn't have been provided

12   during discovery because it hadn't happened yet.

13        MS. RYAN:  We understand that, Your Honor.  We don't

14   think it's relevant, first of all, the ongoing treatment.

15        Also, the document is dated June 4.  We received it, I

16   believe, middle to end of July and only in response to our

17   multiple e-mails asking for a copy of it.  So plaintiff, yes,

18   he did supplement, but only at our insistence.

19        And also, it doesn't go to expert discovery.  It

20   should be out.

21        THE COURT:  Right, but in the normal course you do

22   have a supplementing of discovery with records and information

23   that comes in later; and, indeed, the plaintiff has an

24   obligation to supplement.

25        So this is not an expert issue; you are right.  It is

MICHELE NARDONE, CSR -- Official Court Reporter

Cortes v. City of New York

1    about supplementing discovery properly under the rules.  Why

2    should I not construe in that way?

3            MS. RYAN:  One moment, Your Honor.

4            (Pause.)

5            MS. RYAN:  Your Honor, we will concede on this.

6            THE COURT:  Okay.  Good.  28.  Oh, this is where we

7    are at?

8            MS. RYAN:  Yes.

9            THE COURT:  These all say expert reports.

10           MS. RYAN:  28 through 53 can all be grouped together.

11   These are, our understanding is, transcripts or reports for the

12   impeachment of our expert, Dr. Sherry.

13           THE COURT:  I see.

14           MS. RYAN:  We have asked for copies of these.

15   Plaintiff has told us he does not believe the rules require

16   that he give us a copy at any point in time.  We disagree.  We

17   addressed this in our letter to Your Honor last week.

18           THE COURT:  Give them.  You have a copy?

19           MR. PANEK:  It's several hundred, if not several

20   thousand pages of transcripts.  This is an expert who is --

21           THE COURT:  I'm curious.  How are you going to impeach

22   their expert here, who is opining on the facts here in terms of

23   the causation of this particular plaintiff with other -- wait a

24   minute -- with testimony from another case?

25           MR. PANEK:  Dr. Sherry has said a lot of things over

MICHELE NARDONE, CSR -- Official Court Reporter

72

Cortes v. City of New York

1  the year about a lot of injuries, including shoulders.  He has

2  been circulating the defendant's hired expert regular circle

3  for a very long time.  There are things he might say at trial

4  that are inconsistent with things he said in the past about

5  injury causation, anatomy, what his expertise actually is,

6  whether or not he actually does surgeries, things like that,

7  that are contained within those records.

8       I'm not seeking to affirmatively put anything into

9  evidence, but if he says something that's inconsistent with how

10  he has testified in the past under oath, I'm certainly --

11       THE COURT:  You have digested thousands of pages such

12  that you can, on a dime, be able to -- because we are not going

13  to the library in the middle of trial.

14       MR. PANEK:  Oh, no.  I will have everything dialed in

15  and prepared so that there is no delay once Dr. Sherry takes

16  the stand.  I just, in an overabundance of caution.

17       THE COURT:  So then you should be able to give that to

18  them.

19       MR. PANEK:  Well, I haven't digested that universe

20  yet.

21       THE COURT:  When are you going to do that?

22       MR. PANEK:  Prior to him taking the stand.

23       THE COURT:  Go ahead.

24       MR. PANEK:  It's in pretrial preparations.  I'm

25  preparing for a number of witnesses, a number of medical

Cortes v. City of New York

1    witnesses.

2          These are materials that I will digest prior to

3    Dr. Sherry taking the stand, and I don't know if he is going to

4    get up there and say something that's inconsistent with what he

5    said in the past or how often he does this or how many of these

6    exams he does a year or how many of these reports he does a

7    year.  So it's almost impossible for me to anticipate what I'm

8    going to use.  It's on me.  It's incumbent on me to have a

9    catalog knowledge of where to go in the transcripts, should he

10   deviate from previous testimony.

11         But being asked to telegraph that to them is

12   prejudicial.

13         THE COURT:  I don't think they are asking you to

14   telegraph it.  I think they are asking you for a copy of the

15   transcripts.

16         MS. RYAN:  Your Honor, we also have a right to digest

17   this material, because the proposed impeachment of Dr. Sherry

18   might be improper.  If it's thousands of pages, we should also

19   have a right to look at the full records of potential

20   impeachment so that there is no delay, and we can argue to the

21   court maybe the facts don't match in this case.

22         THE COURT:  I promise you, there will be no

23   impeachment unless you have a copy of what was being used, and

24   me, because I happen to be a stickler on impeachment.  I hate

25   improper impeachment.  It's just one of my -- a thing that is a

MICHELE NARDONE, CSR -- Official Court Reporter

Cortes v. City of New York

1    pet peeve of mine.

2          So I promise you, that's not going to happen, where

3    you guys are sitting here, not able to assess the information

4    that is being used as the basis for impeachment.  I'm trying to

5    figure out where we are with what it is.

6          MS. RYAN:  Your Honor, the time limit we are being

7    told is before he takes the stand.  If it is thousands of

8    pages, we should already have it by now.  We need time to also

9    review it and catalog it.  I mean, if he is not going to use

10   everything on the JPTO, things should be withdrawn and pared

11   down, but that needs to happen as soon as possible.

12         THE COURT:  I agree.

13         MS. RYAN:  That's our objection, Your Honor.

14         MR. PANEK:  I can assure you, Your Honor, everything

15   with respect to preparation for this trial has been happening

16   as soon as possible.  I have been preparing at every turn,

17   getting them every certification.  The onslaught of e-mails

18   that we have received in the last two weeks --

19         THE COURT:  That's neither here nor there.  Trial is

20   tough.  Right.

21         The question is we are talking about tests.  We are

22   talking about transcripts.  We are talking about transcripts

23   that you have.  Presumably, I mean, this is 2019.  Thousands of

24   pages is, you know, I don't know, don't you just put it on a

25   disk or something like that?  It's not like you have to make

Cortes v. City of New York

1    copies in boxes anymore.

2         MR. PANEK:  Okay.  So inasmuch as that's Your Honor's

3    wish here, I will take everything, I will create a Dropbox and

4    give them a link to it and they can sort it themselves and be

5    prepared.

6         THE COURT:  You will give it to them as it is

7    organized here.  That's how you will give it to them.

8         MR. PANEK:  Yes, yes.

9         MS. RYAN:  Your Honor, can we get a court-ordered

10   deadline for that?

11        THE COURT:  Yes.  You can do it today.

12        MR. PANEK:  Sure, Your Honor.

13        THE COURT:  There we go.

14        MS. RYAN:  Thank you, Your Honor.

15        THE COURT:  All right.  That takes us to 53.

16        Please make sure that it is organized in that Dropbox

17   by exhibit number.

18        MR. PANEK:  Sure.

19        THE COURT:  All right.

20        MS. GOYKADOSH:  Your Honor, if I just may, in terms of

21   organization, we have been given things as like big files of

22   200 pages with the exhibits inside that.

23        I would respectfully request that each exhibit be a

24   separate file.  Just it is very voluminous, and I do not want

25   to waste resources trying to like make a file into smaller

MICHELE NARDONE, CSR -- Official Court Reporter

Cortes v. City of New York

1    files.

2            MR. PANEK:  Not a problem, judge.  They are already

3    cataloged.  I will just note when they provided us documents

4    they provided us one big file as well.

5            MS. GOYKADOSH:  It was 43 pages.

6            MR. PANEK:  It was one file.

7            MS. GOYKADOSH:  Okay.

8            THE COURT:  Fair enough.  Okay.

9            Yes, I would suggest that in the future if you are

10   going to make a request that you should follow the same

11   practices and protocols that you said is not a problem.  You

12   will fix it.  Okay.

13           Here we go.  The arrest report.  Is this the same

14   arrest report?  How is this different than the arrest report

15   that's on plaintiff's exhibit list and Defense Exhibit A?

16           MS. RYAN:  It's not, until plaintiff changed it to the

17   handwritten copy.

18           THE COURT:  So, I guess, my question is why is

19   plaintiff objecting to it?

20           MR. PANEK:  No.  There are necessary redactions to be

21   made, based on the court's prior rulings, the narratives of the

22   complaint.

23           THE COURT:  No.  Maybe I'm misreading it.  I see

24   arrest report, and then I see plaintiff's objection, hearsay,

25   prejudicial, and relevance.

MICHELE NARDONE, CSR -- Official Court Reporter

Cortes v. City of New York

1          MR. PANEK:  Yes.  So there are --

2          THE COURT:  Arrest report, you are saying they didn't

3    redact the portions -- can you guys just agree on the arrest

4    report document?

5          MR. PANEK:  Your Honor, the narrative of the arrest

6    report is the hearsay that the court already precluded.

7          THE COURT:  Okay.

8          MR. PANEK:  When they sent it to me, they took half of

9    the hearsay and redacted it and left half of the hearsay in.

10         MS. GOYKADOSH:  Your Honor, I can respond to that

11   because I did the redactions.  So the only portion we left in

12   was defendant -- the complaining witness told the officer that

13   the defendant was intoxicated.

14         The reason why we left that in was not for the truth

15   of the matter.  We left it in because that is where Officer

16   Smith recorded that plaintiff was intoxicated.  So, to the

17   extent that he is going to be cross examined about --

18         THE COURT:  No.  It's out.

19         MS. GOYKADOSH:  Okay.

20         THE COURT:  Okay.  Complaint report, July 1st, 2013.

21   What's this?

22         MR. PANEK:  This is the same issue, Your Honor, where

23   they are seeking to get in the victim states that Mr. Cortes

24   was intoxicated, same hearsay and redaction issues.

25         MS. GOYKADOSH:  Your Honor, we will certainly make

MICHELE NARDONE, CSR -- Official Court Reporter

Cortes v. City of New York

1    sure that all of the exhibits going forward do not have that.

2         MR. PANEK:  Your Honor, I just want to address a

3    concern.  When we discussed this and conferred about it prior,

4    counsel indicated to me that the reason they were having it

5    there is because Officer Smith, in his report, in his

6    observations, states that Mr. Cortes is apparently normal, when

7    he has the option to check that he is intoxicated, he has the

8    option to check that he is injured; and he declines to do so in

9    his paperwork.

10        They indicated that if that question is asked of him,

11   what was your observation, what did you put down, did you

12   record he was intoxicated in his report, he is going to say

13   that this hearsay demonstrates that I thought he was

14   intoxicated; and he is going to volunteer and back door in the

15   hearsay narrative, and that's why they left it.  So that's my

16   concern.  I would like a ruling that Officer Smith can't do

17   that.

18        THE COURT:  Officer Smith's observations and

19   appreciation of the plaintiff's state is obviously different

20   than what was reported by the complainant.

21        MS. GOYKADOSH:  So, just to be clear, Officer Smith

22   did observe plaintiff with alcohol on his breathe and glassy

23   eyes.  He did observe him to be intoxicated.  The only place

24   where it's reported in the paperwork, it says that the witness

25   told Officer Smith.

Cortes v. City of New York

1    THE COURT:  That's not a recording of his observation.

2    MS. GOYKADOSH:  I understand, Your Honor, but --

3    THE COURT:  So.

4    MS. GOYKADOSH:  So I just want to be clear because I

5    want to be sure I don't violate any of your rulings.

6    THE COURT:  Good.

7    MS. GOYKADOSH:  So I understand that he, Officer

8    Smith, cannot testify that the complaining witness told Officer

9    Smith that plaintiff was intoxicated.  That is out.  I get

10   that.

11   What I want to be sure that Officer Smith can testify

12   to is that when he interacted with plaintiff he personally

13   smelled the alcohol on his breath and saw his glassy eyes.

14   That is not recorded in the paperwork.

15   THE COURT:  I don't know why he wouldn't be able to

16   be, and be ripe for cross.

17   MR. PANEK:  Of course.  I will reinvite that.

18   THE COURT:  We are all --

19   MS. GOYKADOSH:  Thank you, Your Honor.

20   MR. PANEK:  If I say, why didn't you record that in

21   your paperwork, he can't say, well, I recorded it through the

22   hearsay of a witness, which is what they told me they intend to

23   do.

24   MS. GOYKADOSH:  I now understand the court's ruling,

25   and it will happen.

MICHELE NARDONE, CSR -- Official Court Reporter

Cortes v. City of New York

1          THE COURT:  Perfect.  Okay, good.

2          Handwritten aided report.

3          MR. PANEK:  Again, Your Honor, this is -- this report

4    contains the narrative.

5          THE COURT:  They are going to address -- the defense

6    has already indicated that they are going to --

7          MR. PANEK:  Right.

8          THE COURT:  -- revise these, consistent with my

9    rulings.

10          MR. PANEK:  Your Honor, with respect to the document,

11    there is nothing of any value to the document.  So we object to

12    it coming in on relevance grounds now altogether.  There is

13    nothing to glean from this.

14          THE COURT:  Can I see it?

15          MR. PANEK:  Sure.  The highlights are just mine, Your

16    Honor.

17          MS. GOYKADOSH:  Your Honor, just to make things

18    easier, we can withdraw that exhibit.

19          THE COURT:  Good.  We addressed the SPRINT report

20    already, correct?  It's out.

21          MR. PANEK:  Yes.

22          THE COURT:  The ambulance call report, that's from the

23    precinct.  There is no objection?

24          MR. PANEK:  No objection.

25          THE COURT:  The academy photograph of Sergeant Musa?

MICHELE NARDONE, CSR -- Official Court Reporter

Cortes v. City of New York

1        MR. PANEK:  This was already precluded by Your Honor.

2        THE COURT:  Oh, okay.

3        MS. GOYKADOSH:  Your Honor, I have a concern with

4   regards to the photo.  I understand that it's precluded by the

5   court, but, to the extent that plaintiff testifies about how

6   Sergeant Musa appeared in 2013, would we be allowed to offer a

7   photo as rebuttal?

8        THE COURT:  Okay.  I'm so confused.  Why does the way

9   this officer looked matter?

10        MS. GOYKADOSH:  Because plaintiff describes this

11   officer as dark haired and not young looking.

12        THE COURT:  Dark haired and not young looking?

13        MS. GOYKADOSH:  Correct.

14        THE COURT:  That sounds like me.  Okay.  So I don't

15   know what that even means to anybody.

16        MS. RYAN:  Your Honor, this trial, I think, is

17   actually about two things.  It's about the causation of the

18   injury and who actually did it.  It's our contention that if an

19   officer did what plaintiff claims, it was not Sergeant Musa.

20   So plaintiff's description of the officer who allegedly

21   assaulted him is relevant, and, to the extent he tries to say

22   that that is what Officer Musa looked like in 2013, it's our

23   contention we should be able to put forward a contemporaneous

24   photo of him because it was six years ago, to say no, this is

25   what he looked like at the time.

MICHELE NARDONE, CSR -- Official Court Reporter

Cortes v. City of New York

1          THE COURT:  Dark haired and not young looking, because

2     you believe in 2013 -- let's assume his hair hasn't changed.

3     He actually did look young.

4          MS. RYAN:  He was 27, Your Honor, and, yes, he was

5     very young looking.

6          MR. PANEK:  So I think Mr. Cortes stated that he

7     looked to be mid-30s versus 27.  This is a photograph from the

8     academy with a shaved head from --

9          THE COURT:  That's not -- yeah, but the academy isn't

10    2013 anyway.  Right?

11         MR. PANEK:  Your Honor, he has dark brown hair.

12         MS. GOYKADOSH:  So what I'm asking, Your Honor, is if

13    we would be able to introduce a photo from that time, from

14    2013, that shows how he looked, just for the purposes of

15    rebuttal.  We are not trying to use it as affirmative evidence,

16    but if plaintiff does say something like that we should be able

17    to show the jury what he did look like.

18         THE COURT:  How are they going to know what time

19    period that photograph came from?

20         MS. GOYKADOSH:  Well, the photographs have, I believe,

21    like metadata stored.  So we can use this to show what date it

22    has.

23         MR. PANEK:  Your Honor, we would request all the --

24    nothing has been provided in discovery, by the way, and we

25    demanded photographs as well.  So we are now reopening

Cortes v. City of New York

1    discovery on photographs from 2013 that we haven't been

2    provided with, that aren't listed on the JPTO at all.  So in

3    the first instance, they are excluded from the universe of

4    things we can discuss at trial.

5            If we would be permitted to conduct discovery and

6    question Sergeant Musa about these photographs and have a

7    deposition of him.  When were these photographs taken?  Did you

8    change your haircut?  Did you dye your hair?  Did you get sun

9    and your hair lighten up in the sun?  All those sorts of

10   things.  But for them to say ah-ha, here is the photograph, it

11   doesn't look like him.

12           THE COURT:  Yes, we are not doing the photograph.

13           Criminal court file?

14           MR. PANEK:  We think, Your Honor, based on the court's

15   ruling, I mean, there are some, I suppose, arraignment

16   documents that show timing that he was there; but, in terms of

17   the majority of this document, it should be excluded.  The fact

18   that a protective order was issued is irrelevant in this case.

19   That's in there.

20           THE COURT:  What's the relevance of this document?

21           MS. JACOBS:  Your Honor, again, this is just potential

22   impeachment material.  I don't believe -- we are not offering

23   it for --

24           THE COURT:  Right.  So why don't we cross the

25   impeachment bridge when we get to it.  Everybody knows

MICHELE NARDONE, CSR -- Official Court Reporter

Cortes v. City of New York

1    impeachment is my pet peeve.  So I suspect everyone will tread

2    lightly.  All right.

3              MS. GOYKADOSH:  Your Honor, one more concern about the

4    JPTO -- I'm sorry -- the video depositions.  So plaintiff --

5              THE COURT:  Is this deposition designations?

6              MS. GOYKADOSH:  Yes.  I'm sorry.  Deposition

7    designation.

8              THE COURT:  I skipped over those, didn't I?

9              MS. GOYKADOSH:  I don't believe it was on the new

10   JPTO.  I believe on the new JPTO there was only the exhibits

11   and the witnesses.

12             THE COURT:  Okay.

13             MS. GOYKADOSH:  So, my understanding, on the JPTO

14   plaintiff initially designated Sergeant Musa's entire video

15   deposition.  Last night we received specific portions of the

16   video deposition that plaintiff apparently intends to play.

17             We have no objection to the video deposition being

18   used for impeachment.  However, to the extent that plaintiff

19   wants to use Sergeant Musa's video testimony as part of his

20   case in chief somehow, there is a preference in this circuit

21   for live testimony.

22             THE COURT:  But don't the rules specifically

23   contemplate the use of deposition testimony of a party for any

24   reason?

25             MS. GOYKADOSH:  For Rule 32 it does, but, again, there

MICHELE NARDONE, CSR -- Official Court Reporter

Cortes v. City of New York

1   is a preference in the circuit.  I believe that the words that

2   are used is that it's a well-established and sensible

3   preference; and the case name is Tardif versus City of New York

4   344 F.Supp. 3d 579, SDNY 2018.

5          THE COURT:  That's SDNY.  What about the circuit?

6          MS. GOYKADOSH:  So in the circuit there is a Learned

7   Hand case from 1939, which has been cited to by many courts.

8   It's called Napier versus Bossard, N-A-P-I-E-R versus

9   B-O-S-S-A-R-D, 102 F.2d 467, and it says that the deposition

10  has always been and still is treated as a substitute, a second

11  best, not to be used when the original is at hand.  So the

12  facts in that case were slightly different.

13         THE COURT:  Was it a party?

14         MS. GOYKADOSH:  No, it was not a party.

15         THE COURT:  Right.

16         MS. GOYKADOSH:  But again, Sergeant Musa will be here.

17         THE COURT:  I get it, but I just don't know how I get

18  around -- because, quite frankly, as a practitioner, I took

19  your view.  I hated it, right; but I couldn't then, nor can I

20  in my mind now, figure out how to get around the words of the

21  rules, which provide for the use of the deposition of a party

22  for any reason.

23         MS. GOYKADOSH:  I think the case law does indicate

24  that the more sensible approach is to allow the witness to

25  testify.

MICHELE NARDONE, CSR -- Official Court Reporter

Cortes v. City of New York

1        THE COURT:  I get it, but there is some reason why the

2   rules provide for a different treatment of a party than it does

3   for other individuals; and I haven't quite figured out the

4   logic, but it's there.  I do prefer live testimony.  It's my

5   opinion, for what it's worth, and so do juries.

6        MR. HARVIS:  A couple of things, Your Honor.  First of

7   all, to clarify the record, it does appear in the designation

8   of Musa's deposition.  It does appear on page 9 of the current

9   JPTO.

10        THE COURT:  It does.

11        MR. HARVIS:  We specifically identify the ranges.

12   It's a total of about 13 minutes of video.  So we are not

13   talking about a lot.

14        I also just want to say in this district Judge

15   Weinstein, in the NAACP versus AA Arms Inc. case -- let me slow

16   down -- 99 CV 3999, allowed it; and Judge Gleeson, in a trial

17   that I lost when I worked at Corporation Counsel admitted it

18   also, and that's Robertson v. Sullivan, 07 CV 1416.  It's

19   regularly done when it's a party.  We are only talking about a

20   party.  So that's our argument.

21        THE COURT:  So you all will be able to use this

22   testimony.  I ask that you limit it to what you have identified

23   so we don't end up going beyond, and also just because I think

24   everybody prefers live testimony.

25        MS. JACOBS:  Your Honor, understood.  I reviewed it

MICHELE NARDONE, CSR -- Official Court Reporter

Cortes v. City of New York

1    briefly.  I think we may have some objections, separate

2    objections, to that.  We have not discussed that yet.  So we

3    will try and work it out between the parties.

4              THE COURT:  Good.  I'm assuming some of those

5    objections were made during the testimony itself.

6              MS. JACOBS:  I think the majority of them are

7    objections that were made during the testimony.  There were a

8    few pieces that that, having done a brief review, may be

9    misleading or incomplete.  So we can either work that out or

10   perhaps add in our own designations, if necessary.

11             THE COURT:  A counter designation?

12             MS. JACOBS:  Yes.

13             THE COURT:  Okay.  All right.  Is it possible that we

14   have done everything?

15             MS. RYAN:  There are a few remaining housekeeping

16   issues, I think, from the letter.

17             THE COURT:  Okay.  This is the joint letter?

18             MS. RYAN:  Yes, Your Honor.

19             THE COURT:  Okay.

20             MR. HARVIS:  Docket entry 88, Your Honor.

21             THE COURT:  Yes, I have it.  August 2.  Okay.

22             With respect to Spanish-speaking jurors, it is my

23   practice during voir dire to ask all jurors if they speak

24   another language, and then I will ask them what that language

25   is.  At the time that I give the charge to the jury, there will

MICHELE NARDONE, CSR -- Official Court Reporter

Cortes v. City of New York

1   be a charge given to all jurors concerning the testimony that

2   came in through the use of an interpreter and that they must

3   rely on the interpreter.  That is standard.  It will not be

4   done by singling out any particular juror, but to give the

5   charge more generally.

6           You are going to go to your toolbox about this expert.

7           MR. PANEK:  Yes, Your Honor.

8           THE COURT:  We talked about the medical records.  We

9   talked about the impeachment exhibits.

10          Alternate theories of causation.  In an effort to

11  prepare for this conference today, I went back and read the

12  transcript from the last conference, and my concern then was

13  that the alternate theories of causation were going to be based

14  on pure speculation.  I'm assuming that you all have an expert

15  that has an alternate theory of causation and you have the

16  evidence that you know you are going to put on.  Right?

17          MS. GOYKADOSH:  Yes, Your Honor.

18          MR. PANEK:  Yes, Your Honor.  However, the expert

19  report of Dr. Sherry does not allow them a causation theory of

20  a slap or a punch or a fight being responsible for the injury.

21  So I ask that that still be precluded from opening statements.

22          THE COURT:  What does your expert say was the

23  potential cause?

24          MS. GOYKADOSH:  So the expert says that a person who

25  is handcuffed behind his back and pushed against a wall would

MICHELE NARDONE, CSR -- Official Court Reporter

Cortes v. City of New York

1  not sustain a rotator cuff tear.  So he didn't speculate as to

2  what the cause might be, but he did say that -- he is going to

3  be testifying.

4          THE COURT:  Then that's what you can say.  You can't

5  say that it potentially was caused by the slap or throwing

6  bottles, but you can say you will hear testimony from an expert

7  that will say that being handcuffed and being thrown against

8  the bars cannot cause this injury.

9          MS. GOYKADOSH:  I understand, Your Honor; but, just to

10  be clear, we can talk about the facts leading up to this

11  incident, for instance, the open-handed slap.

12          THE COURT:  You can say that it happened.  You cannot

13  offer to the jury that it is an alternate theory for causation,

14  yes.

15          MR. PANEK:  They can say there is an allegations of an

16  open-handed slap.

17          THE COURT:  Yes.  We have the language.  Forgive me.

18          MR. PANEK:  Yes.

19          THE COURT:  Whatever we agreed to.

20          MS. GOYKADOSH:  Yes, Your Honor.

21          THE COURT:  Okay.  Now are we done?

22          MR. HARVIS:  I believe so.

23          MR. PANEK:  Yes, Your Honor.

24          THE COURT:  We did this in exactly the amount of time

25  that we had set out.  I am proud of all of us.

MICHELE NARDONE, CSR -- Official Court Reporter

Cortes v. City of New York

1          All right, folks.  So, let's see, I want us to make

2    sure we get started as quickly as possible, in terms of the

3    voir dire of the jury.  So let's make sure.

4          You all should be here at 8:45 so that we can -- I can

5    get here, and we can get on the bench by 9:00.  You guys can

6    resolve any technical issues, hopefully, in that 15-minute

7    period.  If not, if you need 30 minutes, then let me know, and

8    it will be 8:30.

9          And then we will talk about whatever issues we may

10   have, and then we will bring the jury up at 9:30.  But there

11   should only be a few lingering issues.  It shouldn't take much.

12         I will have a proposed charge to you by Friday.  We

13   will have a charging conference -- not on Monday at end of day

14   because Monday is already -- we are going to go to 5 o'clock in

15   hopes to get everybody in.  So we will do the charging

16   conference likely on Tuesday morning.  But you will let me know

17   on Monday at the end of the day how involved you guys expect

18   this charging conference to be.  Telegraph for me whether there

19   is going to be a lot to discuss or not.

20         MR. PANEK:  It should be pretty straightforward.

21         THE COURT:  There is only one cause of action.

22         MR. PANEK:  Right, only one cause of action, and the

23   question of punitives.  That's really it.

24         MS. GOYKADOSH:  Your Honor, just one question with

25   regards to the opening.  I just want to make sure that there is

MICHELE NARDONE, CSR -- Official Court Reporter

Cortes v. City of New York

1   not going to be any exhibits or multimedia used during opening.

2          THE COURT:  Demonstratives?

3          MS. GOYKADOSH:  Demonstratives or anything.

4          THE COURT:  Not that I have anticipated, and no one

5   has suggested to me whether there would be.

6          MR. PANEK:  Typically parties would discuss that and

7   stipulate.  We haven't discussed it yet.  So if that's your

8   indication, that you don't want that, then I suppose we are not

9   going to reach an agreement.  So what I think doesn't matter.

10          THE COURT:  I don't know.  Maybe they like your

11   illustrations.  They haven't shown them to their doctor.  Who

12   knows?  Maybe they will like them.

13          MR. PANEK:  Are you talking about everything or just

14   the demonstratives?

15          MS. GOYKADOSH:  I mean, we can certainly confer.

16          THE COURT:  Why don't you all talk about it.

17          MR. PANEK:  Yes.  The last lingering concern is, is

18   there a time, whether it be now after the conference or at

19   another time, where it's convenient for plaintiff to just have

20   15 minutes to get familiar with the technology in the

21   courtroom, so we don't have to do that in front of the jury and

22   waste time during the trial?  Just to put our hardware to the

23   hardware to see how it works.

24          THE COURT:  I would like for that to happen Monday

25   morning.  So maybe do you want to come in at 8:30 on Monday?

MICHELE NARDONE, CSR -- Official Court Reporter

Cortes v. City of New York

1        MR. PANEK:  Sure.  That's fine.

2        MR. HARVIS:  That's perfect.

3        THE COURT:  All right.  You all come in at 8:30 on

4   Monday morning, and my deputy will be able to assist you.

5        MR. PANEK:  Sure.

6        THE COURT:  I think 30 minutes should be enough time.

7   I'm looking forward to it.

8             I have to tell you, I really appreciate how prepared

9   both of you all were for this pretrial conference.  I really

10  did.  It helped me in making my determinations.  You were

11  prepared with both law and argument, and it was much

12  appreciated.

13       MR. PANEK:  If I can pay my adversaries a compliment

14  now.  I would say the onslaught, as I said, of e-mails

15  facilitated that.  So the credit is due to them as well, judge.

16       THE COURT:  Good.  Thank you all.  All right.  I will

17  see you all on Monday.

18       MR. PANEK:  Thank you, Your Honor.

19       MS. JACOBS:  Thank you, Your Honor.

20            (End of proceedings.)

21                         o O o

22  Certified to be a true and accurate transcript.
    /s/ Michele Nardone
23  MICHELE NARDONE, CSR -- Official Court Reporter

24

25

MICHELE NARDONE, CSR -- Official Court Reporter